UNITED STATES of America,
Plaintiff,

and

National Parks and Conservation Association, Plaintiff–in–Intervention,

v.

GARFIELD COUNTY, Defendant,

and

State of Utah, Defendant–in–Intervention.

No. CIV. 2:96–CV–450J.

United States District Court,
D. Utah,
Central Division.

Oct. 24, 2000.

Daniel D. Price, Assistant U.S. Attorney, U.S. Attorney's Office, Salt Lake City, UT, Paul F. Holleman, U.S. Department of Justice, Environmental & Natural Resources Division, Margo Miller, U.S. Department of Justice, Environmental & Natural Resources Division, Washington, DC, for Plaintiff, USA.

William J. Lockhart, Salt Lake City, UT, Wayne G. Petty, Moyle & Draper PC, Salt Lake City, UT, for Plaintiff-in-Intervention, National Parks and Conservation Association.

Stephen H. Urquhart, Ronald W. Thompson, Thompson, Awerkamp & Urquhart, L.C., Barbara G. Hjelle, St. George, UT, Wallace A. Lee, Garfield County Attorney, Panguitch, UT, for Defendant, Garfield County.

Stephen G. Boyden, Utah Attorney General's Office, Salt Lake City, UT, for Defendant–in–Intervention, State of Utah.

## MEMORANDUM OPINION AND ORDER

JENKINS, Senior District Judge.

This case concerns a road. It brings to court a contest of wills between two governmental entities, each vying for dominion over the road. This case arises from an incident in February of 1996 in which one entity altered one part of the road without the blessings of the other entity.

This case involves equipment, engineering, environment, and ego.

This case asks the very particular meaning of very general words chosen long ago, and seeks to define the character of the road and its relationship to the national park through which it passes, now and in years to come.

At its heart, this case is about *who* gets to say.

### Bench Trial

This matter was tried to the court for eight days, from February 16 through February 25, 1999. Margo D. Miller, and Paul F. Holleman, United States Department of Justice, and Daniel D. Price, Assistant United States Attorney, appeared on behalf of the United States; Ronald W. Thompson and Barbara Hjelle appeared on behalf of Garfield County; Stephen Boyden appeared on behalf of the State of Utah; and William J. Lockhart and Wayne G. Petty appeared on behalf of the National Parks and Conservation Association.

█ The court heard extensive testimony from fact and expert witnesses, and received numerous exhibits into evidence.[1] At the conclusion of the evidence, the court heard closing arguments by counsel and took the matter under advisement. The parties filed extensive post-trial legal

---

1. The exhibits were offered and received according to a common roster annexed to the Final Pretrial Order, filed February 16, 1999 (dkt. no. 342) ("Pretrial Order"), and were submitted in binders labeled "United States Trial Exhibits." In this memorandum opinion, those exhibits are cited as "U.S. Exh. <*number*>," regardless of the party actually offering or relying on them. (*See, e.g.,* U.S. Exh. 7, Final Environmental Impact Statement/General Management Plan (1982).)

memoranda and submitted proposed findings of fact and conclusions of law.[2]

## THE FACTUAL CONTEXT

### The Burr Trail and Capitol Reef National Park

The Burr Trail winds for sixty-six miles through federally owned land in the rugged, dramatic terrain of southern Utah's Garfield County. Connecting the town of Boulder with Lake Powell's Bullfrog Basin Marina, the road at various points traverses across or next to unreserved federal lands, two wilderness study areas, the Capitol Reef National Park, and the Glen Canyon National Recreation Area.

*Sierra Club v. Hodel,* 848 F.2d 1068, 1073 (10th Cir.1988).

Noting that "certain public lands in the State of Utah contain narrow canyons displaying evidence of ancient sand dune deposits of unusual scientific value, and have situated thereon various other objects of geological and scientific interest," President Franklin D. Roosevelt created the Capitol Reef National Monument by Proclamation 2246 on August 2, 1937, 50 Stat. 1856. On January 20, 1969, President Lyndon B. Johnson issued Presidential Proclamation 3888, 83 Stat. 922, which ex-

panded the boundary of the Capitol Reef National Monument to include "the outstanding geological feature known as Waterpocket Fold and other complementing geological features ... such as Cathedral Valley," *id.,* as well as land traversed by the Burr Trail.[3] The Proclamation further declared that "[w]arning is hereby expressly given to all unauthorized persons not to appropriate, injure, destroy, or remove any feature of this monument ...."

On December 18, 1971, Congress established the Capitol Reef National Park, superseding the prior national monument and directing the National Park Service to "administer, protect, and develop the park" under the direction of the Secretary of the Interior. Pub.L. No. 92–207, § 5(a), 85 Stat. 739 (1971), *codified at* 16 U.S.C.A. § 273d(a) (1992). Taking its name from the white dome-shaped rock formations on the Fremont River, Capitol Reef National Park (the "Park") now embraces nearly 242,000 acres of scenic Utah landscape.

Garfield County asserts a right-of-way pursuant to § 2477 of the Revised Statutes of the United States, 43 U.S.C. § 932 (repealed 1976),[4] along the entire 66–mile length of the Boulder–to–Bullfrog Road, including the Burr Trail,[5] as well as the right to construct and maintain the road

---

2. The National Parks and Conservation Association also moved the court to take judicial notice of the pretrial order, briefs and transcript—a total of eight items—in *Sierra Club v. Hodel,* Civil No. 87–C–120A (D.Utah), copies of which have been supplied to court and counsel as attachments to various memoranda. (Motion for Judicial Notice and Receipt into Evidence of Pre–Trial Order, Briefs and Transcript from Proceedings in Sierra Club v. Hodel, filed February 10, 1999 (dkt. no. 327).) As the materials themselves are already part of the record of this proceeding, the court sees no reason not to accede to the request, and the motion will be *granted.*

3. Earlier, on July 2, 1958, President Eisenhower added certain lands "needed for the protection of features of geological and scientific interest" to Capitol Reef National Monument, though that addition apparently did not affect the Burr Trail. Proc. 3249, 72 Stat. c48 (1958).

4. R.S. § 2477: "The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." The statute was first enacted as Section 8 of the Act of July 26, 1866, ch. 262, 14 Stat. 251, 253, then was codified as Revised Statutes § 2477 and subsequently as 43 U.S.C. § 932 (1970 ed.). It was repealed by §§ 706(a) of the Federal Land Policy and Management Act of 1976 ("FLPMA"), Pub.L. No. 94–579, 90 Stat. 2743, 2793.

5. "The Burr Trail, a steep descent through the Waterpocket Fold, was the original portion of the road built to provide access to and from the lower and upper canyon country." (U.S. Exh. 16, "Draft Environmental Assessment: Boulder to Bullfrog Road (Burr Trail) (Dec. 1988)," at 1.)

thereon.[6] For purposes of this litigation, at least, the Government concedes that Garfield County owns an R.S. § 2477 right-of-way along the Capitol Reef portion of the Boulder–to–Bullfrog Road; intervenor National Parks and Conservation Association does not.

This case involves only that portion of the road which traverses Capitol Reef National Park, an unpaved segment approximately 8.4 miles in length,[7] with only the most easterly one-mile of that segment actually involved in the incident giving rise to this lawsuit.

Other segments of the Boulder–to–Bullfrog Road have previously been the subject of litigation, particularly *Sierra Club v. Hodel*, 675 F.Supp. 594 (D.Utah 1987), *affirmed in part, reversed in part and remanded*, 848 F.2d 1068 (10th Cir.1988). That earlier experience provides helpful guidance in resolving the current dispute. Indeed, each of the parties relies upon the opinions in *Hodel* for support of some aspect of its position concerning the Capitol Reef segment.

### The Road & The Park: 1972–1996

In 1973, at the direction of Congress in § 6 of the Act creating the Park,[8] the Park Service completed a study of road alignments in and near the Park, making only brief mention of the Burr Trail road:

> South of Utah 24, the only improved road to cross the park is the Burr Trail. Thirty-six miles long, this county road joins the town of Boulder to the road

[extending south from Utah 24 to Bullfrog Basin]. The nature of the Waterpocket Fold—the steep topography and instability of the land—makes it unfeasible to substantially upgrade the Burr Trail; instead, this road will be maintained as a gravel road.

(U.S. Exh. 1058, at 37–38.)

In October 1982, the Park Service issued its General Management Plan and Final Environmental Impact Statement for Capitol Reef National Park. (U.S. Exh. 7.) While noting that "Garfield County has indicated an interest in paving the county road from Boulder to Ticaboo," which possibly "would shift a portion of the regional traffic from Utah 24 to the Burr Trail in the South District of the park," (*id.* at 70), and that Garfield County was maintaining the road, which was "passable for most vehicles" except in rainy weather (*id.* at 78), the plan expressed little interest in road improvements:

> It is not in the interest of the Park Service to finance improvements of the through-roads in the South and North districts during the lifetime of this plan. Should the county and/or state propose improvements to any of these roads, the Park Service will retain a voice in the design of these roads and the regulation of traffic on them within the park to protect the park lands, resources, and visitors.

(*Id.* at 37.)

The plan addressed proposed road improvements by others. It contemplated

6. At that time of the Park's creation and since, Garfield County has performed work on the segment of the Burr Trail road that traverses Capitol Reef National Park, maintaining the road so that it may be used by motor vehicles. For a brief period, maintenance was performed under a "Cooperative Agreement" between the Park Service and the County, dated January 15, 1979, but the Park Service sought to terminate this agreement in 1981 because it could not compensate the County for the work as had been agreed. (U.S. Exhs. 5, 6.)

7. In many administrative documents, the 8.4–mile portion of the 66–mile–long "Boulder-

to–Bullfrog Road," or "Burr Trail Road," that passes through Capitol Reef National Park is referred to as "Segment 2" or sometimes simply as the "Burr Trail" road. Depending on the specific document, "Burr Trail" may refer to the entire 66–mile road, to only the original Waterpocket Fold trail, to the road connecting the Notom Road with the town of Boulder, or to some other fraction. In this opinion, the court refers to this 8.4–mile portion of the road within the Park boundaries as the "Capitol Reef segment" of the Boulder–to–Bullfrog Road.

8. Pub.L. No. 92–207, § 6, 85 Stat. 740 (1971).

that "[i]mproved roads will retain their existing alignments, with the possible exception of realignment in steep terrain near the park boundary east of The Post," and that "minor realignment may occur" on the switchbacks "down the strike face of the Kayenta formation . . . ." (*Id.*) The Park Service retained "the right to designate and construct access roads and scenic pullouts," would "require and review road designs and will approve the conformity of construction to approved designs," may "restrict use on county or state roads within the park," including "designat[ing] hours of day or season during which heavy equipment such as trucks may be operated within the park." (*Id.*) Yet the plan also contemplated that the Park Service "will cooperate with county or state planning, design, and construction activities within the purview of its authority," and "will grant the county and/or state a right-of-way" for realignments of the Burr Trail road. (*Id.*) [9]

In May, 1984, Creamer and Noble Engineers and the Five County Association of Governments issued a "Preliminary Engineering Report" on a project called the "Boulder–Bullfrog Scenic Road," an "improvement" project that "calls for the construction of approximately 66 miles of paved roadway designed to support an average daily traffic of 250 vehicles . . . ." (U.S.Exh. 9.) The report contemplated "construct[ing] a scenic road which is capable of safely allowing year-round access into the area at a moderate speed" on a roadway cross section that "has been approved by the National Park Service." (*Id.*)

The idea caught the attention of Congress: on October 10, 1984, a congressional conference committee explained that the "managers deleted the $8,500,000 proposed by the Senate to pave the Burr Trail and upgrade it into an all-weather, scenic highway linking the Utah towns of Boulder and Bullfrog. Construction funds were deleted in response to strenuous objections about potentially serious environmental problems." 130 Cong. Rec. 31516 (Oct. 10, 1984). Observing that the "[p]roject proponents point to potentially significant benefits and the long history associated with proposals to upgrade the road," and "in order to provide adequate information respecting environmental concerns," the committee directed the Park Service " . . . to conduct an Environmental Assessment," hold public meetings, and to "transmit such an assessment, together with its recommendation" concerning the proposal to pave the Burr Trail road to the committee by July 1, 1985. (*Id.*) The committee made $200,000 available for that purpose, noting that the conference committee managers "are extremely sensitive to the environmental consequences of such construction." (*Id.*)

On December 2, 1985, the Park Service and the Bureau of Land Management (BLM) issued a final Environmental Assessment ("EA") entitled "Environmental Assessment on Paving the Boulder-to-Bullfrog Road," and including a "Finding of No Significant Impact and Record of Decision." [10] (U.S.Exh. 13.) The documents

---

9. In fact, the plan noted that "[t]he only anticipated road improvements by a county within the park would be in the South District where Garfield County has expressed an intent to upgrade the road across the Burr Trail between Boulder and Ticaboo." (*Id.*)

10. The National Environmental Policy Act of 1969 ("NEPA"), Pub.L. No. 91–190, 83 Stat. 852 (1970), *codified at* 42 U.S.C.A. §§ 4321–4347 (1994), bears upon the historical facts and legal issues in this case:

 Congress, through NEPA, imposed procedural requirements on federal agencies de-

signed to force an agency to consider the environmental consequences of its proposed activity. Thus, NEPA requires a federal agency to produce an environmental impact statement ("EIS") when proposing to engage in an action that will significantly affect the human environment. 42 U.S.C. § 4332(2)(C). Usually, unless a proposed action falls within a categorical exclusion, or the proposal is one which normally requires an EIS, the agency will prepare an environmental assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. § 1501.4. If an EA indicates a pro-

capsulized the differing views concerning the proposed improvements:

> The proponents of paving the road state that they expect a paved road to increase tourism in the county with concomitant increased tourist spending, greater local employment and economic growth. Opponents of paving the road question projected economic benefits, point to possible environmental degradation, and perceive a loss of aesthetic experience.

(*Id.* at 2.) The Director of the Park Service recommended "a version of the limited improvement alternative," proposing that "the entire length of the trail become a rural scenic road maintained by and under the jurisdiction of the National Park Service," with paving of only "[t]he most critical portions of the road" while the remainder "would adhere to the present horizontal and vertical alignment and cross section but would be improved to an all-weather gravel surface." (*Id.*)

Additional environmental assessments or supplements were prepared concerning other segments of the Boulder–to–Bullfrog Road in 1988 and 1989, affecting BLM lands. (U.S.Exh. 16, 19.) The BLM District Manager approved Garfield County's proposal to "upgrade those portions of the existing Boulder to Bullfrog Road that are located on BLM administered or state lands" to "either a paved or gravel surface travel width of 24 feet with a design speed of 30 to 40 miles per hour." (U.S. Exh. 19, at 3.) He also "reconfirm[ed]" the findings contained in the 1985 EA." (*Id.*, "Finding of No Significant Impact.")

In 1992, the Park Service requested additional information from Garfield County concerning its proposal for the Capitol Reef segment. (*See* U.S. Exh. 21.) On May 13, 1992, Thomas Hatch, Chairman of the Garfield County Commission, responded that "Garfield County has no immediate

funding sources available to complete the improvements" then under consideration, and no "biddable documents and design plans for significant portions of the Boulder to Bullfrog Road." Nevertheless, Chairman Hatch asserted, "The county is under no obligation to provide engineering detail beyond NPS review authority," which he believed was limited to "design elements which may unduly or unnecessarily impact park resources." (U.S.Exh. 22.). The response included a memorandum from county engineer Brian Bremner, which Chairman Hatch believed "answers the questions you have outlined ...." (*Id.*)

Subsequent conversations pointed back to the 1985 Creamer and Noble "Preliminary Engineering Report" as the most detailed treatment of the county's proposal. (*See* U.S. Exh. 23.)

In 1993, the Park Service and the BLM prepared another "Environmental Assessment for Road Improvement Alternatives[:] Boulder–to–Bullfrog (Burr Trail)," examining the environmental impact of Garfield County's proposal. By that time, the proposal contemplated several changes to "Segment 2" traversing Capitol Reef National Park:

- "to upgrade the entire road to a maximum 28–foot bituminous, paved road surface with gravel base courses to provide adequate structural stability," requiring a 30 to 32–foot subgrade width;
- to improve the width and drainage of the "switchbacks" portion of the road, widening it wherever possible to accommodate two passing vehicles and installing a barrier on the outside of the roadway;
- in the alternative, to reroute the "switchbacks" several hundred feet south, performing "major rock excavation" and eliminating "two or three of the switchbacks" and using fill to ele-

posed action will significantly affect the human environment, an EIS is required. 42 U.S.C. § 4332(2)(C). Otherwise, the agency may issue a finding of no significant

impact ("FONSI") and then execute the action.
*Sierra Club v. Babbitt,* 65 F.3d 1502, 1505 (9th Cir.1995).

vate the lower portion of the descent; a one- or two-bridge configuration at the top of Waterpocket Fold; and

- to realign or relocate the road leading to the eastern park boundary with "a maximum 28–foot paved top for this area."

(U.S. Exh. 26, at 25, 29–31.) "The cumulative effects of the Garfield County proposal," the assessment observed, "are centered around the projected increase in traffic." (*Id.* at 99.) The assessment document also considered two other approaches, "Alternative B" and "Alternative C," involving more limited improvements to the road, but nevertheless having some "increased traffic" effects.[11]

Later in 1993, following a meeting with County officials, Superintendent Lundy proposed that the Park Service acquire the right-of-way and school section land along the Capitol Reef segment and assume responsibility for the improvement and maintenance of that portion of the road. (U.S. Exh. 1034, letter from Supt. Lundy to Comm'r Hatch, dated December 8, 1993.) In October of 1994, a "Statement of Intent" to "pursue in good faith the preparation and execution of a memorandum of understanding" concerning the Park Service proposal was signed by Marty Ott for the Park Service and Commissioner Hatch for the County. (U.S.Exh. 1035.) No memorandum of understanding was subsequently executed, and negotiations on the proposal ended "without ... a formal letter exchange between the parties that said we're no longer negotiating." (II Trial Transcript, dated February 17, 1999, at 21:20–22 (testimony of Charles Lundy).)

In November 1994, the Park Service's Rocky Mountain Regional Office also completed an "Engineering Evaluation" of an "all-weather route along Burr Trail within Capitol Reef National Park," which provid-

ed "an engineering evaluation of the minimum requirements needed to provide a two-lane, all-weather route" along the Capitol Reef segment. (U.S. Exh. 1041, at 1.) The Engineering Evaluation recommended "a twenty foot wide running surface," including "the ditch foreslope along most segments of the road because, as currently maintained, this slope is flat enough to provide a safe driving surface." (*Id.*) Given that minimum, "It appears that the existing horizontal and vertical roadway alignments can be safely maintained in their current location .... " (*Id.* at 2.) Concerning the portion from the eastern boundary to the Post, the Engineering Evaluation recommended that "gravel surfacing should be applied to the road surface to make it passable in wet conditions," and that to accomplish this, "widening should occur." (*Id.*) That being so, "The steep slopes directly adjacent to the roadway near the east boundary will be the most severely impacted area," and "[s]ome adjustment to the horizontal alignment ... can be performed to reduce these impacts .... " (*Id.*) These considerations, coupled with the need for box culverts, approach fills and stone armoring, indicated that "[t]here will be greater impacts due to proposed improvements along this section than any other." (*Id.*)

Three months later, in February of 1995, the Park Service issued a "Finding of No Significant Impact" (FONSI) under NEPA. The FONSI adopted a "preferred alternative" consisting of "a combination of the alternatives evaluated in the EA," and authorizing limited improvements on all but one mile of the Capitol Reef segment. These improvements included widening the Burr Trail road to "a 20–foot–wide dirt running surface" to permit the road to "be managed as a low impact, low speed, safe, all-weather route for most two-wheel drive vehicles." (U.S. Exh. 30, at 2.) The FON-

---

11. At the same time, Garfield County was seeking to exchange other County land for the existing Utah state school section 16 located within the park, in hopes of paving the "switchbacks" portion of the Burr Trail road that crossed section 16 once the County secured ownership. *See National Parks and Conservation Ass'n v. Board of State Lands,* 869 P.2d 909 (Utah 1993).

SI contemplated the future "graveling the road from the Post to the eastern park boundary" and the construction of "[v]ented low water crossings and box culverts" to create "an all-weather road," but cautioned that "at minimum an environmental assessment will be prepared prior to construction approval of these activities within Capitol Reef National Park." (*Id.* at 2.) The FONSI thus echoed the recommendations and impact concerns discussed in the November 1994 Engineering Evaluation with reference to the eastern one-mile portion of the road.[12]

The FONSI also expressed concern that widening and paving the Capitol Reef segment as proposed by Garfield County would significantly increase traffic, diminishing the wilderness character of the Park:

> [A] fully paved road in which major alterations are made through Capitol Reef National Park, particularly any alterations to the switchback section of the park, and other levels of construction impacts such as substantial bridging, widening, or increases in the elevation of the road bed that fundamentally change the character or use of the road or adjoining areas are likely to cause significant direct, indirect and cumulative impacts. Recreational vehicle and tour bus use and heavy commercial traffic would be more likely to use a signifi-

cantly altered road as a thoroughfare, creating direct, indirect and cumulative impacts on adjacent resources and making the area less suitable for and attractive as a gateway to a wilderness experience. Greatly increased traffic volume and speed would increase the potential for conflicts with wildlife and for damage to the soils and vegetation near the road....

(*Id.* at 4.)[13] In contrast, the FONSI observed that the agencies' "preferred alternative," (the unpaved "low speed, safe, all-weather route"), was "reasonable and necessary for public lands and will not cause unnecessary or undue degradation of public lands or derogation of park/recreation area values." (*Id.* at 1.)

Garfield County appealed from the FONSI by filing a notice with the BLM on March 10, 1995. The Interior Board of Land Appeals later affirmed the FONSI, rejecting the County's assertion that the BLM's role was limited to analysis of the County's proposal, and that the FONSI unlawfully "interferes with its ability to take action reasonable and necessary to ensure safe travel" by users of its Burr Trail right-of-way. 147 IBLA 328, 334, 338. Curiously, though, the County did not pursue an appeal from the Park Service portion of the FONSI concerning the Capitol Reef segment of the road.[14]

12. Superintendent Lundy interpreted the FONSI by reference to the Engineering Evaluation, and thus understood it to authorize the lowering of the slopes of two hills adjoining a particularly narrow portion of the road east of the intersection with the Notom Road near the Post, though the FONSI itself makes no mention of those hill slopes. (I Trial Transcript at 140:5–15, 141:8–143:9, 162:6–21, 163:15–164:19 (testimony of Charles Lundy).) The Engineering Evaluation refers to "two locations about 200 feet long each where the running surface narrows to 17–18 feet adjacent to very steep side slopes and soft shoulders. These areas should be addressed through widening and fill reconstruction, guardrail installation, signage, or some combination of these." (U.S. Exh. 1041, at 3 (emphasis added).) Thus, at those locations, the road was widened and the hill slopes were

cut back with the agreement and approval of the Park Service.

13. Paving the road remains the centerpiece of Garfield County's plans for the Burr Trail. County engineer Brian Bremner once commented that "I'd like to see a real road built.... I'd like to see it as black as the Ace of Spades." (U.S. Exh. 40 (Memorandum to File, dated Nov. 30, 1995).)

14. By letter dated March 10, 1995, the County advised the Director of the Park Service that it intended to appeal from the Park Service portion of the FONSI (*see* Pretrial Order, "Uncontroverted Facts" ¶ 22; U.S. Exh. 31), but apparently did not follow through with that appeal.

About the same time, Park Service officials became concerned that the County's "maintenance" of the road was resulting in widening of the roadway. Superintendent Lundy raised the matter in a letter to Commissioner Liston dated March 16, 1995, suggesting that the Park Service may place stakes "alongside the road through the park to assist your maintenance crews in staying within the roadway." (U.S.Exh. 1046.) Commissioner Liston responded by letter on April 11, 1995, objecting to Park Service staking of the roadway, suggesting instead that "[w]e would be willing to cooperate with you by placing stakes at the appropriate time and at appropriate locations along our right-of-way." (U.S.Exh. 33.) Lundy then set up a meeting with county officials in hopes of reaching agreement as to future maintenance activities. (*See* U.S. Exh. 1048.)

In April 1995, County officials and Park Service representatives toured the road, talking about the proposed improvements on the Capitol Reef segment, beginning at the park's western boundary and extending eastward to the Post. (*See* I Trial Transcript, date February 16, 1999, at 138:2–140:15 (testimony of Charles Lundy).) The work discussed included some fairly significant projects, such as the installation of culverts, the widening of the road, and the lowering of the slopes of two hills to improve sight distance for motorists. (*Id.* at 141:6–142:13; *see* U.S. Exh. 34, letter from Supt. Lundy to Comm'r Liston, dated April 27, 1995.) [15]

During the remainder of 1995, County and Park Service officials exchanged telephone calls and correspondence concerning the County's proposed work, reaching some tentative agreements as to improvements from the western park boundary to the switchbacks. (*See* U.S. Exhs. 34, 35, 37.) [16]

In late November 1995, the County began the maintenance and improvement work, starting at the west entrance of the park. (*See* Pretrial Order, Uncontroverted Facts ¶ 26; U.S. Exh. 38.) Though initially there were concerns expressed about a grader scraping outside of the roadway to gather material, that matter was quickly resolved. (I Trial Transcript at 147:1–150:10 (testimony of Charles Lundy); II Trial Transcript, dated February 17, 1999, at 15:19–18:22 (testimony of Charles Lundy); U.S. Exhs. 39–41.) County road personnel and Park Service officers had frequent contact as the work progressed, and issues that arose were generally resolved by informal agreement or acquiescence. (*See generally* U.S. Exh. 42; U.S. Exh. 63, Declaration of Robert Cox, dated September 18, 1996 ("Cox Decl.").)

**The February 13, 1996 Incident**

On January 8, 1996, County representatives raised the question of improvements at the east entrance to the park. For the first time, they expressed interest in cutting away a hill at that site. (II Trial Transcript, dated February 17, 1999, at 44:13–45:3 (testimony of Robert Cox); U.S. Exh. 59, Robert Cox Notes (entry for Jan. 8, 1996).) Meeting at the eastern boundary the next day, Robert Cox, the Park Service roads foreman, Park Superintendent Charles Lundy, and Robert Ven Belle, Park Service operations chief,

---

**15.** On cross-examination, Lundy acknowledged that when he pulled a copy of the 1995 FONSI out of his car, Commissioner Louise Liston said "if you're here to discuss the FONSI we're going home[;] if you're here to talk about what we need to do to take care of the road in a safe manner we'll stay and discuss it," and Lundy did not display the FONSI again that day. (I Trial Transcript at 161:7–11, 18–19 (testimony of Charles Lundy).)

**16.** In his April 27, 1995 letter to Louise Liston, Chairman of the Garfield County Commission, Park Superintendent Chuck Lundy commented that "[n]othing that we proposed or discussed regarding road maintenance activities should be construed to limit or define either the Counties or the National Park Services ultimate position on the RS–2477 Right of Way issue. In particular the scope of such Right of Way interests." (U.S. Exh. 34, at 1.)

looked at the site and noted that an environmental assessment was needed before such work could proceed. (*Id.* at 47:6–21; U.S. Exh. 59 (entry for Jan. 9, 1996).)

On January 11, 1996, Cox and Brian Bremner, the County's engineer, met again on the eastern end of the Capitol Reef segment, with Bremner making photographs and journal entries from the switchbacks to the eastern boundary of the park. (U.S.Exh. 43.) Cox again cautioned Bremner that as to any work in that portion, "we were going to have to stay with the FONSI." (*Id.* at DJ001719.)[17] Bremner responded that "it is my understanding that there are some questions regarding that," and that "we would decide what to do, and somebody would contact Chuck [Charles Lundy, Park Superintendent] and advise him of our plans." (*Id.*)

On February 9, 1996, Cox and Bremner again met on-site and reviewed what Garfield County workers had marked along the one-mile east entrance segment for construction work. (II Trial Transcript, at 49:10–51:2 (testimony of Robert Cox); U.S. Exh. 46 (Bremner Burr Trail Log); Cox Decl. at ¶¶ 20–22.) By telephone earlier that day, Bremner had explained to Cox that he wanted to cut into the hill at

the park's eastern entrance, working from the bottom, "at least one cat blade width wide." (U.S.Exh. 46.) Cox again raised the question of an environmental assessment of the proposed work, and indicated that consistent with the FONSI, the Park Service could not agree to any work on the hill at the east entrance without such an assessment. (Cox Decl. at ¶ 22.) After reviewing the County's stakes on-site, Cox told Bremner that he "wouldn't recognize these flagged areas as any kind of a right-of-way," and reminded Bremner "that he could not remove any material from the hill." (II Trial Transcript at 51:5–6, 51:17–18.) Cox and Bremner agreed to meet again on February 12 to look at the County's staking of "other areas" of the project. (*Id.* at 51:19–25.)[18]

The February 12 meeting did not occur. Bremner telephoned Cox at 8:00 a.m. that day, informing him that the County would begin work on the one-mile segment at 8:00 a.m. the next day. Both agreed that they would not meet on the road that day, February 12th. (*Id.* at 52:2–8 (testimony of Robert Cox); U.S. Exh. 48 (Bremner Burr Trail Log).) Cox told Bremner that he would be there by 10:00 a.m. on Febru-

---

17. Q Mr. Cox, what happened on January 11th?
 A I met with Brian on the Burr Trail and anyway I'd indicated to him that there wasn't any environmental assessment work that had been completed through this one mile section and that we needed to see a plan of operations.
 Q What did you mean by a plan of operations, Mr. Cox?
 A Just something indicating some kind of a draft indicating how much material they was to remove and just what they had in mind.
 Q Did you ever see a plan of operation?
 A No, I didn't.
 (II Trial Transcript, at 48:3–13 (testimony of Robert Cox).)

18. On February 9th, Mr. Bremner also faxed a letter to Jerry Robker, the Park's maintenance chief:
 After careful consideration of safety features along the road, maintenance characteristics and current operational problems, it has become imperative that Garfield County perform maintenance work on the section of road between the eastern boundary of Capitol Reef National Park and our current work.
 Our maintenance will begin on Tuesday, February 13, 1996, and will be limited to the existing disturbed area. Several times during infield discussions, Park representatives have indicated that the work was reasonable and necessary. We will be instructing our crews to perform the work in the most sensitive manner possible.
 If you have any questions regarding this correspondence, please contact me.
 (U.S.Exh. 45.) Superintendent Lundy testified that he was "surprised" to see the letter: "They had been performing work in the park for several months at that point since back in November and for a letter to show up at this time appeared to me as if someone was trying to establish a paper trail . . . ." (I Trial Transcript at 155:8–12 (testimony of Charles Lundy).)

ary 13th, and understood Bremner to say that the crew would begin the routine maintenance work already agreed to at the Post. (*Id.* at 52:6–20 (testimony of Robert Cox); Cox Decl. at ¶ 23.)

That same day, Park Superintendent Charles Lundy telephoned the County's special counsel, Barbara Hjelle, to discuss the proposed work at the eastern end of the Capitol Reef segment. At 3:30 p.m. that day, the entire County Commission, the County Clerk and Mr. Bremner met and conferred with Ms. Hjelle, using Bremner's speaker phone. Ms. Hjelle outlined three concerns expressed by Lundy, Bremner recalled, including the County's plan "to steepen the cut slope" at the east boundary of the park, and "that we were taking approximately half of a 40–foot hill." (U.S. Exh. 48 (Bremner Burr Trail Log).) Mr. Bremner recalls responding "that there is no 40–foot cut; that our intention is to steepen the slope on the existing cut bank, the east bank of Capitol Reef National Park; that it will probably entail about one cat blade width at the toe of the existing slope." (*Id.*) Bremner thought "that we can have the material stand fairly steep since it's hardened clay," and that the existing slope was "also of a very dangerous nature." (*Id.*) Bremner rejected Lundy's suggestion that signs be posted: "Considering the nature of the road, the extremely limited sight distance, and the effect signs have on the motoring public, I indicated that it would not solve any problems *and that widening was the only solution.*" (*Id.* (emphasis added).)

Mr. Bremner then noted that

[s]everal points were discussed regarding potential outcome strategy and methods of proceeding. Throughout the conversation through gestures, whispers, and mouthing, the Commission indicated that we should go ahead. At approximately 4:00 p.m., the conversation ended. Upon hanging up, *each of the Commission members indicated to me that they think we should move for-*

*ward on the project and continue with the work that we have planned.*

(*Id.* (emphasis added).) Ms. Hjelle attempted to contact Charles Lundy by telephone, but without success, leaving a message and informing the County Commission she would try again in the morning. (*Id.*)

Bremner and others arrived at the site by 8:00 a.m. the next morning, February 13, 1996. Unable to reach Hjelle by telephone that morning, Bremner directed the county workers to go forward with the planned work on the road, including the cut of the hill at the park's east entrance, and he told Jake Leibenguth, the bulldozer operator, to work quickly:

Q How quickly were you working that day?

A As fast as I could.

Q Why was that?

A I was told to.

Q Who told you to?

A Mr. Bremner.

(II Trial Transcript, dated February 17, 1999, at 116:21–117:1 (testimony of Jake Leibenguth).) Mr. Leibenguth cut into the hill at the east entrance just short of the newly placed stakes marking the "previously disturbed area" north of the road. He did the same at 45, cutting with his bulldozer up to the stakes marking the "disturbed area:"

Q Were you operating of any plans or drawings?

A No.

. . . .

Q And how did you decide when you were finished working here?

A Well there are stakes right here. It doesn't show up very good but I got right back to the stakes that we staked there and that's as far as I got back. When I got to them I was through.

(*Id.* at 118:12–21.) The "disturbed area" defined the scope of the work, as counsel emphasized on cross-examination:

Q So prior to the time that you started this area was there any discussion ... where Mr. Bremner says, look guys this is a sensitive area, be careful, don't get outside of the disturbed area?

A Oh yeah, we knew that, not to get past them stakes.

Q And I want to start at the east end.

A The big hill.

Q You spend an hour and a half on that hill. Had you staked where you thought the disturbed area was before?

A Yeah. You mean the disturbed area?

Q Yeah.

A Yeah.

Q Did any of the work you performed that day, did you get outside of the disturbed area on the east entry of what we call .05?

A Uh-uh.

(*Id.* at 122:12–123:3.) The same may be discerned from some of the visual exhibits presented at trial, and to which Mr. Leibenguth referred. (*See, e.g.,* U.S. Exh. 62, photos 191, 193, 196, 205, 214, & *passim;* 1099, 1104.)

By the time Cox arrived at the site at about 10:00 a.m., much of the work had been done, including the bulldozing of part of the hill and the widening and realignment of the road approaching the east entrance of the park, and a three- to four-foot cut on the north lane near the Post. Upon observing the work and speaking briefly with Bremner, Cox contacted the park superintendent, who instructed him to have all work stopped at the site. (II Trial Transcript at 53:1–54:14 (testimony of Robert Cox).) Cox told Bremner to cease all widening, culvert and riprap

work, and took photographs at various points between the Post and the east entrance. (*Id.* at 54:15–57:13; *see* U.S. Exh. 61 (photographs).) He also measured the width of the road at the east entrance hill at 30 feet, six inches, in contrast to an earlier measurement of 19 feet from the same stake—a difference of eleven feet six inches. (*Id.* at 57:14–58:22.)

In addition to performing maintenance work on this most easterly one-mile segment of the road—grooming the backslopes, foreslopes, and repairing the crown of the road—it remains uncontroverted that the County made improvements to the road. At approximately milepost .05, "the County excavated into the north backslope of the road,"—the hill at the park's east entrance—"steepening it by removing about 160 cubic yards of material, which was then used on the road." (Pretrial Order, dated February 16, 1999, "Uncontroverted Facts," at ¶ 44.) Doing so changed the alignment of the road—the horizontal alignment by at least four feet, the vertical alignment by two feet. (*Id.; see* U.S. Exh. 54, part E.) At approximately milepost .45, the County pulled the backslope, removed stone at the base of the rock slope, and created a drainage ditch. (*Id.* "Uncontroverted Facts" at ¶ 46.) At approximately milepost .9, the county cut about two feet of material away from a small rise in the road, filling most of that material back into the road and thereby "extending the sight distance." (*Id.* "Uncontroverted Facts" at ¶ 47.) Here, the County's second bulldozer had made "a vertical cut by about 3 or 4 feet on the north lane." (II Trial Transcript, at 55:1–2 (testimony of Robert Cox).) [19]

In compliance with Cox's request, the County did not complete the additional

19. A number of exhibits—photographs, videotapes, diagrams, drawings—show the particular locations at .05, .45 and .9 where the disputed work was done, some indicating the changes made at each location. (*See, e.g.,* U.S. Exhs. 28, 50, 61, 62, 1114, 1114A, 1115.) The County submits that Exhibits 1106a–1106c, consisting of diagrams generated using aerial photographs, accurately depict the work done at those locations, and the degree to which the road and surrounding landscape was altered by that work. The United States' expert also relied on Exh. 1106a in preparing his report. (*See* IV Trial Transcript, dated February 19, 1999, at 12:21–14:23, 68:23–70:9, 73:4–74:7 (testimony of Thomas Puto).)

work it had planned for the one-mile segment, including installing culverts, placing riprap, and widening the cattle guard, but removed loose materials and rocks, as well as uninstalled culverts, and carried them outside of the Park. (Pretrial Order, "Uncontroverted Facts," at ¶ 49.)

The facts concerning what happened on February 13, 1996, through words, images, and drawings describing what was actually done, have largely been established without material dispute. The parties differ as to the proper *characterization* of those facts, and the legal consequences that flow from them.

According to the United States, Garfield County workers engaged in road *construction* work, and "bulldozed two hillsides and dug a four-foot trench . . . excavating more than forty dump trucks worth of material. These construction activities performed by the County . . . widened and realigned the road, destroyed vegetation, disturbed dirt that had been in place for millennia and changed the experience of the visitor entering the Park at that location." (United States' Post Trial Brief, filed March 22, 1999 ("U.S. Brief"), at 1.) In doing so, the United States insists, the County engaged in unauthorized road construction, and did so outside of its statutory right-of-way, thereby committing an unlawful trespass upon the federal lands embraced within Capitol Reef National Park, and damaging park resources. (*Id.* at 2–36.)

According to Garfield County, "the work done on February 13, 1996, was reasonable and necessary to meet applicable safety standards," was *maintenance* rather than road construction, and "because the County did not exceed the scope of the right-of-way which had been established before the lands were reserved, it did not trespass or impact any values for which Capitol Reef National Park was created . . . ." (Garfield County's Post–Trial Brief, filed April 5, 1999, ("County Brief"), at 1.) That being so, the County submits, the "NPS did not have authority to impede the work." (*Id.*)

The intervenors likewise express divergent views of the February 13, 1996 incident. According to the State of Utah, "all roadwork undertaken by the road crew on February 13, 1996 was reasonable and necessary to enable to vehicles to safely pass each other." (Intervenor State of Utah's Post–Trial Brief, filed April 2, 1999 ("State Brief"), at 1.) The Park Service, the State says, "lacks regulatory authority and a possessory interest sufficient" to maintain its claims against the County because "the authority of the NPS is subject to the County's valid, existing right-of-way to operate and maintain the Boulder–to–Bullfrog Road." (*Id.*) On the other hand, according to the National Parks and Conservation Association, the County "unlawfully and without permission undertook substantial construction" on the road—unlawful "because it was undertaken in calculated disregard of explicit determinations by the National Park Service that further engineering evaluation and environmental assessment of construction plans were required," because "it caused unauthorized damage to Park lands owned by the United States and enjoyed by NPCA's members in direct violation of Park Service regulations" governing road construction,. and because "it was undertaken with full knowledge that the work was disapproved by the responsible officials of the National Park Service . . . ." (National Parks and Conservation Association's Post–Trial Brief, filed April 13, 1999 ("NPCA Brief"), at 2–3.)

## LEGAL FRAMEWORK

The United States Constitution vests Congress with the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const., art. IV, § 3, cl. 2. *See also Federal Power Comm'n v. Idaho Power Co.,* 344 U.S. 17, 21, 73 S.Ct. 85, 97 L.Ed. 15 (1952) ("the power of Congress over public lands . . . is 'without limitation.' ") Congress, in turn, has exercised that power over the years by enacting many pieces

legislation intended to serve diverse public purposes. Several different Acts of Congress, each enacted through the exercise of the Property Power, bear upon the issues in this case.

Section 8 of the Act of July 26, 1866, ch. 262, 14 Stat. 251, 253, originally codified as § 2477 of the Revised Statutes of the United States, provided "That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Congress, in its role as proprietor and in its role as sovereign, thus made a generous grant of public property to those who proved to be enterprising enough to construct a highway across the public domain. Of course, the grant made available rights-of-way only over the unreserved public lands; excluded from the grant were any lands that Congress or its designees chose to reserve for a particular purpose. No matter how enterprising, someone could not acquire a right-of-way under R.S. § 2477 across lands "reserved for public uses" such as a national monument or a national park.

By enacting the National Park Service Organic Act ("NPSOA"), ch. 408, 39 Stat 535 (1916), *now codified as amended at* 16 U.S.C.A. §§ 1 *et seq.* (1992), Congress created the National Park Service and delegated part of its constitutional power to the Secretary of the Interior, authorizing the Secretary to "make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service." 16 U.S.C.A. § 3 (1992). Congress imposed a duty on the National Park Service to "promote and regulate the use of the Federal areas known as national parks, monuments, and reservations hereinafter specified ... by such means and measures as conform to

the fundamental purpose of the said parks, monuments," which purpose is "to conserve the scenery and the natural and historic objects and the wild life therein," and to "provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C.A. § 1 (1992). The Park Service "has broad discretion in determining which avenues best achieve the Organic Act's mandate," *National Wildlife Federation v. National Park Service*, 669 F.Supp. 384, 390 (D.Wyo.1987), but all park areas must be managed "with resource protection the overarching concern." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1453 (9th Cir.1996) (app.).

Exercising the power delegated by Congress, the Secretary of the Interior has made rules "for the proper use, management, government, and protection of persons, property, and natural and cultural resources within areas under the jurisdiction of the national park service," 36 C.F.R. § 1.1(a) (2000), including 36 C.F.R. § 5.7, which reads:

> *Constructing or attempting to construct* a building or other structure, boat dock, *road,* trail, path, or other way, telephone line, telegraph line, power line, or any other private or public utility, *upon, across, over, through* or under *any park areas,* except in accordance with the provisions of a valid permit, contract, or other written agreement with the United States, *is prohibited.*

36 C.F.R. § 5.7 (2000) (emphasis added).[20] These Park Service general regulations "apply to all persons entering, using, visiting or otherwise within ... [t]he boundaries of federally owned lands and waters administered by the National Park Service." 36 C.F.R. § 1.2(a)(1) (2000).[21]

---

**20.** Of course, regulations promulgated pursuant to such express statutory authority will be upheld "unless the are arbitrary, capricious, or manifestly contrary to the statute." *Chev-. ron U.S.A., Inc. v. Natural Resources Defense*

*Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**21.** The regulations also apply to "[o]ther lands and waters over which the United States holds less than a fee interest, to the

The Federal Land Policy and Management Act ("FLPMA"), Pub.L. No. 94–579, 90 Stat. 2744, enacted by Congress in 1976, undertook to delineate the roles of the executive and the legislative branches in managing the public lands in light of no less than thirteen express public policies, and established a comprehensive set of guidelines for the management of federally owned lands under the jurisdiction of the BLM. Among those policies, Congress for the first time expressly stated its intent to retain public lands in federal ownership unless a federal interest would be served by conveying them. 43 U.S.C.A. § 1701(a)(1)-(13) (1986). Consistent with that policy, FLPMA repealed the R.S. § 2477 grant, effective October 21, 1976— the date of FLPMA's enactment. 43 U.S.C.A. § 1770(a) (1986). Existing rights-of-way remained vested; nothing in the statute "shall have the effect of terminating any right-of-way ... heretofore issued, granted, or permitted." 43 U.S.C.A. § 1769(a) (1986).

Under FLPMA, existing R.S. § 2477 rights-of-way remained in place, but could not be expanded without an additional grant by the Secretary of the Interior pursuant to the 1976 Act. *See* 43 U.S.C.A. § 1761(a)(6) (1986).

In *Sierra Club v. Hodel*, 675 F.Supp. 594 (D.Utah 1987), *affirmed in part, reversed in part and remanded*, 848 F.2d 1068 (10th Cir.1988), this District, and later the Tenth Circuit, addressed the relationship between Garfield County and the United States arising from the County's R.S. § 2477 right-of-way along the Burr Trail. *Hodel* involved another segment of the road crossing lands administered by the BLM. Judge Aldon J. Anderson of this District read the R.S. § 2477 grant in light of Utah state law:

> The Utah Supreme Court has declared the width of an R.S. § 2477 right-of-way to be *that which is reasonable and necessary for the type of use to*

which the road has been put .... The court has also said that rights-of-way should not be restricted to the actual beaten path, but should be widened to meet the exigencies of increased travel. More specifically, they should be wide enough to allow travelers to pass each other....

675 F.Supp. at 606 (emphasis added & citations omitted) (citing *Lindsay Land & Live Stock Co. v. Churnos*, 75 Utah 384, 285 P. 646, 649 (1929), and *Whitesides v. Green*, 13 Utah 341, 44 P. 1032, 1033 (1896)). "As a matter of state law," he wrote, "the Burr Trail may be widened into a two-lane road and may deviate from the present path, as long as such extensions are reasonable and necessary." *Id.*

Judge Anderson did not decide the precise width of Garfield County's right-of-way, but did address the question of *who* gets to say:

> Whether the proposed construction is actually reasonable and necessary is for the BLM to decide and for this court only to review. In *City & County of Denver v. Bergland*, 695 F.2d 465, 481 (10th Cir.1982), this circuit held that the initial determination of whether activity falls within an established right-of-way is to be made by the BLM and not by the court. The court should pay considerable deference to the BLM's experience in examining the stakes, determining traffic patterns and evaluating the impact of the project on the surrounding environment. *Id.* at 477.

*Id.* "As long as the project stays within the county's right-of-way," Judge Anderson noted, "no BLM authorization is needed for construction to proceed." *Id.* at 605 n. 31. Conversely, "[t]he county must apply to the BLM for a permit for any construction activity which substantially deviates from its right-of-way," with "substantial deviation" defined as construction "outside the prescribed boundaries of the right-of-

---

extent necessary to fulfill the purpose of the National Park Service-administered interest

and compatible with the nonfederal interest." 36 C.F.R. § 1.2(a)(5) (2000).

way authorized by the instant grant ...." *Id.* at 605–06 n. 31 (quoting 43 C.F.R. § 2803.2(b)).

Relying on the BLM District Manager's finding that the County's entire proposal fell within the existing right-of-way, as well as evidence concerning engineering factors and highway standards, and the fact that "the project is entirely consistent with the historic physical alignment of the road," *id.* at 607, Judge Anderson concluded that "all of the construction now proposed is reasonable and necessary given the current condition of the road and the increasing traffic. All of the proposed construction is therefore within Garfield County's right-of-way." *Id.* at 618.

On appeal, the Tenth Circuit affirmed much of Judge Anderson's analysis, including his determination that the proposed work fell within the scope of Garfield County's right-of-way.[22] The court of appeals refined the appropriate standard measuring the scope of the R.S. § 2477 right-of-way:

> We believe the "reasonable and necessary" standard must be read in the light of traditional uses to which the right-of-way was put. Surely no Utah case would hold that a road which had always been two-lane with marked and established fence lines, could be widened to accommodate eight lanes of traffic without compensating the owners of proper-

ty that would be destroyed to accommodate the increased road width.

848 F.2d at 1083. The scope of the right-of-way also finds limitation in light of the uses to which the road was put at the time that FLPMA repealed R.S. § 2477, October 21, 1976: "all uses before October 21, 1976, not terminated or surrendered, are part of an R.S. 2477 right-of-way[;]" thus, "the County's right-of-way as of the repeal of R.S. 2477 on October 21, 1976, was that which was reasonable and necessary for the Burr Trail's preexisting uses." *Id.* at 1084.[23]

> The district court opinion recited several pre-October 21, 1976, uses: driving livestock; oil, water, and mineral development; transportation by County residents between Bullfrog and other cities in Garfield County; and at least since 1973, access for tourists to Bullfrog Marina on Lake Powell. 675 F.Supp. at 597 & n. 4. These findings of fact are not clearly erroneous and must be affirmed. Fed.R.Civ.P. 52. Thus, the scope of Garfield County's right-of-way is that which is reasonable and necessary to ensure safe travel for the uses abovementioned, including improving the road to two lanes so travelers could pass each other.

*Id.*

The Tenth Circuit likewise did not "decide the precise width of this road ease-

---

**22.** As the Tenth Circuit explained, "The 'scope' of a right-of-way refers to the bundle of property rights possessed by the holder of the right-of-way. This bundle is defined by the physical boundaries of the right-of-way as well as the uses to which it has been put." 848 F.2d at 1079 n. 9.

**23.** This "preexisting uses" standard is premised upon the Tenth Circuit's view that "[b]ecause the grantor, the federal government, was never required to ratify a use on an R.S. 2477 right-of-way, each new use of the Burr Trail automatically vested as an incident of the easement" until R.S. 2477 was repealed by Congress in 1976. 848 F.2d at 1084. However, history may distinguish the scope of the right-of-way through Capitol Reef from that discussed in *Hodel*.

The segment of the Burr Trail right-of-way now at issue was withdrawn from the operation of the R.S. § 2477 grant on *January 20, 1969*, when the underlying lands were added to the Capitol Reef National Monument. After that date, the lands were no longer public lands "not reserved for public uses," and further R.S. § 2477 rights could not thereafter accrue, regardless of additional uses. For this segment of the road, the "open-ended and self-executing grant" had been terminated. 848 F.2d at 1083. If, as *Hodel* indicates, use of the right-of-way for tourist access to Bullfrog Marina on Lake Powell began in 1973, then consistent with *Hodel*, that use *cannot* serve as a "preexisting use" defining the scope of Garfield County's right-of-way through what is now Capitol Reef National Park.

ment held by the County," *id.*, concluding instead that Judge Anderson was not clearly erroneous in finding that the County's "proposed improvements fall within the scope of the right-of-way." *Id.* at 1085.

Besides the existence and scope of the County's right-of-way, *Hodel* addressed the applicability of the National Environmental Policy Act ("NEPA") [24] to the BLM's review of the County's proposed work. The Tenth Circuit directed the BLM to perform "an environmental assessment, followed by either a finding of no significant impact or an environmental impact statement ... to address environmental issues affecting only those areas in which ... it still has authority to act," *viz.*, authority measured by *"what is relevant to its duty to prevent unnecessary degradation of the WSAs* [Wilderness Study Areas]." 848 F.2d at 1096 (emphasis in original). Indeed, the NEPA requirements were triggered by the BLM's statutory duty to prevent undue degradation of the wilderness study areas.[25] *Id.* Absent that environmental assessment, *Hodel* found that the BLM acted improperly in authorizing the County's proposed improvements. "[W]hen a proposed road improvement will impact a WSA the agency has the duty under FLPMA § 603(c) and the regulation to determine whether there are less degrading alternatives, and *it has the responsibility to impose an alternative it deems less degrading upon the nonfederal actor." Id.* at 1090–91 (emphasis added).

Like the BLM, the Park Service has a statutory duty and responsibility to protect national park lands. Congress has mandated that use of national parks be regulated "by such means and measures as conform to the fundamental purpose of the said parks ... which purpose is to conserve the scenery and the natural and historic objects and the wild life therein,"

and to "provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C.A. § 1 (1992 & Supp.2000).

> The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress.

16 U.S.C.A. § 1a–1 (1992).

## THE PARTIES' THEORIES

### The United States' Theory of the Case

The United States seeks declaratory and injunctive relief (as well as damages) on theories of trespass (Count I) and violation of federal regulations concerning construction of roads within park areas, 36 C.F.R. § 5.7 (Count II), including a declaration that *Garfield County may not engage in any construction or "maintenance" activity altering the Capitol Reef segment of the Boulder–to–Bullfrog Road without environmental analysis under NEPA and prior authorization from the Department of the Interior in light of that analysis.* Though it concedes the existence of Garfield County's R.S. § 2477 right-of-way on the Capitol Reef segment, the United States asserts that Congress and its delegate, the Secretary of the Interior, retain the power under the Property Clause to regulate the use and maintenance of a right-of-way that traverses national park lands.

The United States contends that the work done by Garfield County on Febru-

---

**24.** National Environmental Policy Act of 1969, Pub.L. 91–190, 83 Stat. 852 (1970), *codified at* 42 U.S.C.A. §§ 4321–4347 (1994).

**25.** Section 603(c) of FLPMA, 43 U.S.C. § 1782(c) mandated that the agency "by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources...."

ary 13, 1996 was unlawful because (1) it violated 36 C.F.R. § 5.7, quoted above, governing construction of roads across park lands; (2) it violated the rule of law established by the Tenth Circuit in *Hodel,* which counsel reads to prohibit improvement of the County's right-of-way "without first providing the NPS specific plans for its proposed work and giving the agency the opportunity to propose the least degrading alternative," (United States' Post–Trial Brief, filed March 22, 1999 ("U.S.Brief"), at 1); and (3) construction activities were performed outside of the County's R.S. § 2477 right-of-way without permission, constituting a trespass. (*Id.*) The United States seeks to recover damages in the amount of the total cost of restoring vegetation to the hill at the eastern entrance to Capitol Reef National Park, estimated at trial to approximate $6,840.00. (*Id.* at 38.)

### The Scope of Garfield County's Right-of–Way

The United States concedes that the "reasonable and necessary" standard articulated in *Hodel* defines the scope of the County's right-of-way, but disagrees with Garfield County's view of what is "reasonable and necessary" on the eastern one-mile stretch of the Capitol Reef segment.

Observing that "the Burr Trail was a narrower, rougher road as constructed prior to January 20, 1969 than it is in the 1990's," the United States argues that Garfield County's "rights to use the land froze as of January 20, 1969," that thereafter "the County could only expand the on[-]the[-]ground disturbances if the expansion was included within the scope of its right-of-way as determined by" the Park Service, and that "[t]he report prepared by Thomas Puto and Elizabeth Koreman is the official scope determination" by the Park Service. (U.S. Brief at 23, 24, 25; U.S. Exh. 65.) The Puto–Koreman Report contemplates a right-of-way accommodating a road surface 20 feet wide, including nine-foot lanes and one-foot shoulders, consistent with Park Service road standards for minor two-way park roads. (*Id.* at 25–26; U.S. Exh. 65.) A 20–foot road width, the United States argues, is also consistent with AASHTO standards when the low traffic volume is taken into consideration. (*Id.* at 27; U.S. Exh. 71, at 514.)

The United States emphatically rejects the County's suggestion that its right-of-way should be measured by the "previously disturbed area" adjacent to the road. (U.S. Brief at 32–33.) Such an approach, the government argues, "has no basis in law or fact," "makes no logical sense," and "would result in an 'ever-expanding right-of-way.'" (*Id.*) [26]

### Park Service Power to Regulate

The United States asserts that the existence of an R.S. § 2477 right-of-way does not diminish the Park Service's power to regulate road construction activities within a national park, and points to cases such as *United States v. Jenks,* 22 F.3d 1513 (10th Cir.1994), and 129 F.3d 1348 (10th Cir. 1997), and *United States v. Vogler,* 859 F.2d 638 (9th Cir.1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 779 (1989), as vindicating its position. In *Jenks,* the Tenth Circuit rejected a claim that use of access roads across forest service lands to reach private lands lay beyond the reach of federal regulation, and upheld agency requirements of a special use permit and payment of a user fee. 22 F.3d at 1517–18. *Jenks* also denied a claim of implied easement pursuant to the Homestead Act of 1862,[27] observing that "[n]othing in the Homestead Act of 1862 suggests that Congress intended to abrogate its right to regulate access over roads

---

26. "Under the County's theory," counsel suggests, "Mr. Leibenguth [the County's bulldozer operator] could have dug to China." (U.S. Brief at 33.)

27. Act of May 20, 1862, ch. 75, 12 Stat. 392 (codified at 43 U.S.C. §§ 161–284)(repealed 1976).

located on federal lands." 129 F.3d at 1354.

Rejecting the contention that the Park Service lacked power to regulate travel on the "Bielenberg trail," a claimed R.S. § 2477 right-of-way, the Ninth Circuit in *Vogler* explained:

> Even if we assume that the trail is an established right-of-way, we do not accept Vogler's argument that the government is totally without authority to regulate the manner of its use.
>
> Congress has made it clear that the Secretary has broad power to regulate and manage national parks. The Secretary's power to regulate within a national park to "conserve the scenery and the nature and historic objects and wildlife therein . . . ." *applies with equal force to regulating an established right-of-way within the park. See* 16 U.S.C. § 1.

859 F.2d at 642 (emphasis added & footnote omitted). *See also Wilkenson v. Department of Interior*, 634 F.Supp. 1265, 1279 (D.Colo.1986).

The Park Service, counsel submits, may regulate the construction, improvement, and maintenance of a right-of-way, as well as its use. As *Vogler* observed: "Congress' power under the property clause is extensive; 'the property clause gives Congress the power over public lands "to control their occupancy and use, to protect them from trespass and injury and to prescribe the conditions upon which others may obtain rights in them. . . ."'" 859 F.2d at 641 (citations omitted) (quoting *Kleppe v. New Mexico*, 426 U.S. 529, 540, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976) (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405, 37 S.Ct. 387, 61 L.Ed. 791 (1917))). The United States asserts that the Secretary's exercise of that power in promulgating 36 C.F.R. § 5.7 bears upon the events of February 13, 1996.

### The February 13, 1996 Incident

The United States asserts that trespass and injury to public lands occurred at Cap-

itol Reef on February 13, 1996—trespass and injury that Congress has vested the Secretary of the Interior and the Park Service with the constitutional and statutory power to prevent.

Even if the events of February 13, 1996 may be characterized as "improvement" or even as "maintenance" of an existing right-of-way, the United States contends that any such improvement or maintenance of the Burr Trail within Capitol Reef National Park is subject to (1) the prior submission of plans for evaluation in light of NEPA and the purposes of the Park reservation, and (2) prior federal approval under 36 C.F.R. § 5.7. It remains uncontroverted that Garfield County did not request or receive authorization from the Park Service for the specific work performed on February 13, 1996. (Pretrial Order, "Uncontroverted Facts" ¶ 55.) The United States argues that the County's widening and realignment of the Burr Trail road without prior environmental assessment or agency authorization amounts to trespass and injury to the lands of Capitol Reef National Park. *Cf. United States v. King*, 581 F.2d 800, 801 (10th Cir.1978) (operation of Caterpillar bulldozer by rancher and contractor beyond the existing Old Creek Trail within Capitol Reef National Park without permission may violate 36 C.F.R. § 5.7).

### Garfield County's Theory of the Case

Garfield County contends that it committed no trespass upon Park Service land on February 13, 1996, that all of its work on the eastern one-mile of the Capitol Reef segment of the Burr Trail road—however characterized—was "reasonable and necessary" and was performed within the scope of its R.S. § 2477 right-of-way, and that it needed no additional approval or authorization from the Park Service before commencing the work. The County seeks declaratory relief that pursuant to its right-of-way, it "may continue to maintain the boulder-to-Bullfrog highway in its discretion to meet applicable state safety stan-

---

dards within the existing road prism."[28] (County Brief at 40.) Further, the County argues, "even if the County were liable for trespass, the damages allowable in this case would not even reach $100 ...." (*Id.* at 38.)

### The Scope of the Right–of–Way

Relying on *Sierra Club v. Hodel*, 675 F.Supp. 594, 606–07 (D.Utah 1987), and 848 F.2d 1068, 1084–85 (10th Cir.1988), Garfield County asserts the scope of its R.S. § 2477 right-of-way is correctly measured according to Utah state law, under which it asserts an "undisputed" scope extending to—at minimum—"that which is reasonable and necessary to ensure safe travel for the established uses, including improving the road to two lanes." (County Brief at 9.) The County asserts a scope for its right-of-way ultimately embracing "the entire beaten path," which the County defines as "the disturbed area created by prior road construction and maintenance" (*id.* at 12)[29]—a path as wide as 100 feet in some places. (*Id.* at 16.) According to the County, the legal extent of its R.S. § 2477 right-of-way is best defined by this "previously disturbed area," and in any event under *Hodel* embraces a traveled surface not less than 24 feet wide at any point.

**28.** According to Alex Mansour, the "road prism" is "generally taken to mean the cross-section of the right-of-way extended along the length of the road. The cross-section[']s typically the extremity of the right-of-way enjoyed by the responsible party for the road. It would include the backslopes, the fill slopes[,] the ditches, the clear zone, the shoulders[,] the roadways and any adjacent land needed for maintenance purposes." (VII Trial Transcript, dated February 24, 1999, at 33:20–34:1 (testimony of Alex Mansour).)

**29.** The phrase "beaten path" appears in *Hodel* as a paraphrase of Utah case law. 675 F.Supp. at 606 (citing *Whitesides v. Green*, 13 Utah 341, 44 P. 1032 (1896)). *Whitesides v. Green* uses the phrase "actual beaten path," which when read together with the court's quoted authorities, appears synonymous with "the traveled path," or "the traveled part," with no mention whatsoever of a "disturbed area." 13 Utah at 350, 44 P. at 1033. In fact, the court rejected appellant's insistence "that the public have only a right to travel on

(County Brief at 11–20.)[30] Garfield County submits that within that scope, the County remains free to construct, improve and maintain its road as it sees fit, without Park Service approval. (*Id.* at 20–32.)

Pointing to earlier Utah case law concerning highways established by use, Garfield County asserts that its right-of-way must not be "anything less than safety standards would allow over time for at least a two-lane highway." (County Brief at 14.) Beyond the track actually made by vehicles,

> there must be room enough for travelers with wagons, carriages, or implements to pass each other, and for necessary improvements and repairs to be made so as to keep it in a suitable condition. The right acquired by prescription and use carries with it such width as is reasonably necessary for the public easement of travel, and where the public have acquired the easement the land subject to it has passed under the jurisdiction of the public authorities for the purpose of keeping the same in proper condition for the enjoyment thereof by the public.

the beaten path, and must be confined to one rod in width," which the court understood to refer to "the track made by vehicles," 13 Utah at 349, 44 P. at 1033; the court spoke of a width that is "reasonably necessary," and affirmed the district court's finding that the "highway in question was three rods in width." 13 Utah at 349, 351, 44 P. at 1033. If "beaten path" is a legally significant term under Utah law, then, this court understands "beaten path" to refer to the actual traveled surface of a highway established by use, *not* the entire "disturbed area."

**30.** Garfield County's theory as to scope seems to be a train running on two tracks: on one track, the right-of-way encompasses the "previously disturbed area," whatever the breadth or origin of the perceived disturbance may be; on the other track, the right-of-way has the scope described in *Hodel*, i.e., "that which is reasonable and necessary to ensure safe travel for the established uses, including improving the road to two lanes so travelers could pass each other."

(*Id.* at 11 (quoting *Whitesides v. Green,* 13 Utah 341, 44 P. 1032, 1033 (1896)).)

Not only does it own its Burr Trail right-of-way pursuant to the R.S. § 2477 grant, Garfield County contends it also possesses the discretion conferred by the Utah Legislature to determine what is "reasonable and necessary" to ensure safe travel upon a highway, including the making of improvements to the existing roadway. Congress having granted the right-of-way to the County, " 'the grant of title to the use encompassed the right to improve the right of way for its use as such.' " (*Id.* at 15 (quoting *Big Cottonwood Tanner Ditch Co. v. Moyle,* 109 Utah 213, 174 P.2d 148, 156 (1946)).) Garfield County concludes that its R.S. § 2477 right-of-way is all the "agreement" or "approval" the County needs under 36 C.F.R. § 5.7 to engage in road construction in park areas without further Park Service authorization or approval.

If the scope of its right-of-way is to be measured prior to the reservation of the Capitol Reef lands in 1969, Garfield County looks to the 1965 AASHTO design standards as "the best source to determine what was reasonable and necessary for a rural highway right-of-way." (*Id.* at 16.) Starting with a two-lane highway as a minimum, " 'it is desirable to construct all 2–lane highways with 12–foot lanes and with usable shoulders 10 feet wide.' " (*Id.*) (quoting Exhibit 70, at 260.) Where two lanes "encompass 24 feet, an 80–foot minimum is suggested, with 100 feet or more deemed desirable." (*Id.*) (citing Exhibit 70, at 263 (Fig.V–1).) The desirable 100–foot right-of-way width, the County submits, "is consistent with the disturbed area created in connection with the road at the western end of the park." (*Id.*)

In *Hodel,* Judge Anderson explained that "the proposed construction in this section consists of cutting and filling in order to *widen the traveled surface to a uniform 24 feet,*" as well as "building an adequate road base, crowning the road surface to shed rain, installation of adequate drainage ditches, culverts and catch basins to prevent flooding, and application of a gravel surface." 675 F.Supp. at 598 (emphasis added). *Hodel* also adopted the BLM District Manager's determination that the proposed construction fell within the existing R.S. § 2477 right-of-way. *Id.* at 606–07. Putting these two points together, Garfield County asserts that *Hodel* establishes a minimum traveled surface width of 24 feet, plus adjoining shoulders, cut and fill slopes, culverts, etc., for its entire Burr Trail right-of-way, consistent with 1965 design standards promulgated by the American Association of State Highway and Transportation Officials (AASHTO), for a road having a design speed of 40 miles per hour. (County Brief at 11.) Garfield County argues that the Park Service's proffered definition limiting the County's right-of-way to a 20–foot wide road in some places *reduces* the lawful extent of the right granted by R.S. § 2477, which at minimum under *Hodel* should be a 24–foot wide, two-lane road.

Garfield County claims "the right to build a safe, all-weather, two-lane highway meeting the safety standards set forth above, in the interest of the public which is invited to come and use this highway, not just by Garfield County and the State of Utah, but by the [P]ark . . . ." (*Id.* at 20.)

### The Park Service's Power to Regulate

Garfield County contends that within the scope of its right-of-way, it remains free to maintain and improve the Boulder–to–Bullfrog Road as it sees fit in an effort to meet AASHTO standards, without need for prior consultation with or approval of the Park Service, and free of Park Service regulation and control. "R.S. 2477 grants no regulatory authority to any federal agency," the County submits, "but rather offers the right-of-way for construction of public highways, thus divesting the federal ownership of that bundle of rights when the grant is accepted." (County Brief at 22.) The County equates the assertion of federal regulatory authority over its right-of-way with the reacquisition of the inter-

ests it received under the R.S. § 2477 grant—a retrocession of ownership or jurisdiction to which it has not consented. That lack of consent "precludes the NPS from asserting control over actions designed for safety on the Boulder-to Bullfrog highway." (*Id.* at 24.)

### *The February 13, 1996 Incident*

Concerning the work done on February 13, 1996, the County insists that its actions represented "maintenance," not "construction" as those terms are defined by Utah statutes and understood in common usage. (*Id.* at 32–33 & n. 26.) Regardless of terminology, however, the County contends that the work done on February 13, 1996 was "reasonable and necessary to meet applicable safety standards," that it "did not exceed the scope of the right-of-way which has been established before the lands were reserved," and that the Park Service therefore "did not have authority to impede the work." (*Id.* at 1.) Further, the County asserts that no trespass occurred, and that the Park Service "has failed to show harm to park resources or values" resulting from the work done. (*Id.* at 35.)

The County argues that the Park Service's attempt to apply 36 C.F.R. § 5.7 in this context finds no support in the regulation or the statutes, and also runs contrary to its prior treatment of the Boulder–to Bullfrog Road, when "the County was never told it needed a permit from NPS." (*Id.* at 29.) The County asserts that its R.S. § 2477 right-of-way is its "permit" to construct roads under 36 C.F.R. § 5.7, and it need not apply for a second one. (*Id.* at 9, 27–28.)

### **The State of Utah's Theory of the Case**

The State of Utah takes a position parallel to that of Garfield County in almost all respects, arguing that "Garfield County needs to be able to improve the Boulder–to–Bullfrog Road within its right-of-way to meet applicable State safety standards without having to ask 'Mother, may I?' on

every detail of roadwork within the Park." (Intervenor State of Utah's Post–Trial Brief, filed April 2, 1999 ("State Brief"), at 4.) Using its adoption of AASHTO standards as its benchmark, the State of Utah argues that "[t]he balance between Park protection and road safety must weigh heavily in favor of safety when the function of the road is a public highway or thoroughfare connecting destinations outside the Park . . . ." (*Id.* at 5.) The scope of Garfield County's right-of-way should be fixed "at a reasonable width in order that the County may accomplish necessary roadwork to fulfill the statutory duty . . . of providing for the safety of travelers on the Road." (*Id.* at 5–6) (citing Utah Code Ann. § 72–1–201(1) (1998).)

The State of Utah disputes the Park Service's characterization of the Burr Trail as an "interior Park road," asserting that it should be treated as a primary access road under AASHTO standards and as a Class I Principal Park Road under Park Service road standards.

Relying on expert testimony, the State of Utah submits that the right-of-way should embrace "a minimum width of 52 feet to accommodate two 12–foot lanes, two 4–foot shoulders, two 10–foot clear zones, plus approximately 32 feet if necessary to accommodate cut and fill slopes (totaling 84 feet)." (State Brief at 14) (citing VII Trial Transcript, dated February 24, 1999, at 42–43 (testimony of Alex Mansour).)

Concerning the work done on February 13, 1996, the State of Utah asserts that all of the work "stayed within a 52–foot corridor fixed by the centerline of the 1993 road," even "within the scope of the right-of-way for a 24–foot traveled way with adjoining shoulders, ditches, cut and fill slopes" described in *Hodel*, and certainly within the "prior disturbed area" and "did not go out of bounds onto natural terrain." (*Id.* at 16 (record citations omitted).) Moreover, the State argues, the work done on February 13, 1996 "did not significantly

harm or compromise Park values." (*Id.* at 16; *see id.* at 16–18.)

On the issue of regulatory authority, the State of Utah contends that the State—not the Park Service—has regulatory authority over the Burr Trail road as a state highway, and by state statute has delegated control over Class B roads such as this one to the counties, in this case Garfield County. (*Id.* at 17.) "State statutes regulate such matters as design, construction, operation and maintenance of Class B roads," and there has been no cession of jurisdiction to the United States. (*Id.*) That power, counsel submits, remains unaffected by the creation of Capitol Reef National Monument, then Capitol Reef National Park, and consequently, the Park Service "is without authority to regulate the Road." (*Id.* at 19.) [31]

The State's theory of this case thus would draw bright lines not less than 52 feet apart (preferably 84 feet), presumably running parallel to the centerline of the traveled path of the Burr Trail road. Inside those lines, County power would be plenary, restrained only by its own discretion and the requirements of State law; outside those lines, away from the highway on the "natural terrain," Park Service administrative authority presumably would apply.

### The National Parks and Conservation Association's Theory of the Case

According to the National Parks and Conservation Association ("NPCA"), this case is about "Garfield County having the obligation to come to the United States when it wants to improve its right-of-way and letting [it] analyze its proposals and make sure that the Federal Government is complying with the laws established by Congress and regulations established by the agencies and with the law determined by the Tenth Circuit." (VIII Trial Transcript, dated February 25 1999, at 92:2–8.) NPCA seeks to vindicate the federal administrative process and the primacy of the National Park Service in matters affecting park lands.

NPCA contends that the court must defer to the Park Service's interpretation of its own regulations, including its reading of "construction" as used in 36 C.F.R. § 5.7, absent a showing that the agency's interpretation conflicts with Constitution or statute, or is "plainly erroneous." As interpreted by the agency, 36 C.F.R. § 5.7 reaches "any road work activities that have the potential for impairment of the values which the regulation is intended to protect," including any work that the County would characterize as "maintenance." (NPCA Brief at 4.)

Moreover, NPCA submits that the County's actions on February 13, 1996 "preempted any 'final agency action' and thereby precluded [judicial] review of the County's claims that the Park Service cannot regulate within the 'scope' of its claimed right-of-way." (*Id.*) The County's failure to utilize the available procedures for review of any Park Service determination concerning the proposed work precludes consideration of any defenses challenging the Park Service's power to regulate. (*Id.*)

According to NPCA, the Park Service has the power and duty to protect park

---

**31.** The State of Utah also points to an uncodified legislative provision, specifically Title I, § 108, of the Department of the Interior and Related Agencies Appropriations Act of 1997, which itself was enacted as Title I, § 101(d) of the Omnibus Consolidated Appropriations Act of 1997, Pub.L. No. 104–208, 110 Stat. 3009 (1996). Inserted among a series of miscellaneous Interior appropriations matters, § 108 reads: "No final rule or regulation of any agency of the federal Government pertaining to the recognition, management or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. § 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act," which was September 30, 1996. 110 Stat. 3009–200. *See* 43 U.S.C.A. § 932 note (Supp.2000). By this provision, the State posits, "Congress put the skids to agency regulation of R.S. 2477 roads in 1996 ...." (State Brief at 23.) *But see "The Revised Statutes 2477 Rights–of–Way Settlement Act,"* at 61–65, *infra.*

lands by regulating rights-of-way, to perform environmental assessments required by NEPA and applicable regulations, and to formulate less burdensome alternatives to proposed actions that may degrade park resources or impair park values or the visitor experience. (*Id.* at 17–25.)

Finally, NPCA disputes the existence of Garfield County's R.S. § 2477 right-of-way in the Capitol Reef segment, but insists that this court lacks jurisdiction to decide the existence and scope of Garfield County's claimed right-of-way because of Garfield County's failure to raise the claim in a fashion that comports with the requirements of the federal Quiet Title Act, 28 U.S.C.A. § 2409a (1994). *See Washington County v. United States*, 903 F.Supp. 40, 42 (D.Utah 1995) (complaint dismissed for lack of case or controversy and lack of particularity in pleading R.S. § 2477 right-of-way claims as to 800+ road segments).

NPCA urges the court to "forcefully remind the county it cannot short-circuit the legal process for agency environmental assessment by taking unilateral action." (VIII Trial Transcript, dated February 25, 1999, at 76:5–7 (argument by Mr. Lockhart).)

As to the existence and scope of the County's R.S. § 2477 right-of-way, NPCA asserts that this court lacks jurisdiction to determine that existence and scope because the parties have failed to comply with the pleading and proof requirements of the Quiet Title Act, 28 U.S.C. § 2409a. In this respect, NPCA would distinguish *Hodel* because, it says, the court in *Hodel* did not make a formal determination of the existence and scope of the County's right-

of-way; *Hodel* simply articulated the appropriate standards for that determination, with the initial responsibility for that determination being vested in the agency—in that instance, the BLM, and in this case, the Park Service.

## FACTUAL & LEGAL ISSUES

### The Existence of Garfield County's R.S. § 2477 Right–of–Way

R.S. § 2477 granted "[t]he right of way for the construction of highways over public lands, not reserved for public uses," suggesting that a highway must be constructed to perfect the right-of-way grant. NPCA argues that the County has failed to prove "construction" of a "highway" on the Capitol Reef segment of the Burr Trail by 1969 that would perfect its claim to an R.S. § 2477 right-of-way. (NPCA Brief at 33.)[32] NPCA correctly points out that *Hodel* did not formally adjudicate the existence of a right-of-way outside of the 28-mile segment at issue in that proceeding. While the United States has conceded the existence of the County's right-of-way on the Capitol Reef segment, (*see* Pretrial Order, "Uncontroverted Facts," ¶52*), and Garfield County relies upon that concession, (*see* County Brief at 4), that concession does not bind NPCA, or preclude its challenge to the County's claim.

NPCA insists that Garfield County has failed to meet its burden to prove the existence of the right-of-way through the submission of evidence as to construction and use, and failed even to submit proposed findings of fact establishing these requisite facts. (NPCA Brief at 34–35.)[33] That being so, NPCA submits that the

---

**32.** NPCA echoes the view expressed in an April 28, 1980 Opinion Letter of the Interior Department Solicitor that "in order to determine whether a valid R.S. 2477 highway exists on the federal lands, the several elements of the offer provided by the terms of the statute must be met. *First*, was the land reserved for a public use? *Second*, was there actual construction? *Third*, was what was constructed a highway?" (U.S. Exh. 25, "Report to Congress on R.S. 2477," App. II, exh. J, at 5.)

**33.** The NPCA asserts that the consequence of the County's failure is two-fold: (1) the County cannot establish the existence of its right-of-way for the Capitol Reef segment; and (2) the County's lack of particularity in pleading and proof deprives this court of jurisdiction to decide the claim because of the requirements of the Quiet Title Act, 28 U.S.C.A. §§ 2409a *et seq.*, for raising and adjudicating such claims. (NPCA Brief at 41–45.)

County may be precluded from raising its right-of-way claim as a defense to the United States' trespass action; if so, "it would merely be the product of the County's choice to directly violate protective regulations to exercise 'self help'—undertaking construction without first establishing its right through appropriate legal proceedings." (*Id.* at 45.)

In *Hodel,* Judge Anderson found that "the establishment and acceptance of the Burr Trail as an R.S. § 2477 right-of-way is supported by overwhelming evidence." 675 F.Supp. at 605. In the record of this proceeding, historical evidence as to the pre–1969 construction of the Capitol Reef segment of Burr Trail road is somewhat sparse. The most detailed historical information appears to be found in the Declaration of Bradford Frye, and its extensive attachments, filed April 15, 1998 (dkt. no. 243), by the United States in opposition to Garfield County's Motion for Partial Summary Judgment. Mr. Frye, a park ranger with a background in history, in 1992 had surveyed federal, state, county and court records, interviewed persons having pertinent knowledge, and synthesized the assembled information in at least two documentary reports. He found very little indication of any road construction in the area from the switchbacks to the eastern boundary prior to 1938. (*Id.* at ¶¶ 28–37.) "In approximately 1948, the Division of Raw Materials for the Atomic Energy Commission had a caterpillar tractor develop the Burr Trail Switchbacks in order that uranium mines could be accessed...." (*Id.* at ¶ 40.) This rendered the switchbacks passable to vehicles for the first time, and through the 1950s, segments of the Burr Trail road were used by those involved in uranium mining. According to Frye, "the 1960s finally saw the

completion of what is today the Boulder–Bullfrog Road; ..." (*Id.,* exh. 3, at 20.)

In May 1967, an cooperative agreement was reached between the Utah State Road Commission and Garfield County to construct "a graded road from the Park Boundary of the Bullfrog Recreational Area ... northeasterly to a connection with the Burr Trail, a length of approximately 22.0 miles; and betterment work on a portion of the Burr Trail." This road was funded under a grant from the Economic Development Administration and was to be maintained, upon completion, by Garfield County. The purpose of the road was to link Boulder and other parts of Garfield County with the newly constructed Bullfrog Marina on Lake Powell and thus complete a "golden circle" of roads into and around this new recreation area.....

The Burr Trail switchbacks were also widened and improved, along the existing alignment, under the same project....

(*Id.,* exh. 3, at 21–22 (footnotes omitted).) [34] Mr. Frye recounts that "[d]edication ceremonies for Utah 276 and the Boulder–Bullfrog connection were held on August 16, 1968. Here state and county officials praised the new roads because the would 'open up an area for a better economic program and living for people who live in this area,'" as well as opening up " 'a new part of our state that has been locked in for residents of the State of Utah and the country.' " (*Id.,* exh. 3, at 23 (footnote omitted); *see also* U.S. Exh. 1007, Dedication Ceremonies.)

■ Except for the earlier work on the Burr Trail switchbacks, it appears that construction work on the Capitol Reef segment of the road occurred mainly in 1967,

---

**34.** The Preliminary Engineering Report prepared by Creamer and Noble in 1984 recounts that the present Burr Trail road runs along much of the route historically used by early travelers in the area, and that "[i]n 1967, the Atomic Energy Commission widened the Burr Trail into a more easily passa-

ble uranium haul road," establishing "the configuration which provides the base for the proposed all-weather scenic road." (U.S. Exh. 9, at I–4.) There may be some confusion concerning the sponsoring agency, but both accounts agree that construction work was performed on the Burr Trail road in 1967.

and in some places amounted to little more than grading of the existing traveled path. (*See id.*, exh. 4 *passim; id.*, exh. 4, at 10–11 ("The only significant difference is the improvement of the road to graded dirt."). *See also* U.S. Exh. 1005, Letter from District Engineer W.J. Stephenson to Garfield County Comm'n, June 12, 1967 ("Within the next two weeks we anticipate the widening work on the Burr Trail will be completed. With this completion, the road will be wide enough for passing in most places.").) Yet "construction" within the meaning of R.S. § 2477 [35] did take place prior to the reservation of the underlying land as an addition to the national monument in 1969.

Likewise, the construction accomplished in 1967 established the Capitol Reef segment as a "highway" within the meaning of R.S. § 2477, in the sense of "a road freely open to everyone; a public road." [36] *See, e.g.*, 39A C.J.S. *Highways* § 1(1) (1976) ("The term 'highway' means a way open to all the people without distinction ... or, as stated succinctly, a public way or road." (Footnotes omitted.)). The completion of the "Boulder–to–Bullfrog Road" as a route passable by passenger vehicle traffic by the time of its dedication in 1968 satisfied the terms of the statute, and did so while acceptance of the R.S. § 2477 grant was still possible.

That Garfield County perfected its claim to an R.S. § 2477 right-of-way by 1969 finds corroboration in the subsequent treatment of the Capitol Reef segment by federal agencies—in particular, the Park Service.

Though the 1972 Master Plan for the Park does not list the Burr Trail road as among the area's "major" or "minor" highways, it does list it among the roads proposed for improvement by the Utah State Department of Highways and Garfield County, and not among the Park Service's own road proposals. (U.S. Exh. 3, Capitol Reef National Park Master Plan, "Transportation" at 22, 26.) Similarly, the Park's 1982 General Management Plan observed that "[t]here are several county and state roads located within Capitol Reef National Park that provide access to the outlying districts of the park. These roads include portions of ... the Burr Trail ..." (U.S. Exh. 7, Final Environmental Impact Statement/General Management Plan at 37.) The same document contemplated that "[s]hould the county and/or state propose improvements to any of these roads, the Park Service will retain a voice in the design of these roads and in the regulation of traffic on them within the park to protect park lands, resources and visitors," and further, that "[t]he Park Service will grant the county and/or state a right-of-way" for "minor realignment" of the Burr Trail at the switchbacks as that road is improved. [37] (*Id.*) The Plan document also acknowledges that Garfield County maintained the Burr Trail road within the Park. (*Id.* at 77.) [38] The 1985 Draft Environmen-

---

35. In the April 28, 1982 Opinion Letter, the Interior Solicitor advised that "[c]onstruction ordinarily means more than mere use," that "there must have been the actual building of a highway." (U.S. Exh. 25, app. II, Exh. J, at 5.) "[W]e think such a road can become a highway within the meaning of R.S. 2477 if state or local government improves and maintains it by taking measures which qualify as 'construction'; *i.e.*, grading, paving, placing culverts, etc." (*Id.* at 8.) *Cf. Wilkenson v. Department of Interior*, 634 F.Supp. 1265, 1272 (D.Colo.1986) (R.S. § 2477 highways "can also be roads 'formed by the passage of wagons, etc. over the natural soil.' ") (quoting *Central Pac. Ry. Co. v. Alameda County*, 284 U.S. 463, 467, 52 S.Ct. 225, 76 L.Ed. 402 (1932)).

36. (*Id.* at 8 (citing *Webster's New World Dictionary* (College ed.1951) at 686, among other authorities).)

37. "Retaining a voice" in improvements proposed by the County suggests that the County has primary authority over the road, not that it is a park road managed by the Park Service. And why would the Park Service grant the county a right-of-way for *realignment* of the road if no right-of-way for the road existed in the first place?

38. The year before, Derek Hambly, the Park Superintendent, sought to terminate a cooperative agreement under which the Park Service reimbursed Garfield County for mainte-

tal Assessment on Paving the Boulder–to–Bullfrog Road acknowledged the County's claim of right concerning maintenance on the Boulder–to–Bullfrog Road:

> Garfield County claims an existing right for use and maintenance of the present road. Activities considered to be within the purview of normal maintenance would be covered by that right which predates FLPMA, the BLM Wilderness Study Policy, and the BLM Interim Management Policy. Therefore, reasonable reconstruction and maintenance activities could occur under prior existing right.

(U.S. Exh. 10, at 24.)

Other references to "county road," or the "county's interest in the road" in agency documents consistently acknowledge Garfield County's relationship to the Capitol Reef segment of the Boulder–to–Bullfrog Road—one even suggesting that the entire road become a "rural scenic road" maintained by the Park Service, and that "Garfield County would transfer its interest in the road to the National Park Service ...." (U.S. Exh. 13, Finding of No Significant Impact Concerning the Boulder–to–Bullfrog Road (Burr Trail), Utah (Dec. 2,1985), at 2.)

The 1993 Environmental Assessment for Road Improvement Alternatives: Boulder–to–Bullfrog (Burr Trail), took the next step, explicitly recognizing the existence of the County's right-of-way: "Based on the opinion of the Tenth Circuit Court, which was reaffirmed at *Sierra Club v. Lujan* in 1991, *the position of the United States is that Garfield County has a right-of-way for the entire road from Boulder to Bullfrog.*" (U.S. Exh. 26, "Legal/Administrative History," at 8 (emphasis added).) [39]

Though the 1995 FONSI "determined that the 'Legal/Administrative History' section and related discussions throughout the [1993] assessment contain errors, are outdated and accordingly are withdrawn," the FONSI itself expresses no contrary position. (U.S. Exh. 30, Finding of No Significant Impact Road Improvement Alternatives Boulder–to–Bullfrog Road (Burr Trail), at 1 (Feb. 9, 1995).) Nor has the Park Service taken any different position in more recent documents pertaining to the Capitol Reef segment.

The United States' pretrial concession as to the existence of Garfield County's R.S. § 2477 right-of-way thus reflects a consistent position taken by the United States, in both word and deed, concerning Garfield County's right-of-way in the Burr Trail road. That position, in turn, reasonably comports with the historical and factual material submitted to the court in this case. By 1969, the "construction" of a "highway" along the Burr Trail—rudimentary as it may have been—had been accomplished, perfecting the grant of a right-of-way for that highway to Garfield County pursuant to R.S. § 2477. The existence of the right-of-way finds support in the historical record prior to 1969, and since 1969 in consistent recognition of its existence by the pertinent agency, the National Park Service. In so finding, the court gives due deference to the Park Service's long-standing, practical interpretation of the governing statute.

**The Scope of Garfield County's R.S. § 2477 Right–of–Way**

*The Burr Trail, Historic Uses & R.S. § 2477*

Treated purely as a question of *right,* Garfield County's right-of-way today ex-

---

nance of the road. He did so "[b]ecause of the status of the subject roads," in light of "a solicitor's opinion regarding use, jurisdiction and maintenance of county roads passing through Capitol Reef National Park." (U.S. Exh. 6, Letter dated July 10, 1981.)

39. Further, the 1993 EA commented that "there are areas where some road realign-

ment was or may be necessary to provide safe access and accommodate drainage issues. Where realignment outside the existing right-of-way is necessary, a separate right-of-way under ... Title 36, Part 14 of the *Code of Federal Regulations* (for NPS lands) will be required." (*Id.* at 9.)

tends no farther than historic construction and historic uses had extended it by January 20, 1969—the day the lands underlying the Capitol Reef segment were added to the national monument, thereby withdrawing the lands surrounding the Burr Trail from the public domain, or at the very latest, by October 21, 1976—the day Congress repealed R.S. § 2477.[40] After January 20, 1969, those lands were "reserved for public uses" under R.S. § 2477 and no longer available for the creation or expansion of rights-of-way for state highways— by Garfield County, or anyone else.

The R.S. § 2477 grant, therefore, is not open-ended,[41] and the legal rights conferred under that statute cannot be expanded today by the unilateral actions of a right-of-way claimant. Thus, Garfield County's rights, as they existed under Utah law on January 20, 1969 "are the maximum rights it can exercise today," and the scope of its right-of-way "is limited . . . to the width permitted by state law as of that date." *Hodel*, 848 F.2d at 1083. All uses established before that date not terminated or surrendered, "are part of an R.S. § 2477 right-of-way." *Id.* at 1084.

And what of the Burr Trail's historic uses? *Hodel* explains that "[t]he trail has hosted a variety of uses: during the late 1800s and early 1900s to drive cattle, sheep and horses to market; around 1918

to facilitate oil exploration; and since the 1930s for various transportation, emergency, mineral, agricultural, economic development, and tourist needs." *Id.* at 1073. The evidence received in this proceeding proves to be generally consistent with that description. (*See also* Pretrial Order, "Uncontroverted Facts" ¶ 51.) However, the historical information assembled by Bradford Frye suggests that the Capitol Reef segment of the road did not become passable by vehicles until the AEC improved the Burr Trail switchbacks in 1948,[42] was infrequently traveled until the uranium boom of the 1950s, and did not become useful for tourism until the Boulder–to–Bullfrog Road was improved and connected together as a continuous roadway in 1967. (Declaration of Bradford Frye, at exh. 3.)

*"Reasonable and Necessary "*

With historic construction and historic uses as the starting point, the law asks in this case the same question asked in *Hodel* in 1987 [43]—or for that matter, the same question asked in *Whitesides v. Green*, in 1896: what width "is reasonable and necessary for the type of use to which the road has been put," 675 F.Supp. at 606, such that there is "room enough for travelers . . . to pass each other, and for necessary improvements and repairs" to be made? 13 Utah at 349, 44 P. 1032.[44] As

---

**40.** The State of Utah adopted this position in its brief. (*See* State Brief at 12 (scope of the right-of-way is defined by " 'the type of use to which the road has been put' before the passage of FLPMA in 1976 . . ., and before the creation of the Park in 1969").)

**41.** As the Tenth Circuit explains in *Hodel*, "FLPMA preserved only pre-existing rights-of-way as they existed on the date of passage, October 21, 1976." 848 F.2d at 1083.

**42.** With no small amount of irony, this essential step in the construction of what would become the Boulder–to–Bullfrog Road was accomplished by a federal agency for a specific federal purpose—obtaining uranium, a strategic metal—and was accomplished, not on the public lands, but on Section 16, Township 34 South, Range 8 East, Salt Lake Base & Meridian—a school trust lands section

granted to and owned by the State of Utah. Garfield County thus cannot and does not have an R.S. § 2477 right-of-way embracing the Burr Trail Switchbacks. Instead, the County may own Section 16 outright through a subsequent conveyance from the State of Utah. *See National Parks and Conservation Ass'n v. Board of State Lands*, 869 P.2d 909 (Utah 1993).

**43.** *See Hodel*, 848 F.2d at 1084 ("the scope of Garfield County's right-of-way is that which is reasonable and necessary to ensure safe travel for the uses above-mentioned, including improving the road to two lanes so travelers could pass each other").

**44.** The scope of a grant of federal land is, of course, a question of federal law. *United States v. Oregon*, 295 U.S. 1, 28, 55 S.Ct. 610,

*Whitesides* long ago suggested, "such width must be determined from a consideration of the facts and circumstances peculiar to the case ...." 13 Utah at 349–50, 44 P. 1032.

Garfield County, the State of Utah, and the United States [45] turn to the facts to define the law. But which facts are definitive?

### Garfield County's "Previously Disturbed Area" Theory

The County's "disturbed area" theory proves to be the most singularly unhelpful, uncertain and ungovernable approach to answering the question of scope. What is "disturbed" at a particular location may or may not correspond at all to what is "reasonable and necessary" to ensure the safe travel of two vehicles passing each other— which Garfield County itself insists is the proper standard under Utah law for measuring the scope of its right-of-way.[46] (*See* County Brief at 9.) The "disturbed area" approach depends upon an inescapably subjective perception of what land has been "disturbed" and what land has not. Reasonable people may differ as to what has been "disturbed," when, by what, and

what has not been disturbed. Nor is the approach limited to land "disturbed" by identifiable road work done by the County in the past. Any disturbance will do.

It remains unclear what the County contends the "previously disturbed area" really delineates. At times, Garfield County seems to suggest that the "previously disturbed area" defines that portion of its right-of-way within which the County may make improvements without any need to consult with the Park Service, apparently something less than the whole width. (*See, e.g.,* VIII Trial Transcript, dated February 25, 1999, at 56:6–10, 57:9–12, 60:22–61:1, 62:3–63:25 (argument by Mr. Thompson).) [47] Other times, the "disturbed area" seems to represent the outermost extent of the County's claim as to the existing scope. (*Id.* at 60:11–13) (same) ("it says that's where the interface between the underlying subservient estate and the dominant estate takes place"); County Brief at 3, 12 ("the disturbed area created by prior road construction and maintenance was clearly created for highway purposes and thus must be deemed within the right-of-way"), 16 ("The 100-foot right-of-way width is consistent with

---

79 L.Ed. 1267 (1935). But in some instances "it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction as applicable to its conveyances." *Id.* Because R.S. § 2477 is silent as to the scope of the grant, *Hodel* accorded great weight to the BLM's conclusion, acquiesced in by Congress, that the grant should be construed according to the law of the state in which the land subject to the grant is situated. *Hodel,* 848 F.2d at 1079–83.

**45.** The NPCA contends that the scope of Garfield County's right-of-way is not properly before the court for several reasons, including jurisdictional ones. (*See* NPCA Brief, *passim.*)

**46.** Counsel for the County conceded as much at closing argument:

> THE COURT: How does the disturbed area concept help us at all?
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> MR. THOMPSON: Well in terms of the whole right of way I don't think this necessarily helps. I think you have to listen to

the testimony of what's reasonable and necessary....

(VIII Trial Transcript, dated February 25, 1999, at 59: 10–11, 20–23.)

**47.** This seemed to be the concept at the time of the Pretrial Conference on July 6, 1998:

> MR. THOMPSON: Well I think the right-of-way is broader than the disturbed area....
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> When I talked about the adjacent disturbed area I was trying to talk about the area where I think the county can work without park interference. I think the right-of-way is defined fairly well in the Hodel case which is what's reasonable and necessary.

(*See* Transcript of Hearing, dated July 6, 1998, at 57:16–58:3.)

the disturbed area created in connection with the road at the western end of the park.").

Counsel for the County suggests that the "disturbed area" theory finds support in the *Hodel* opinions. And in fact, there is some reference in *Hodel* to "disturbed areas." However, the County seems to overlook the specific context in which those references were made. *Hodel* in part dealt with the BLM's power to protect adjoining Wilderness Study Areas from undue degradation caused by County improvements to the Boulder-to-Bullfrog Road.

In that context, the "disturbed area" has special significance.

To be eligible for protection as a Wilderness Study Area, an area of land "must have been affected primarily by the forces of nature, *with the imprint of man's work substantially unnoticeable,* and must have outstanding opportunities for solitude or a primitive and unconfined type of recreation." *Hodel,* 848 F.2d at 1085 (emphasis added) (quoting 675 F.Supp. at 608 n. 37).[48] In that context, Judge Anderson observed that "[i]t is undisputed that the WSAs extend to the edge of the Burr Trail. There is disagreement, however, as to what is meant by the "edge": the boundary of the traveled surface, the pile of dirt left by a grader as it goes by, or even the perimeter of *the disturbed area.*" 675 F.Supp. at 608 n. 36 (emphasis added).[49]

In this context, however, the "disturbed area" has no particular legal significance. Under the applicable statutes and regulations, the Park Service's authority embraces all of the lands within the Park's boundaries regardless of whether the "imprint of man's work" is "substantially unnoticeable," or not. 16 U.S.C.A. § 1131(c). Different policies inform the protection of park lands in contrast to wilderness areas, and what may be inappropriate for a wilderness designation may be immaterial to protection of the same land as part of a national park.

Ungrounded in the applicable law, the County's "previously disturbed area" theory lacks a clearly articulated standard for its application, creating practical problems as well. Where is the "previously disturbed area?" Counsel for the County suggests that it is "an area that's previously been used as part of the building of the roadway prism today," (VIII Trial Transcript at 66:6–7 (argument by Mr. Thompson)), an area wider than "the roadway," which is "the fillslopes, the backslopes, the drainage ditches, the shoulders and travel ways of the road." (*Id.* at 63.) Counsel for the State speaks of "the top of the cut slope and the bottom of the fill slopes as evidenced by mechanically disturbed earth work or clearing regardless of when such earth work was accomplished if that exceeds 52 feet." (*Id.* at 71:8–11 (argument by Mr. Boyden).) Jake Leibenguth testified that the "disturbed area" was staked

---

**48.** 16 U.S.C.A. § 1131(c) (1985):

A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2)

has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

**49.** Judge Anderson also noted that under the County's proposal in *Hodel,* "While the traveled surface will be 24 feet wide, *the disturbed area will be considerably wider in many places,* especially around curves, since it will included the shoulders and drainage ditches." 675 F.Supp. at 598 n. 9 (emphasis added).

by him on February 8, 1996 "just where it looked like it had been moved before the dirt or something there. I don't really know how to explain it." (II Trial Transcript at 114:14–16.) Carl Skyrman attempted to explain it, relying to some extent on conjecture:

A I walked that hill and it would be my opinion that the previously disturbed area very closely parallels to what Mr. Bremner has already illustrated, that is to say that *sometime I would venture to say in the '60s or '70s some roadwork had been accomplished* in addition to an apparent excavation for the park entrance sign and that's to me, that was indicated by its lack of vegetation or certainly a change in vegetation patterns from the original state adjacent to it, and also the type of rivules or rivulets, small gullies if you will that are attendant on that type of clay hillside.

(VI Trial Transcript, dated February 23, 1999, at 70:14–24 (testimony of Carl Skyrman) (emphasis added).) Brian Bremner testified that "[i]f an area has been disturbed at sometime in the past by mechanical equipment" engaged in road work, it is "previously disturbed." (V Trial Transcript, dated February 22, 1999, at 169:3–7, 12–14 (testimony of Brian Bremner); *see* VI Trial Transcript at 21:4–22:4 (same); U.S. Exh. 1056.)

If anything, measuring the County's right-of-way in this context by what has been "disturbed" only invites more conflict and confrontation between road builders, who may gain space by increasing the range of disturbance, and park managers, who are duty-bound to protect park scenery and resources in their natural state.

The law simply demands a more thoughtful standard than that.

### AASHTO Standards & The Scope of the Right-of-Way

Garfield County points to a Utah statute providing that the "width of rights-of-way for public highways shall be such as the highway authorities of the state, counties, cities or town may determine for such highways under their respective jurisdiction." Utah Code Ann. § 72–5–108 (Supp. 2000). "Thus," the County submits, "the discretion to determine what is reasonable and necessary for a Garfield County road has been vested in the County commission." (County Brief at 10.) [50]

Having said that, and starting with the premise that the Boulder-to-Bullfrog Road is classified as a Class B road under Utah law, the County points to the statutory commitment of Class B roads to counties for construction and maintenance, Utah Code Ann. § 72–3–103 (Supp. 2000), and another Utah statute requiring that Class B roads conform to the "design and construction standards as currently adopted by the American Association of State Highway and Transportation Officials," or AASHTO. Utah Code Ann. § 72–6–110 (Supp.2000).[51] Referring to the 1965 AASHTO design standards—the standards in effect when the highway was actually constructed in 1967—the County argues that safety considerations require a minimum 24–foot–wide traveled surface: "From the standpoint of driver convenience, ease of operation, and safety, it is desirable to construct all 2–lane highways with 12–foot lanes and with usable shoulders 10 feet wide." (U.S. Exh. 70,

---

**50.** In *Hodel*, Judge Anderson noted Garfield County's adoption on June 15, 1987 of a resolution setting the width of all R.S. § 2477 road rights-of-way within the county at a minimum of 100 feet—eleven years after FLPMA's repeal of R.S. § 2477, and eighteen years after the 1969 expansion of Capitol Reef National Monument that embraced the road. 675 F.Supp. at 607 n. 33. Here, as in *Hodel*, the "reasonable and necessary" standard defines the scope of the County's right-of-way,

not the post–1969 exercise of its own legislative "discretion."

**51.** This statute was first enacted in 1982, fifteen years after significant construction on the Capitol Reef segment, and thirteen years after the lands were incorporated within the national monument. *See* 1981–1982 Utah Laws ch. 30, § 3 (Budget Sess.).

AASHTO, *A Policy on Geometric Design of Rural Highways* ("1965 AASHTO Standards"), at 260.) Beyond that, for a 24–foot traveled way, the 1965 AASHTO standards suggest a highway right-of-way cross-section with an 80–foot minimum, with 100 feet or more being deemed "more desirable." (*Id.* at 263.)

The County recalls *Hodel*, where the County's proposed work conformed to optimum AASHTO standards with a 24–foot traveled surface, plus shoulders, cut and fill slopes, etc., and where the BLM concluded that at least insofar as the work was conducted within the existing road alignment, the proposed work fell within the County's existing right-of-way. (County Brief at 11.) The County also points to the construction work done on the Capitol Reef segment in 1967, where the design specifications contemplated a 28–foot traveled way, though it acknowledges that "the width of the traveled way throughout most of the park ranged between 20 and 26 feet" prior to February 13, 1996. (*Id.* at 12–13.) The County further asserts that Park Service documents endorse a roadway having a traveled path of similar width. (*Id.* at 11–12,16–18.)

Of course, what may be "desirable" may not in all instances be what is "reasonable and necessary" in a particular setting. The 1965 AASHTO Standards contemplate a minimum width of 20 feet for roads having a design speed between 30 and 50 miles per hour and an average of less than 400 vehicles traveling each day. (U.S. Exh. 70, 1965 AASHTO Standards at 260–61 & tbl. V–1.) [52] For such roads, "surfacing widths that are two feet narrower may be used on minor roads with few trucks where shoulders are flush with the pavement and are capable of supporting vehicles at all times." (*Id.* at 260.) Again, while ten-foot shoulders are "desirable on all highways," the 1965 AASHTO Stan-

dards say that "narrower widths are often considered acceptable on low volume highways in rugged terrain . . . ." (*Id.* at 261.)

The County also relies on the testimony of its expert witnesses that "a 26 to 32–foot roadway is necessary to provide safety for the traveling public . . . ." (County Brief at 11 (record citations omitted).) Relying on the same experts, the State of Utah asserts that the minimum right-of-way width that would provide "two lanes so travelers could pass each other" would be 52 feet, accommodating "two 12–foot lanes, two 4–foot shoulders, two 10–foot clear zones,"—"plus," the state proffers, "approximately 32 feet if necessary to accommodate cut and fill slopes" or a total of "84 feet." (State Brief at 14 (citing VII Trial Transcript, dated February 24, 1999, at 42–43 (testimony of Alex Mansour)).)

Emphasizing the road's limited uses in 1969 as the proper basis for measuring the right-of-way's current scope, the United States relies on its own experts who concluded that the right-of-way encompasses a 20–foot–wide traveled way, and recommended that any narrower sections of the road be widened to two nine-foot lanes and one-foot shoulders. (U.S. Brief at 25–26; U.S. Exh. 65.) The United States urges that this conclusion remains consistent with both the 1965 AASHTO Standards (U.S.Exh. 70) and the 1984 AASHTO standards (U.S.Exh. 71), as well as the 1984 National Park Service road standards. (U.S.Exh. 8.)

All of the road standards referred to by the parties offer some guidance as to what may be reasonable, even necessary, for a passable two-lane dirt road. (*See generally* U.S. Exh. 65.) However, AASHTO standards cannot authoritatively define the legal scope of the County's right-of-way because the reservation of the Park lands

---

**52.** The County's engineer, Brian Bremner, testified that under AASHTO standards, "I think the minimum width in a collector road would be a 20 foot traveled way and 2 foot shoulders on each side which would be a roadway of 24 feet" for a road handling "zero to 400 vehicles a day." (VI Trial Transcript, dated February 23, 1999, at 17:8, 14–17 (testimony of Brian Bremner).)

predates the Legislature's adoption of those standards in Utah Code Ann. § 72–6–110 (Supp.2000) by many years, and thus the standards cannot define the width of the right-of-way as a matter of state law at the time in 1969 when R.S. § 2477 became ineffective. *See Hodel,* 675 F.Supp. at 606, 607 n. 33. Garfield County is "limited ... to the width permitted by state law as of that date." 848 F.2d at 1083.

Nevertheless, the AASHTO standards prove helpful in applying the older common-law standard to measure what is "reasonable and necessary" in light of pre-existing uses.

**Park Service Authority & R.S. § 2477 Rights-of-Way**

The near-consensus among the parties concerning the substantive road design standards that define what is "reasonable and necessary" evaporates when they reach the question of *who* gets to say—that is, who it is that decides how those standards are actually implemented on the ground. Garfield County and the State of Utah insist that Garfield County gets to say, with no need for the prior approval of, or even prior consultation with the Park Service.

*Colorado v. Toll & Kleppe v. New Mexico*

The State of Utah points to *Colorado v. Toll,* 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927 (1925), as support for the view that "absent express congressional action and a cession from the State, the State's power and authority over its roads remains unaffected by the creation of a federal reservation." (State Brief at 19.) In *Toll,* the superintendent of Rocky Mountain National Park had issued regulations banning from the park any automobiles "carrying passengers who are paying, either directly or indirectly, for the use of the machines"—except those operated by one corporation graced with a Park Service permit. Justice Holmes, writing for the

Court, concluded that the State may be entitled to injunctive relief where "the defendant is undertaking to assert exclusive control and to establish a monopoly in a matter as to which... the State has not surrendered its legislative power," and remanded the matter for additional fact-finding. 268 U.S. at 231, 45 S.Ct. 505. *Toll* thus raised serious doubt whether the creation of a national park by itself vests the Park Service with *exclusive* authority over the use of roads within the park boundaries.[53]

Fifty-one years later, in *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), the Court revisited *Toll,* reading Justice Holmes' opinion to say that "the Court found that Congress had not purported to assume jurisdiction over highways within the Rocky Mountain National Park, not that it lacked the power to do so under the Property Clause." 426 U.S. at 544, 96 S.Ct. 2285. Writing for a unanimous Court in *Kleppe,* Justice Marshall explained that at most, *Toll* "stands for the proposition that where Congress does not purport to override state power over public lands under the Property Clause and where there has been no cession, a federal official lacks power to regulate contrary to state law." *Id.* at 544–45 n. 12, 96 S.Ct. 2285.

*Kleppe* upheld provisions of the federal Wild and Free Roaming Horses and Burros Act against a challenge by the State of New Mexico on the grounds that they conflicted with state law and infringed upon the State's traditional powers over wild animals: "We hold today that the Property Clause also gives Congress the power to protect wildlife on the public lands, state law notwithstanding." *Id.* at 546, 96 S.Ct. 2285. Under *Kleppe,* then, where Congress exercises the Property Power for purposes of managing the public lands, that exercise will be sustained even if it intrudes into subject areas that are

**53.** In this case, the court has *not* heard the United States suggest that the Park Service has *exclusive* authority over the Burr Trail or over those persons who travel over it. Thus the issue raised in *Toll* has not been raised here.

traditionally a matter of state power, authority, and control.

While *Toll* says that there was "no attempt to give exclusive jurisdiction to the United States" in the statute creating Rocky Mountain National Park, and that "the rights of the State over the roads are left unaffected in terms" by that particular statute, 268 U.S. at 231, 45 S.Ct. 505, *Kleppe* stands for the more general proposition that federal authority over federal lands may be enlarged, and state authority within the public lands may indeed be curtailed, either through the exercise by Congress of the Property Power, or by a state's cession of land or jurisdiction to the United States, or both. 426 U.S. at 541–46, 96 S.Ct. 2285. Thus, absent such cession, Congress defines the scope and extent of an agency's powers. The existence of state power, including state power over traditional subjects of state regulation, does not by itself define the reach of federal administrative authority, or raise an impassable barrier to its exercise. *Kleppe*, 426 U.S. at 543–46, 96 S.Ct. 2285.

### *"Valid Existing Rights" & the Park Service's Power to Regulate*

Shifting from concepts of constitutional federalism to concepts of vested property rights, the State of Utah also relies on the savings clause found in § 1 of the statute creating Capitol Reef National Park, which reads: "*Subject to valid existing rights,* the lands, waters, and interests therein" within a defined boundary "are hereby established as the Capitol Reef National Park ...." Pub.L. No. 92–207, § 1(a), 85 Stat. 739 (1971), *codified at* 16 U.S.C.A. § 273(a) (1992) (emphasis added). "The National Park Service," the statute continues, "shall administer, protect, and develop the park, subject to the provisions of sections 1 and 2 to 4 of this title, ..." *Id.* § 5(a), 16 U.S.C.A. § 273d(a). "[I]n creating the Park," the State argues, "Congress specifically excepted 'valid existing rights'

from the control and restrictions placed on land in the Park." (State Brief at 19.) "Because Congress ... protected the right-of-way as a 'valid existing right,' NPS is without authority to regulate the Road." (*Id.*)

Congress did grant the right-of-way to Garfield County. Congress also created the Park Service. Congress later saw fit to incorporate the County's right-of-way within a national park; and shortly before it did that, it imposed the duty on the Park Service to study any proposed action that may have a significant impact on the environment. At the same time that Congress protects the County's "valid existing rights," Congress also seeks to protect the natural scenic value of the Park lands.

The Park Service has consistently treated the County's R.S. § 2477 right-of-way as a "valid existing right" within the Park's boundaries, and has taken that position in this proceeding. *Hodel* recognized that "[t]he right to make reasonable and necessary improvements within the boundaries of the right-of-way is part of the County's valid existing rights in the Burr Trail." 848 F.2d at 1086 n. 16. The Park Service acknowledges that as well.

To say that, however, does not necessarily mean that the Park Service has no voice in the County's improvement, widening or realignment of its right-of-way. In the same legislation as well as prior enactments, Congress has vested the Park Service with the power to manage the Park and protect Park lands, resources and values.[54] Beginning with its 1982 General Management Plan, the Park Service has consistently asserted that it "will retain a voice in the design of these roads and in the regulation of traffic on them within the park to protect the park lands, resources, and visitors." (U.S. Exh. 7, at 37.) And as discussed in more detail below, the Park Service also has a duty imposed upon it by

---

**54.** That the County's "valid existing right" may be subject to Park Service regulation does not mean that the Park Service has the

power to preclude *all* improvements within Garfield County's existing right-of-way. *See Park Service Authority & R.S. § 2477, infra.*

Congress to consider the impact on the environment of projects the County may initiate.[55]

That the Park Service's power to protect Capitol Reef National Park under § 5 is "subject to valid existing rights" under § 1 may indeed constitute a latent ambiguity in the statute. But ambiguities, by definition, are subject to more than one reasonable interpretation, and the State's reading of the provision lacks compelling force.

### *"The Revised Statutes 2477 Rights–of–Way Settlement Act"*

■ As noted above, the State of Utah relies on a 1996 legislative proviso to buttress its argument that the Park Service "is without authority to regulate the Road." Section 108 of Title I of the Department of the Interior and Related Agencies Appropriations Act of 1997, (Title I, § 101(d) of the Omnibus Consolidated Appropriations Act of 1997, Pub.L. No. 104–208, 110 Stat. 3009 (1996)) reads: "No final rule or regulation of any agency of the federal Government pertaining to the recognition, management or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. § 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act," which was September 30, 1996. 110 Stat. 3009–200. *See* 43 U.S.C.A. § 932 note (Supp.2000). Congress enacted § 108, according to the State, to "put the skids to agency regulation of R.S. 2477 roads . . . ." (State Brief at 23.) The Conference Report on the 1997 Omnibus Consolidated Appropriations Act says little about § 108: "Section 108 provides for limiting final rules or regulations on RS 2477 rights-of-way as proposed by the Senate. The House bill included a similar provision." H.R. Conf. Rep. 104–863, 104th Cong., 2d Sess. 1008 (1996).

The Senate Committee on Energy and Natural Resources offered a more helpful explanation of § 108 in a report made two years later:

On March 14, 1996 the Full Committee held a hearing on S. 1425 to recognize the validity of rights-of-way granted under section 2477 of the Revised Statutes, and for other purposes. As originally written S. 1425 provided a process by which RS 2477 rights-of-way could be validated by means other than a quiet title action in the courts. Because of controversy over the legislation the Full Committee on May 1, 1996 passed a substitute amendment by voice vote. The substitute amendment placed a permanent moratorium on any agency of the federal government from issuing final regulations on RS 2477 rights-of-way without Congressional approval. The measure was included as part of the Continuing Resolution.

Sen. Rep. No. 105–160, 105th Cong., 2d Sess. 10–11 (1998). Section 108 appears to have been lifted verbatim from the substitute bill S. 1425, 104th Cong., 2d Sess., the "Revised Statutes 2477 Rights–of–Way Settlement Act," which had been reported by the Committee to the full Senate on May 9, 1996. *See* S.Rep. No. 261, 104th Cong., 2d Sess. (1996).[56]

According to the committee report accompanying the substitute version of S. 1425, the bill originated as a response to regulations proposed by the Department of the Interior in August of 1994. *See* 59 Fed.Reg. 39216 (Aug. 1, 1994). The proposed regulations would have required "R.S. 2477 claimants to file a claim with the Department within two years, even if the right-of-way had been formally recognized," with the Secretary or his delegate making the initial determination "as to the

---

55. In *Hodel,* only Judge Barrett agreed with the County that "its performance of construction activities within the scope of its right-of-way does not require a BLM environmental analysis." 848 F.2d at 1101 (per curiam on rehearing).

56. A House bill, H.R. 1296, 104th Cong., 2d Sess., included identical language. *See* H.R. Conf. Rep. No. 836, 104th Cong., 2d Sess. (1996).

validity of the claim." S.Rep. No. 104–261, 104th Cong.2d Sess. at 2. Observing that "[r]esolution of R.S. 2477 right-of-way claims has been a very complex and contentious process," the committee report suggests that the substitute S. 1425—ultimately enacted as § 108 of the 1997 Interior Appropriations Act—"will allow the Department to proceed with the development of new regulations, while prohibiting their implementation until expressly approved by an Act of Congress." *Id.*

Section 108 thus imposed a moratorium on *final* rule-making concerning the process for resolving claims as to the existence and validity of R.S. § 2477 rights-of-way, anticipating that the Interior Department's drafting of *proposed* rules would continue unimpeded. Nothing in S. 1425, now § 108, was meant to address the day-to-day governance of construction, improvement or maintenance of roads on R.S. § 2477 rights-of-way. Indeed, the committee report expressly states that "no changes in existing law are made by the bill S. 1425, as ordered reported." *Id.* at 5.

Whatever power to regulate road construction activities on the Capitol Reef segment the Park Service had on February 13, 1996, that power remains unaffected by § 108 of the 1997 Interior Appropriations Act because (1) the measure was enacted after the fact, on September 30, 1996; (2) it speaks in purely prospective terms; and (3) it does not address and was not intended to reach questions of the construction, improvement and maintenance of existing highways on R.S. § 2477 rights-of-way.

Garfield County points to a prior provision, § 349 of the National Highway System Designation Act of 1995, Pub.L. No. 104–59, 109 Stat. 568, 617–18 (1995), which provided: "Notwithstanding any other

provision of law, no agency of the Federal Government may take any action *to prepare, promulgate, or implement* any rule or regulation addressing rights-of-way authorized pursuant to section 2477 of the Revised Statutes (43 U.S.C. 932), as such section was in effect before October 21, 1976," and further, that "[t]his subsection shall not be effective after September 30, 1996." (Emphasis added.) According to the House Conference Report on the 1995 bill, "This provision prohibits the Federal government from taking any action to prepare or implement any regulation concerning rights-of-way across public lands" until the date specified in the bill. H. Conf. Rep. No. 104–345, 104th Cong., 1st Sess. 108, 1995 U.S.Code Cong. & Admin. News 575, 610 (1995).

The May 9, 1996 Senate Committee Report on S. 1425 viewed the 1995 moratorium on rule-making as a temporary one: "The Committee expects that *once the current moratorium expires,* the Department of the Interior will continue to develop the proposed final regulations." S.Rep. No. 104–261, 104th Cong.2d Sess. at 2 (emphasis added).

Neither Act, as Garfield County seems to suggest, carves out an exception to existing federal land statutes and regulations in favor of R.S. § 2477 rights-of-way. (County Brief at 2.) Nor did either Act grant R.S. § 2477 claimants *carte blanche* to construct, widen, and realign roads or highways across national park lands as they please. Congress was concerned with rule-making concerning the process for deciding the validity of R.S. § 2477 claims,[57] and as far as this proceeding is concerned, § 108 of the 1996 Appropriations Act, and its now-expired predecessor, § 349 of the 1995 Highway System Designation Act, contribute nothing to resolving the substantive issues now in dispute.

---

57. The senate committee report expressed "the Committee's hope that in reviewing and analyzing the extensive number of comments received after the publication of the draft regulations, the Department will be in a better position to propose final regulations that address and hopefully more completely resolve the many competing concerns raised during this process." S.Rep. No. 104–261, at 2.

*Park Service Authority & R.S. § 2477*

As noted above, the United States relies on cases such as *Vogler, Jenks,* and *Wilkenson* in asserting that the Park Service's power to manage and protect the Park's lands, resources and values extends to the regulation of construction and improvement of R.S. § 2477 rights-of-way across Park lands. The State of Utah counters that these cases either involve "something other than an R.S. 2477 road," or "depend on an erroneous reading" of one of those cases. (State Brief at 20–23.) "Plaintiff's wispy dream of plenary regulatory power over State or County roads within the Park," the State continues, "does not have the structural foundation to adequately support itself." (*Id.* at 24.) Garfield County responds that cases like *Vogler* and *Jenks* involve "activities of private entities, often in connection with express Congressional authorization to regulate the activities in question," and that "[t]hese cases provide no basis to conclude that NPS has any authority to require that the County forego application of the safety standards that apply to this highway . . . ." (County Brief at 31.)

Indeed, *Vogler, Jenks, Wilkenson,* and other cases cited by the United States involved private litigants, and some, *e.g., Jenks,* involve easements other than R.S. § 2477 rights-of-way. Very few of the cases discussed by the United States involved a state or local government as an R.S. § 2477 claimant, or a dispute between federal and local officials over construction or improvement of an existing right-of-way.[58] *Hodel* did, and that case offers much helpful guidance to the resolution of the dispute now before the court.

*Wilkenson v. Department of Interior,* 634 F.Supp. 1265 (D.Colo.1986), discussed in all of the briefs, involved private claimants as plaintiffs, but also involved the existence of R.S. § 2477 rights-of-way within the Colorado National Monument and the validity of Park Service regulations addressing commercial traffic using those rights-of-way. In *Wilkenson,* Judge Matsch enjoined the Park Service from collecting user fees for use of the rights-of-way by vehicles engaged in continuous "non-recreational" travel through the monument. He did so, however, relying on the limitation on fees found in the pertinent statute and regulation—a regulation he held to be valid. He also upheld a Park Service rule limiting commercial traffic, but held that it could not be enforced as an absolute prohibition.[59] Judge Matsch concluded that "[t]he reasons advanced . . . for the ban on commercial vehicles," including the substantial impacts of heavy traffic, "are within the scope of the Secretary's authority to prescribe rules and regulations to 'conserve the scenery and the natural and historic objects and the wildlife [in the national parks and monuments] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.' 16 U.S.C. § 1," and that "there is a rational basis for the regulation, even as applied to the Colorado National Monument." 634 F.Supp. at 1280. The United States thus correctly asserts that *Wilkenson* upheld the validity of Park Service regulations governing reserved lands, including R.S. § 2477 rights-of-way for public highways crossing those lands. (U.S. Brief at 6 & n. 4.)

58. That case law seems relatively scarce concerning improvement of R.S. § 2477 roads by local governments suggests that, many times, such questions as have arisen between local and federal officials have been resolved through negotiation, mutual accommodation, and agreement, rather than controversy and litigation.

59. "[T]he public has a right of access across the subject road segments for purposes of going between Grand Junction and Glade Park. It includes all of the public, including commercial vehicles. Size and weight restrictions would appear to be appropriate matters for regulation, and control over hazardous substance transportation is necessary." *Id.* at 1280.

*Vogler* also involved a private litigant resisting Park Service regulation of his use of an R.S. § 2477 right-of-way in the Yukon–Charley Rivers National Preserve in Alaska on the ground that the Park Service had no power over the right-of-way. The Ninth Circuit rejected his view: "we do not accept Vogler's argument that the government is totally without authority to regulate the manner of its use." 859 F.2d at 642. To the contrary, "Congress has made it clear that the Secretary has broad power to regulate and manage national parks. The Secretary's power to regulate within a national park to 'conserve the scenery and the nature and historic objects and wildlife therein ....' applies with equal force to regulating an established right-of-way within the park. *See* 16 U.S.C. § 1." *Id.* The regulations requiring a permit for heavy vehicles such as Vogler's D–8 caterpillar [60] "are necessary to conserve the natural beauty of the Preserve; therefore, they lie within the government's power to regulate national parks.... Thus," the Ninth Circuit concludes, "the government is not without authority to regulate the manner of Vogler's use of the Bielenberg trail." *Id. Vogler* thus stands for the proposition that the Park Service may lawfully regulate the use of heavy equipment within a national park

on an R.S. § 2477 right-of-way to protect the scenery and natural beauty of the park lands. *Accord, Clouser v. Espy,* 42 F.3d 1522, 1538 (9th Cir.1994); *Adams v. United States,* 3 F.3d 1254, 1258 n. 1 (9th Cir.1993) ("Even if the Adamses had an easement under R.S. 2477, they would still be subject to reasonable Forest Service regulations. *United States v. Vogler,* 859 F.2d 638, 642 (9th Cir.1988), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 787, 102 L.Ed.2d 779 (1989).")

Remarkably, despite their confident assertions, neither the State of Utah nor Garfield County cite to a single reported opinion of a federal or state court that in so many words adopts or endorses their theory of the exclusive power of an R.S. § 2477 right-of-way holder to improve a road, vis-a-vis the authority of the Park Service—or complete lack thereof—to regulate the making of such improvements.[61] Even *Colorado v. Toll,* which indicated that federal authority over the use of roads within the Rocky Mountain National Park may *not* be exclusive, did not suggest that state or local authority *was* exclusive, or that the Park Service was powerless to act in pursuit of its congressional mandate to protect park lands. 268 U.S. at 231, 45 S.Ct. 505.[62]

**60.** Jake Leibenguth operated a D–7 Caterpillar within Capitol Reef National Park on February 13, 1996. (II Trial Transcript, dated February 17, 1999, at 115:6–7 (testimony of Jake Leibenguth).)

**61.** Counsel had raised essentially the same argument in essentially the same words in *Washington County v. United States,* 903 F.Supp. 40 (D.Utah 1995) (Sam, J.), but that action was dismissed for lack of a concrete case or controversy, as well as the plaintiff county's failure to comply with the pleading requirements of the Quiet Title Act, 28 U.S.C.A. § 2409a, and Fed.R.Civ.P. 8(a)(2). *Id.* at 42.

**62.** *City and County of Denver v. Bergland,* 695 F.2d 465 (10th Cir.1982), a non–2477 case cited by Garfield County, involved a 1924 canal right-of-way across national forest lands granted under a 1905 statute, and Denver's plans to install closed conduits in place of canals on an alignment different from the

original grant. The Tenth Circuit held that "the Secretary of the Interior retains the exclusive authority to administer such rights of way," *id.* at 476, and that the Forest Service, an agency under the Secretary of Agriculture, had authority to issue stop orders on Denver's work, but "only if Denver indeed was constructing beyond the authorized scope of its right of way." *Id.* at 477. The original 1905 statute expressly contemplated "pipelines" as well as "canals;" conduits required no greater width, and were therefore "an authorized use within a right of way granted for 'canals.'" Consequently, the Forest Service could not stop the construction of the conduits as conduits. *Id.* at 479. However, Denver had constructed its conduits along a different alignment than shown on the original grant maps. The Tenth Circuit held "that by virtue of constructing on the new alignment, without having obtained prior approval from the Interior, Denver exceeded the authorized scope of its grant." *Id.* at 480. The Forest Service

Other litigants have taken more extreme positions. In *United States v. Nye County, Nevada,* 920 F.Supp. 1108 (D.Nev. 1996), *appeal dismissed,* 133 F.3d 930, 1997 WL 804210 (9th Cir.1997) (table), officials of Nye County, Nevada initially argued that the United States was entirely without jurisdiction to regulate the public lands, reserved or not, within the State of Nevada, and therefore could not act to restrain a county official from using a bulldozer to reopen a road located within the Toiyabe National Forest. Nye County ultimately retreated from this position,[63] and although considering "the concession as tantamount to a consent to judgment," the court granted declaratory relief that "absent consent or cession Nevada undoubtedly retains jurisdiction over federal lands within Nye County, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause." 920 F.Supp. at 1118 (paraphrasing *Kleppe,* 426 U.S. at 543, 96 S.Ct. 2285).[64] While *Nye* did not attempt to "define the broad boundaries between local and federal jurisdiction over the public land in Nye County," *id.,* the court explicitly recognized that "the United States owns and has the power and authority to manage and administer the unappropriated public lands and National Forest System lands within Nye County, Nevada," *id.* at 1120, rejecting the contrary views of county officials, one of whom, the court noted, had earlier tried to decide the issue using a county-owned bulldozer.[65] *Id.* at 1118 (declaratory relief "will resolve a dispute initiated by Nye County despite clear law to the contrary").

*Nye,* like *Toll* and *Kleppe* before it, contemplates the *concurrent* exercise of state/local and federal jurisdiction over federal lands traversed by R.S. § 2477 rights-of-way and other easements. Not surprisingly, none of the cases cited by counsel appears to have abandoned the concept of concurrent jurisdiction in favor of the bright-line, all-or-nothing approach now urged by the State of Utah and Garfield County.

■ This court remains unpersuaded by that approach as well, concurring instead with the view that "[t]he Secretary's power to regulate within a national park to 'conserve the scenery and the nature and historic objects and wildlife therein ....' applies with equal force to regulating an

stop order based on deviations from the original alignment "was consistent with the intent of Congress in that it protected the national forest land from destruction and unauthorized use," and was valid. *Id.*

In *Bergland,* as in *Hodel* six years later, the federal agency made the initial determination of the scope of Denver's right-of-way, subject to judicial review. *Id.* at 475–77. The relevant federal agency was also responsible for ensuring that NEPA requirements were satisfied as to the proposed work, given that "the requirements of NEPA do apply to the BLM's consideration of Denver's deviation." *Id.* at 482. Indeed, *Hodel* relies on *Bergland* as to these issues. *See Hodel,* 848 F.2d at 1084, 675 F.Supp. at 606, 616.

**63.** All parties, including Nye County, now agree with the Supreme Court that

[a]bsent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause.

*Kleppe,* 426 U.S. at 543, 96 S.Ct. 2285, ... 920 F.Supp. at 1117 (citations omitted).

**64.** *Nye* also struck down a county resolution to the extent that it sought to establish county-owned rights-of-way in "ways, pathways, trails, roads, country highways, and similar travel corridors across public lands" for which no valid right-of-way exists under federal law. 920 F.Supp. at 1120.

**65.** The matter was settled by the United States, Nye County, and the State of Nevada, resulting in the pending appeal being dismissed for lack of jurisdiction. *United States v. Nye County,* No. 95–16599, 133 F.3d 930 (table), 1997 WL 804210 (9th Cir.1997) (unpublished disposition).

established right-of-way within the park," including an R.S. § 2477 right-of-way held by the County. *Vogler*, 859 F.2d at 642.

As explained above, all of the lands traversed by this segment of the right-of-way are protected against degradation by their incorporation into Capitol Reef National Park, and the Park Service has been charged with the affirmative duty to "administer, protect, and develop the park" under the direction of the Secretary of the Interior. 16 U.S.C.A. § 273d(a). Congress has required the Park Service generally to "promote and regulate the use of" national park lands "to conserve the scenery and the natural and historic objects and the wild life therein"—the "fundamental purpose" of the parks—and to "provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations," 16 U.S.C.A. § 1, and expressly demands that "the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established." 16 U.S.C.A. § 1a–1.

According to the 1982 General Management Plan, "The primary management objective of Capitol Reef National Park is to protect and preserve the natural and cultural environments and provide for the enjoyment of those environments by present and future generations." (U.S. Exh. 7, Final Environmental Impact Statement/General Management Plan at 1.) Consistent with that objective, the Park Service may regulate activities to prevent damage to Park lands and Park resources, and to prevent impairment of Park values, particularly where compliance with Park regulations "is essential to ensuring the protection of the [Park]'s natural beauty and value," *Vogler*, 859 F.2d at 641.

66. "Congress exercises the powers both of a proprietor and of a legislature over the public domain." *Kleppe v. New Mexico*, 426 U.S.

16 U.S.C.A. § 3 empowers the Secretary to make such rules "for the use and management" of national parks "as he may deem necessary or proper." As *Wilkenson* acknowledges, "the grant of authority to the Secretary is very broad." 634 F.Supp. at 1279. The Secretary has exercised that authority, and where construction work is concerned, the Park Service has been vested with the power under 36 C.F.R. § 5.7 to authorize such work—or if it comes to that, to deny permission for that work to proceed when necessary to fulfill its duty to protect park lands.

■ At the same time, however, the Park Service may not preclude or unreasonably interfere with the reasonable exercise of the rights of those who hold valid rights-of-way within the boundaries of the Park. The authority to regulate and to protect the Park was vested by Congress in the Park Service "subject to valid existing rights," clearly indicating that those rights cannot be ignored. The Park Service should remain true to its word that "the spirit of the regulation is not that these activities can't take place, it's that these activities take place under the purview of a permit or a written agreement or a contract with the National Park Service," where the regulations indicate a permit is required. (I Trial Transcript, dated February 17, 1999, at 32:12–16 (testimony of Denis Galvin, Deputy Director, NPS).)

### The Park Service, Garfield County & Correlative Rights

In this setting, the United States thus wears two hats: one as the proprietor of an estate in land servient to Garfield County's right-of-way, the other as a governmental instrumentality invested with the power to make rules and regulations concerning that same property.[66] Garfield County wears two hats as well: as owner of a right-of-way traversing federal lands

529, 540, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976) (citations omitted).

and as a governmental instrumentality charged with the duty and power to maintain public highways within its limits.

Given these diverse and overlapping roles, *who,* finally, gets to say?

*Hodel* acknowledges both the County's vested interest in its R.S. § 2477 right-of-way, and the duty imposed by Congress upon federal agencies—the BLM in that case—to take action to protect the public lands, particularly where those lands have been set aside by Congress for a particular public purpose—in that case Wilderness Study Areas (WSAs). *Hodel* strikes a balance, albeit an uneasy one, between the rights and powers of one governmental unit and the authority and duty of another.

Garfield County and the State of Utah would tip that balance in favor of County initiative, arguing that within the scope of the County's right-of-way—the scope defined by the County itself—the County remains free to construct such improvement as it sees fit, without prior consultation with anyone. The State's theory of exclusive control and bright-line jurisdictional boundaries pays little mind to the teachings of *Hodel,* or to the real-life overlap of power, right and duty at the interface of traveled path and protected land.

 Congress did not grant Garfield County title to the Burr Trail in fee simple absolute. By its express terms, R.S. § 2477 grants a *right-of-way,* a species of easement across the public lands of the United States. *Hodel,* 848 F.2d at 1083. Where rights-of-way and easements are concerned, one party cannot serve as the sole judge of scope and extent, or as the sole arbiter of what is "reasonable and necessary."

> Rights-of-way are a species of easements and are subject to the principles that govern the scope of easements. *See* J. Cribbett, *Principles of the Law of Property* at 273–74 (1962). Utah adheres to the rule that the owners of the dominant and servient estates "must exercise [their] rights so as not unreason-

ably to interfere with the other." *Big Cottonwood Tanner Ditch Co. v. Moyle,* 109 Utah 213, 174 P.2d 148, 158 (1946). *See Nielson v. Sandberg,* 105 Utah 93, 141 P.2d 696, 701 (1943) (an easement is limited to the original use for which it was acquired).

*Hodel,* 848 F.2d at 1083. Even between private landowners, a grant of an easement or right-of-way does not paint a bright line dividing the dominant and servient estates; both must co-exist, with duties owed on the part of each owner to the other:

> Whenever there is ownership of property subject to an easement, there is a dichotomy of interests, both of which must be respected, and which must be kept, as nearly as possible, in balance. The right of an owner of an easement and the right of the owner of the servient estate are not absolute, but are so limited each by the other, that there may be a reasonable enjoyment of both; their rights are correlative.

28A C.J.S. *Easements* § 143, at 344 (1996) (footnotes omitted). The fact that in this case the "dichotomy of interests" redoubles because each landowner is also a governmental entity in no way lessens the need for of balance and reasonableness as between the two. Where two parties exercise correlative rights, the right of one cannot be measured without reference to the right of the other, using the rule of reason as the yardstick.

 The holder of a right-of-way, private or public, "cannot lawfully take dominant possession and deal with the land upon which the easement exists as if he were the owner of the land," because he is not the owner of the land:

> Easements do not carry any title to the land over which the easement is exercised, and work no dispossession of the owner. Since the interest itself is nonpossessory, the holder of the easement does not have the degree of control over the burdened property that is en-

joyed by the owner of the servient estate; complete dominion is inconsistent with a claim of easement.

28A C.J.S. *Easements* § 144, at 347 (footnotes omitted). At the same time, the owner of the servient estate must abstain from acts that impermissibly interfere or are inconsistent with the proper use or enjoyment of the easement. *Id.* § 143, at 344. And "ordinarily ... · no material changes can be made by either party without the other's consent ...." *Id.* § 173, at 391.

The Utah Legislature recognized these principles when in 1993 it enacted the Rights–of–Way Across Federal Lands Act, which mandates that "[t]he holder of an R.S. 2477 right-of-way and the owner of the servient estate *shall exercise their rights without unreasonably interfering with one another.*" Utah Code Ann. § 72–5–303 (Supp.2000) (emphasis added).[67] Utah law thus does not depart from traditional principles governing easements in dealing with R.S. § 2477 rights-of-way; to the contrary, Utah law expressly reaffirms them.

Congress clearly intended these parties to talk to each other, and to adjust and even expand the County's right-of-way interests so long as park lands, resources, and values will not suffer significant adverse effects. Besides empowering the Park Service to protect Park lands, resources, and values, § 5 of the Act creating the Park provides that "[t]he Secretary shall grant easements and rights-of-way on a non-discriminatory basis upon, over, un-

der, across, or along any component of the park area unless he finds that the route of such easements and rights-of-way would have significant adverse effects on the administration of the park." 16 U.S.C.A. § 273d(b) (1992). The parties can thus bypass interminable debate about the scope of the existing right-of-way by working together to create additional rights-of-way with width as needed to accomplish useful projects.

At the intersection of power, right, and duty, then, the law comprehends that one entity may not act upon its rights without regard for the other. Each must acknowledge the need for reasonable accommodation of the other's duties, powers and purposes. And each has been given the tools needed to cooperate with the other in a productive fashion. To the extent that Garfield County or the State of Utah suggest otherwise, this court remains unpersuaded.[68]

Who gets to say?

██ *Hodel* instructs that "the initial determination of whether the activity falls within an established right of way is to be made by" the federal land management agency having authority over the lands in question. 848 F.2d at 1085. For the agency to be able to make that determination, Garfield County needs to communicate its plans to the Park Service in a meaningful fashion, and in turn, the Park Service has a duty to evaluate those plans and make the initial determination contem-

---

**67.** Citation to this section of the Utah statute was noticeably absent from both the County and State briefs.

**68.** Indeed, Garfield County and the State of Utah argue a status for this right-of-way that may correspond to another type of congressional land grant—what Congress these days calls a *road corridor.* For example, besides imposing a temporary moratorium on rulemaking, as discussed above, § 349 of the 1995 Highway System Designation Act also granted to the State of Virginia a series of 19 "road corridors" crossing the lands of the

Shenandoah National Park, located in that state. Pub.L. No. 104–59, § 349(b), 109 Stat. 618 (1995). The road corridors consisted of "county roads," together with "land contiguous to the road ... such that the width of the corridor is 50 feet." *Id.* Rather than a right-of-way, the 1995 Act directed the transfer "without consideration or reimbursement, [of] *all right, title, and interest* of the United States in and to each county road corridor," in order "to permit the State of Virginia to maintain and provide for the safe public use" of the reconveyed roads. *Id.*

plated by *Hodel* in a timely and expeditious manner.[69]

If the County disagrees with the agency's decision, it may appeal or seek judicial review—as Garfield County did with the BLM portion of the 1995 FONSI. The court may then review the agency's initial determination in accordance with the provisions of the Administrative Procedure Act, 5 U.S.C.A. § 706 (1996), as was done in *Hodel*.

### NEPA & Road Construction on the Capitol Reef Segment

*Hodel* also suggests that both the County and the Park Service must be cognizant of the additional requirements for study and evaluation imposed by Congress in NEPA.

Here, as in *Hodel*, the threshold question bearing upon the applicability of NEPA to road construction on the Capitol Reef segment is whether the Park Service "either has exercised control over the County's major road improvement project or has the authority and duty to do so." 848 F.2d at 1090. This court concluded in a preceding section that the Park Service does indeed exercise some measure of regulatory authority over the construction and improvement of the road within Garfield County's R.S. § 2477 right-of-way. And, like the BLM, the Park Service remains bound by the study requirements of NEPA. *See* 42 U.S.C.A. § 4332 (1994); 40 C.F.R. Parts 1500–1508 (1999).

Beyond evaluating the environmental impact of proposed construction work, where that work would impair the value of the scenery and natural objects of the park, or would otherwise be conducted in derogation of park values, the Park Service has the responsibility to formulate less burdensome alternatives.[70]

Where county plans and federal purposes collide, as happened here on the easternmost one-mile section of the Capitol Reef segment, the key to resolution of the conflict in the first instance would appear to be the formulation of *viable alternatives* to the disputed work, if such alternatives may be found to exist. Where a proposed improvement is inconsistent with the management plan for the surrounding federal lands, logically it must first be established that no other viable alternative exists which will achieve the County's goals without significantly impairing federal purposes, before the work could proceed.[71]

---

69. Counsel for the County emphasized this:

 MR. THOMPSON: ... The agency must recognize a reasonable ability to complete a safe 2 lane all weather road within the highway right-of-way. The agency must respond within a reasonable time and a reasonable manner by showing where a given proposal proceeds is undue and unnecessary and where the work would have a significant adverse impact on the park considering appropriate standards, the true nature of the road and the scope of the right-of-way.

 (VIII Trial Transcript, dated February 25, 1999, at 56:21–57:3 (argument by Mr. Thompson).)

70. *Hodel* explained that "[w]hen dealing with defining boundaries of public lands or existing rights-of-way, BLM has no power to designate alternatives or deny nonfederal actors a course of action. The same is true as to improvements on R.S. 2477 rights-of-way that do not affect WSAs *or implicate other federal duties containing some measure of discretion.*" 848 F.2d at 1090 (emphasis added). Here, by contrast, the County's construction work on the Capitol Reef segment implicates Park Service duties "containing some measure of discretion" to protect and conserve park resources and park values.

71. *See, e.g.,* Harry R. Bader, *Potential Legal Standards for Resolving the R.S. 2477 Right of Way Crisis,* 11 Pace Envtl. L.Rev. 485, 510–11 (1994):

 [T]he development or improvement of an R.S. 2477 right of way, *if inconsistent with the surrounding federal lands management,* must be necessary for the ability of the state to achieve its compelling objectives. Mere efficacy is insufficient to justify such action. *It must be demonstrated that there is no other viable alternative available which will achieve the desired results.* This criterion ... is essential if the federal government is to protect itself from ulterior motives other than the stated reasons for the right of way improvement.... [Emphasis added.]

Where a federal agency has the power to protect public lands, *Hodel* recognized that agency's power—and duty—to formulate viable alternatives, and if needs be, "the responsibility to impose an alternative it deems less degrading upon the nonfederal actor." 848 F.2d at 1090–91.[72]

As in *Hodel*,[73] permitting road construction work to proceed prior to any required environmental assessment frustrates NEPA policy because the agency does not have the opportunity to determine if a significant impact on the environment exists, *see* 40 C.F.R. § 1501.4, and if so, to consider the adverse environmental effects which cannot be avoided should the proposed action go forward, and to consider alternatives to the proposed action—as Congress has mandated in NEPA. 42 U.S.C.A. § 4332(C). "Agencies are to perform this hard look *before* committing themselves irretrievably to a given course of action, *so that the action can be shaped to account for environmental values.*" *Hodel*, 848 F.2d at 1093 (emphasis added). Action of an irreversible nature, taken before an assessment has been prepared, frustrates the agency's ability to carry out the duties and responsibilities assigned to it by Congress.

Congress did not impose these duties and responsibilities without reason or purpose.

Often there is great virtue in simply taking the time to *think.* And thinking about viable alternatives may lead to a workable resolution of a conflict on the road more readily than thinking about things like litigation.[74]

In the past, the Park Service has addressed construction alternatives when dealing with the proposed improvement of the Capitol Reef segment, including for example, the possible rerouting of a mile-long portion of the road along a new path to bypass existing problems of erosion and washouts by water along the existing roadway. (*See* U.S. Exh. 13, "Finding of No Significant Impact," dated December 2, 1985, at 2 ("The 6,000 foot-long section in the creek bed on the east side of Capitol Reef National Park would be rerouted to

**72.** The Tenth Circuit traces this duty to § 603(c) of FLPMA, 43 U.S.C.A. § 1782(c), requiring the BLM to "take any action required to prevent unnecessary or undue degradation of" wilderness study areas, and the agency's interpretation setting the standard that " 'all projects must employ the latest available technology and the least degrading alternatives,' " 848 F.2d at 1086 (quoting *Hodel*, 675 F.Supp. at 610). While § 603(c) has no direct application here, the court concludes that the national park statutes discussed above impose an analogous duty upon the Park Service, with a corresponding duty and responsibility to consider, formulate, and—if necessary—impose viable alternatives to proposed R.S. § 2477 right-of-way construction that would impair or derogate park lands, resources, or values. At the very least, the Park Service need not authorize such work unless no viable alternative may be found. *See* Bader, 11 Pace Envtl. L.Rev. at 510–11.

Special Counsel for the County has expressed a similar view:

Under *Sierra Club v. Hodel*, BLM's NEPA analysis, insofar as it may impact actions by the holder of an R.S. 2477 right-of-way, must focus on whether any unnecessary or undue impacts would occur. In other words, the analysis must address whether or not the project, as planned, would fail to use the best reasonably available technology under the circumstances. Although the issue has not yet been litigated, *a similar principle should apply in the exercise of regulatory power by other administrative agencies.*

Barbara Hjelle, *Ten Essential Points Concerning R.S. 2477 Rights–of–Way*, 14 J. Energy, Nat. Resources & Envtl. L. 301 (1994) (emphasis added).

**73.** "[P]ermitting construction to proceed before the NEPA studies have been completed would defeat the purpose of undertaking the studies, whose purpose is to make the agency aware of relevant environmental considerations before acting." 848 F.2d at 1097.

**74.** By the time *Hodel* came to court, for example, both county and agency had reached general agreement as to the proposed work within the existing right-of-way, supplemented by court-mandated consideration of alternatives to the original proposal that would reroute one part of the roadway along a new path. 675 F.Supp. at 606, 611.

the adjacent bench so that it becomes all-weather.").)[75] The court also notes that February 13, 1996 did not mark the beginning of work on the road. The County's program of maintenance and improvements to the Capitol Reef segment actually began the preceding November, with the work progressing largely on the basis of communication, mutual accommodation and agreement, at least up to the point of the discussions in early February concerning the eastern one-mile section.

Even the 1995 FONSI—from which Garfield County prosecuted no appeal prior to this lawsuit—did not purport to absolutely preclude the improvement of the eastern one-mile section. To the contrary, it expressly contemplated improvements, including "graveling the road from the Post to the eastern park boundary," widening the road "to a subgrade width of 22–24 feet in order to retain a 20 foot running surface"—the AASHTO minimum width—as well as placement of culverts to improve stream crossings. (U.S. Exh. 30, "Finding of No Significant Impact," dated February 9, 1995, at 2.) What the FONSI required was that "at minimum an environmental assessment will be prepared prior to construction approval of these activities," or any others, presumably, that the County might propose, "in order to evaluate the most appropriate solutions to these design and engineering solutions in this environment." (*Id.*)

Moreover, the Park Service is not the only entity in this case charged with the duty to assess environmental impact. The Utah Legislature has imposed an affirmative duty upon the County as a holder of an R.S. § 2477 right-of-way to "design and conduct construction and maintenance activities *so as to minimize impacts on adjacent federal public lands*, consistent with applicable safety standards." Utah Code Ann. § 72–5–303(3) (Supp.2000) (emphasis added).[76] Study of environmental impact under NEPA thus also bears upon the County's own affirmative statutory duty to "minimize impacts" on federal lands traversed by its right-of-way, as would the formulation of viable alternatives that would have less impact on the lands than specific proposed work.

As holder of the right-of-way, Garfield County would be the proper party to maintain the road along its right-of-way and to undertake any improvements which prove reasonable and necessary to ensure safe travel over the road. However, where the work involves "construction" rather than "maintenance," and the traveled path is widened, realigned, or even resurfaced, the County must advise the relevant federal land management agency of that work in advance, affording the agency a fair opportunity to carry out its own duties to study, and if necessary, to formulate alternatives that serve to protect the lands while allowing for the improvement of the County's road.[77] The County's participation in the NEPA process will also serve to ensure that the County complies with its own legislative mandate to minimize the impact its work will have on the Park lands.

75. Apparently this proposal originated with Carl Skyrman. (*See* VI Trial Transcript, dated February 23, 1999, at 101:8–102:7 (testimony of Carl Skyrman).)

76. Citation to this provision was also absent from both the County and State briefs.

77. Study and preparation of an environmental assessment need not be either unduly burdensome or interminable. For example, following *Hodel*, the Final Environmental Assessment and FONSI on BLM "Segment 1" of the Boulder–to–Bullfrog Road was issued in March of 1989, in which the BLM District Manager announced, "It is my decision to allow Garfield County to proceed with its proposed improvements to those portions of the Burr Trail Road located on public lands within the Cedar City District .... All construction activities shall be subject to the County's design standards and the appropriate mitigating measures contained in the attached environmental assessment (EA)." (U.S. Exh. Tab. 19, at 1.) Following and administrative appeal, the Tenth Circuit two years later sustained that FONSI against a challenge by the Sierra Club. *Sierra Club v. Lujan*, 949 F.2d 362, 369 (10th Cir.1991).

## "Construction" vs. "Maintenance"

■ Garfield County questions the applicability of 36 C.F.R. § 5.7 to work done by a county government on its right-of-way, noting that § 5.7 is grouped in 36 C.F.R. Part 5 with other regulations governing "Commercial and Private Operations." Indeed, Part 5 of Title 36, C.F.R., is so titled. The Park Service, on the other hand, would apply the regulation "any time somebody wants to construct within a national park." (I Trial Transcript, dated February 16, 1999, at 35:7–8 (testimony of Denis Galvin, Park Service Deputy Director).)

The court has found no authority in this Circuit directly addressing the application of 36 C.F.R. § 5.7 to county road improvements along an R.S. § 2477 right-of-way. In *United States v. King*, 581 F.2d 800 (10th Cir.1978), the Tenth Circuit construed 36 C.F.R. § 5.7 to apply to bulldozing for the purpose of clearing obstructions from a road (the Old Creek Trail within Capitol Reef National Park), but that incident involved a rancher and his contractor rather than a state or county work crew. *Id.* at 801.[78]

36 C.F.R. § 5.7 originated in 1941 as part of a regulation affecting "Private operations," but over the years has been

rewritten,[79] together with the rest of the Park Service's general regulations.

The current version of the rule was issued in 1966 as part of a major revision and recodification of the general Park Service regulations, intended to "clarify and bring up to date" the regulations applicable to Park Service lands and "bring them into conformity with the basic policies of the Department of the Interior relating to administration and preservation of natural resources in areas of the National Park System." 31 Fed.Reg. 12750 (Sept. 29, 1966) (proposed rules). 36 C.F.R. § 5.7 reads:

> *Constructing or attempting to construct a building or other structure, boat dock, road, trail, path, or other way, telephone line, telegraph line, power line, or any other private or public utility, upon, across, over, through or under any park areas, except in accordance with the provisions of a valid permit, contract, or other written agreement with the United States, is prohibited.*

31 Fed.Reg. 16650, 16660 (Dec. 29, 1966), *codified at* 36 C.F.R. § 5.7 (2000). Section 5.7 consolidated several prior regulations, and broadened the language of the prior rule.

---

**78.** *United States v. Martin*, 140 F.Supp. 42 (M.D.N.C.1956), applied a predecessor version of the regulation (36 C.F.R. § 1.31(d) (1949)) to construction of a road by private landowners adjoining the Guilford Battleground National Park. "Congress vested in the Secretary of the Interior the control, maintenance and authority over National Parks, Park roads and approach roads to National Parks and National Monuments," enabling it to require permits before construction of connecting roads by adjoining landowners. *Id.* at 45–46.

**79.** In 1941, Interior Secretary Harold L. Ickes issued a series of regulations for the Park Service, including:
(d) No person, firm, or corporation shall construct or attempt to construct a road, trail, path, or other way, over, across, or upon any parkway lands without a license or permit from the Secretary or the Director.

6 Fed.Reg. 1626, 1630 (March 26, 1941), *codified at* 36 C.F.R. § 2.31(d). The regulation was amended and renumbered in 1948, but still grouped under "Private operations:"
(d) No person, firm, or corporation shall construct or attempt to construct, a road, trail, path, or other way, over, across, or upon any Federally owned land within any park or monument without a revocable permit from the Director, or when authorized by the Director, any Regional Director.
13 Fed.Reg. 8654 (Dec. 29, 1948), *codified at* 36 C.F.R. § 1 .31(d) (1949). That section was again amended in 1953, authorizing such permits to be issued "by an authorized officer or employee of the National Park Service," and allowing applications for permits to be "addressed to the superintendent of the area involved." 18 Fed.Reg. 6775 (Oct. 27, 1953), *codified at* 36 C.F.R. § 1.31(4) (1960).

During the Reagan administration, Interior revisited the general regulations, and in an effort to "stress consistency, clarity and increased public involvement in Service management procedures," amended the rules to include an expanded set of definitions, including *"Person,"* which means "an individual, firm, corporation, society, association, partnership, or private or *public body.*" 48 Fed.Reg. 30252, 30275 (June 30, 1983), *codified at* 36 C.F.R. § 1.4 (emphasis added) [80] A 1986 revision applied the general regulations, including Part 5 and § 5.7, to "all persons"—including "public bodies"—"entering, using, visiting, or otherwise within ... the boundaries of federally owned lands" administered by the Park Service. 36 C.F.R. § 1.2(a)(1) (2000), and over other lands in which the United States "holds a less-than-fee interest" at least "to the extent necessary to fulfill the purpose" of the Park Service's interest and "compatible with the non-federal interest." 36 C.F.R. § 1.2(a)(5).

The United States relies on the current language of the regulation and the Park Service's interpretation applying that language to road "construction" by Garfield County along the Capitol Reef segment of the Boulder–to–Bullfrog Road, as does the NPCA. Absent a showing that the agency's interpretation is arbitrary and capricious, NPCA argues, this court should defer to the Park Service's reading of its own rule.

Though the Park Service general regulations make no explicit reference to activities of state and local governments that touch upon park lands, these general regulations have been held to apply to action by state government, including any relevant permit requirements.[81] *See, e.g., United States v. Moore,* 640 F.Supp. 164, 166–68 (S.D.W.Va.1986) (state must have permit to conduct mosquito abatement activities on park waters). The language of § 5.7 is expansive, and appears to embrace all construction activities occurring on park lands, without limitation as to *whose* construction it is. No exemption for state or local government activity is carved out of the general regulations; to the contrary, they extend to all "persons," including a "public body." 36 C.F.R. §§ 1.2(a), 1.4.

At this point, the court is satisfied that "construction" is "construction," even when performed by a Garfield County work crew, and comes within the ambit of 36 C.F.R. § 5.7 when performed within the boundaries of the Park. The Park Service's reading of that rule does not appear "arbitrary," "capricious," or even "plainly erroneous."[82] The court is not inclined to engraft an exception to the regulation in favor of local governments—"public bodies" within the scope of the regulations—or even R.S. § 2477 claimants asserting "valid existing rights,"[83] where none otherwise exists.

---

80. In proposing the 1982 revisions, the Interior Department explained: "The proposed revisions will help the National Park Service provide improved visitor safety and resource protection. Enactment of the revised regulations will eliminate many requirements which are ineffective or out-of-date, and apply new rules which reflect current public use and resource management needs." 47 Fed.Reg. 11598 (Mar. 17, 1982)(proposed rules).

81. *"Permit* means a written authorization to engage in uses or activities that are otherwise prohibited, restricted, or regulated." 36 C.F.R. § 1.4.

82. The State of Utah queries whether the Park Service's application of 36 C.F.R. § 5.7 may be set aside as " 'arbitrary, capricious, or not in accordance with law,' [5 U.S.C.

§ 706(2)(A) ], as being 'without observance of procedure required by law,' [5 U.S.C. § 706(2)(D) ], or 'contrary to constitutional right, power, privilege, or immunity,' (5 U.S.C. § 706)." (Pretrial Order at 25–26 ¶¶ 8, 10.) The answer is "no." Nor for that matter is it "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C.A. § 706(2)(C) (1996).

83. Even if a valid R.S. § 2477 right-of-way represents land in which "the United States holds a less-than-fee interest," 36 C.F.R. § 1.2(a)(5), the court is also satisfied that "construction" as defined herein effectively limits the exercise of Park Service authority to that which is "necessary to fulfill the purpose" of the Park and that which is "compatible with the non-federal interest." *Id.*

Where road work on the Capitol Reef segment is concerned, the law thus empowers Park Service to speak and to act when the work constitutes "construction" within the meaning of 36 C.F.R. § 5.7, and beyond that, whenever the work—however characterized—would so impact park lands, resources, or values that it triggers the Park Service's duty to study under NEPA. At either point, the work becomes relevant to the Park Service's statutory duty to administer, conserve and regulate the use of Park lands so as to protect against impairment or derogation of Park resources and values.

Not everything that the County may want to do on the road is "construction" or environmentally "significant." The United States agrees that Garfield County may engage in "maintenance" of the existing road along its right-of-way without Park Service construction approval or further NEPA study—at least so long as the "maintenance" work comports with the terms of the 1995 FONSI, and its contemplated 20–foot traveled path. And the existing road, the United States submits, already exceeds that 20–foot minimum in many areas of the Capitol Reef segment.

Of course, because the United States asserts that 36 C.F.R. § 5.7 was violated, the question now before this court is whether the work performed by Garfield County on February 13, 1996, was of the more significant nature—"construction"—or whether the work was routine "maintenance" of such little actual consequence that no action, participation, or acquiescence by the Park Service was required or warranted. The United States and the NPCA argue that changing the horizontal

and vertical alignment of the road, removing and relocating substantial amounts of earth, and widening the road constituted "construction" requiring Park Service approval, and within the eastern one-mile portion was so significant as to require an environmental assessment as indicated by the 1995 FONSI. (U.S. Brief at 14–18, 19–21; NPCA Brief at 9–10.)

Garfield County insists that the work done that day was not "construction" within the meaning of 36 C.F.R. § 5.7, (see County Brief at 32–35), and both the County and the State of Utah insist that the work did not adversely impact park lands, park resources, or derogate park values. (See id. at 35–37; State Brief at 16–18.)

The parties look in differing directions in searching for the meanings of the words.

The United States asserts that the Park Service has defined construction to include "widening, realigning, significant movement of earth, and installation of new drainage structures." (U.S. Brief at 10.) Pointing to similar definitions in 23 U.S.C. § 101(3),[84] AASHTO guidelines, and the Utah Code, the United States insists that "[w]idening and realigning a roadway, significant earth movement, and installation of new drainage structures all fall under this definition." (U.S. Brief at 13.) The United States also points to a Garfield County resolution that tracks the definition found in a Utah statute, and defines "construction" as:

> any physical act of readying a highway for use by the public according to the available or intended mode of transportation, including foot, horse, vehicle,

---

84. 23 U.S.C.A. § 101(3) (Supp.2000) defines "construction" to mean "the supervising, inspecting, actual building, and incurrence of all costs incidental to the construction or reconstruction of a highway," including:

> (A) locating, surveying, and mapping . . . ;
> (B) resurfacing, restoration, and rehabilitation;
> (C) acquisition of rights-of-way;
> (D) relocation assistance, . . . ;

> (E) elimination of hazards of railway grade crossings;
> (F) elimination of roadside obstacles;
> (G) improvements that directly facilitate and control traffic flow, such as . . . widening of lanes, channelization of traffic, . . . ; and
> (H) capital improvements that directly facilitate an effective vehicle weight enforcement program . . . .

pipeline, or other mode. "Construction" includes:

 A. Removing vegetation;

 B. Moving obstructions, including rocks, boulders, and outcroppings;

 C. Filling low spots;

 D. Maintenance over several years;

 E. Creation of an identifiable route by use over time; and

 F. Other similar activities.

(*Id.* at 13–14) (quoting Utah Code Ann. § 72–5–301(2) (Supp.1999) & U.S. Exh. 57, Garfield County Resolution 94–4, at 144). That same Utah statute, entitled the "Rights–of–Way Across Federal Lands Act," defines "maintenance" as "any physical act of upkeep of a highway or repair of wear and damage whether from natural or other causes." Utah Code Ann. § 72–5–301(4) (Supp.2000).[85]

The United States also relies on AASHTO documentation for its definition of "construction" of a road, pointing to the *AASHTO Maintenance Manual* (U.S. Exh. 79 (1976)), which begins by distinguishing "construction," "reconstruction," and "betterment" from "maintenance." In introducing a cross-table of comparisons, the *Manual* advises that " 'Construction and Reconstruction' and 'Betterments' as shown on the attached chart (Figure 1) are not part of maintenance unless exceptions are noted." (*Id.* at 3.) Figure 1 of the *Manual*, quoted by the United States, makes comparisons in several categories of work.

Concerning alignment changes, "Minor changes in alignment and profile, as easing horiz. curves or eliminating irregularities in profile," are classified as "betterments," not maintenance; so is "Regrading or re-surfacing ... to improve sight distance ...." (*Id.* at 6.) For alignment changes deemed to be "maintenance," the *Manual* lists "None." "Widening the roadbed" is listed as a betterment, as is "Widening with no change in the number of lanes." According to the *Manual*, "Building flood control, flood prevention, and earthwork protective structures" constitutes "construction," while "Installation of additional pipe culverts or additional structures with spans not greater than 20 [feet]" qualifies as a betterment. (*Id.* at 4.) "Maintenance," on the other hand, includes "Replacement of ... culverts" and "Cleaning and repairing culverts." (*Id.* at 5.) [86]

"Widening the road" beyond what is was in 1969, or 1976, or January of 1996, and certainly "changing the alignment, increasing the ... number of drainage structures, surfacing an unsurfaced road, all of those are construction" within the meaning of 36 C.F.R. § 5.7, at least in the eyes of the Park Service. (I Trial Transcript, dated February 16, 1999, at 73:5–8) (testimony of Denis Galvin). "Construction" involves "things like additions, expansions ... expansion of the footprint of a building or something like that ...." (*Id.* at 60:12–16.)

Starting with a dictionary definition of "construction" as "[t]he creation of something new, as distinguished from the repair or improvement of something already existing,"[87] Garfield County argues that none of the work performed on February 13, 1996 was "construction," but was better characterized as "maintenance." (County

---

**85.** This statute was originally enacted in 1993 and codified at Utah Code Ann. § 27–16–102, *see* 1993 Utah Laws ch. 6, § 2 (2d Special Sess.), and was renumbered in 1998 as § 72–5–301. 1998 Utah Laws ch. 270, § 147.

**86.** Beating a hasty retreat from this set of AASHTO standards, the County responds that the Park Service's reliance is "misplaced" because "the AASHTO maintenance manual ... has not been adopted in Utah." (County Brief at 33–34 & n. 27.)

**87.** (County Brief at 32 (quoting *Black's Law Dictionary* 312 (6th ed.1990)).) The most recent edition of *Black's Law Dictionary* speaks of "[t]he act of building by combining or arranging parts or elements," *Black's Law Dictionary* 308 (7th ed. Bryan A. Garner, ed.1999), a definition similar to that found in *Webster's New World College Dictionary* 313 (4th ed.1997): to "construct" is "to build, form, or devise by fitting parts or elements together systematically."

Brief at 32.) As the County defines the term, it appears doubtful that "construction" work could ever take place within the existing roadway; where the road already exists, nothing "new" is being created.

To the Park Service, "maintenance" of a roadway "simply attempts to protect the value of an asset as built," which for a dirt road include "maintaining the shape of the road, grading it, making sure that the shape of the road permits drainage ... keeping drainage ditches open, ... free of obstructions, culverts, bridges, etc...."(I Trial Transcript, dated February 16, 1999, at 36:2–3, 38:16–21 (testimony of Denis Galvin).) "Maintenance" preserves what already exists against deterioration through normal wear and tear, erosion by wind and water, or the intrusion of obstacles, such as rocks. (*See* II Trial Transcript, dated February 17, 1999, at 27:4–37:15 (testimony of Charles Lundy).) *See also* 23 U.S.C.A. § 101(14) (Supp.2000) ("The term 'maintenance' means the preservation of the entire highway, including surface, shoulders, roadsides, structures, and such traffic control devices as are necessary for safe and efficient utilization of the highway.").

To the County, "maintenance" includes " 'horizontal and vertical alignment changes necessary to being an existing road in compliance with current safety standards,' " as well as " 'any physical act of upkeep of a highway or repair of wear or damage whether from natural or other causes.' " (County Brief at 33 (quoting Utah Code Ann. §§ 72–6–109 and 72–5–301(4)).)

For the NPCA, finely drawn distinctions between construction and maintenance seem meaningless because 36 C.F.R. § 5.7 extends to "any road work activities that have the potential for impairment of the values which the regulation is intended to protect." (NPCA Brief at 12 (citing 36 C.F.R. § 1.1 (1999) (regulations will be utilized "to fulfill the statutory purposes of units of the National Park System: to conserve scenery, natural and historic ob-jects, and wildlife, and to provide for the enjoyment of those resources in a manner that will leave them unimpaired for the enjoyment of future generations")).) NPCA insists that the Park Service's interpretation of its own regulations should be given "controlling weight" unless it is plainly erroneous, and that here, the Park Service's reading of 36 C.F.R. § 5.7, particularly in light of the FONSI, is not plainly erroneous in reaching the conclusion that the work performed on February 13th fell within the scope of the regulation. (*Id.* at 11–14 (citing *Rocky Mountain Radar v. Federal Comm. Com'n,* 158 F.3d 1118, 1123 (10th Cir.1998)).)

At closing argument, the court inquired of counsel as to what road work could be performed on the Capitol Reef segment without prior approval by the Park Service, *i.e.,* what might constitute "maintenance" rather than "construction." Counsel for the United States listed a series of items:

THE COURT: ... why don't you tell me your view as to what Garfield County could do without asking permission?

MS. MILLER: ... Basically what Garfield County can do on that road, it's the same thing that a regular maintenance crew in the park can do on roads within a park. They can maintain the status quo.

\* \* \* \* \* \*

THE COURT: Well can they take a scraper out?

MS. MILLER: They can take a grader out.... And they can grade the road, they can crown the road. If they need materials they can't take new material from—

THE COURT: Can they put in a culvert to maintain the surface?

MS. MILLER: If there's already a culvert there they can clean out the culvert.

\* \* \* \* \* \*

... They can groom and grade the previously constructed road surface; they can maintain the crown with materials from the existing roadway; they can fill ruts; they can spot fill with the same materials; they can level or smooth washboards; they can clear the roadway of obstructing debris; they can clean culverts including the head basins and outlets; they can resurface with the same material; they can maintain, repair and replace riprap where necessary to protect the existing surface from erosion; they can maintain the drainage; they can maintain and repair washes in gullies; they can maintain, repair and replace guard rails ... [and] marker posts; they can maintain and repair wash crossings; they can maintain, repair and replace cattle guards ... [and] road signs and they can do routine repair and stabilization of failed fill slopes.

THE COURT: Now would that include putting some kind of an aggregate on the bentonite sections down there where the clay is, where if it rains it gets slick?

MS. MILLER: It would not includ[e] putting aggregates there because it would be new surface material ....

(VIII Trial Transcript, dated February 25, 1999, at 23:10–26:8.)[88] Counsel for Garfield County also responded to the same query:

THE COURT: ... what do you think the county can do without asking permission?

MR. THOMPSON: Well I certainly think they can do everything on February 13th without asking for permission, ... I think they can put in culverts, I

think they can put in gravel as long as it stays in the disturbed area.

I don't think they can knock down beyond those pegs that were set on .05, I think they come to the disturbed area, I think if they extend beyond that then they have to go consult with the resource agency.

I do not think they have to consult with them if they stay within that, from the top of that cut slope to the bottom of the fillslope on the other side of .05, I think that's their discretion ....

\* \* \* \* \* \*

But I think ... if they are doing maintenance work or construction, I don't suppose it really matters which, and it's within the disturbed area then they don't have to go consult with either the private property owner or the adjoining landowner if it's the Federal Government.

To the extent they start moving or they move at all into previously undisturbed area then their statutes require them to consult. I think that's a rational basis where the breakpoint is. I think they can put culverts in, I think they can repair drainage items. I think if they need to put gravel on sections of road they have the right to do that.

(*Id.* at 61:3–62:15.)

The United States thus distinguishes work that requires approval from work that does not by looking at *what* the nature of the work will be; the County, in contrast, looks to *where* the work will be performed to determine whether approval is required.[89]

---

**88.** Curiously, Garfield County asserts that "this case has been forced into litigation" because "it is impossible to clean culverts, maintain rip rap, maintain drainage, repair washes and gullies and repair and stabilize cut and fill slopes within the existing roadway," as the United States seems to suggest. (County Brief at 34–35.) Yet none of the conduct about which the United States now complains in this case involves cleaning culverts, or the other "maintenance" tasks listed.

Those tasks seemed to have been accomplished by the County in the first 7.4 miles of the Capitol Reef segment with the approval, or at least the acquiescence of the Park Service.

**89.** The State of Utah apparently concurs in this approach; arguing that all of the work on February 16, 1996 took place within the County's existing right-of-way, the State does not address 36 C.F.R. § 5.7, or "construc-

Taking into account NEPA's concern for the environmental impact of government action, the nature of the work-*what* will be done-has far more bearing upon the need for agency study or action—or the lack of need—than does the location of the work—*where* it will be done, which in this case will always be somewhere within the boundaries of a national park and within the jurisdictional reach of 36 C.F.R. § 5.7. *What* the work is, and what finally will be done on the ground, has far more importance to measuring the parties' correlative rights. What is "reasonable" between dominant and servient owners must be measured in terms of the work to be performed and the result to be accomplished. *Where*—in this case, along an existing right-of-way inside a national park—simply establishes the factual setting in which to address the question of *what*.[90]

Defined in terms of the nature of the work, "construction" for purposes of 36 C.F.R. § 5.7 includes the widening of the road, the horizontal or vertical realignment of the road, the installation (as distinguished from cleaning, repair, or replacement in kind) of bridges, culverts and other drainage structures, as well as any significant change in the surface composition of the road (*e.g.*, going from dirt to gravel, from gravel to chipseal, from chipseal to asphalt, etc.), or any "improvement," "betterment,"[91] or any other change in the nature of the road that may significantly impact Park lands, resources, or values. "Maintenance" preserves the existing road, including the physical upkeep or repair of wear or damage whether from natural or other causes, maintaining the shape of the road, grading it, making

sure that the shape of the road permits drainage ... keeping drainage features open and operable—essentially preserving the status quo.

This construction comports with the commonly understood meanings of the words, the pertinent statutes, agency interpretations, and the past experience of the parties on the Capitol Reef segment, including the experience leading up to February 13, 1996.

To the extent that a proposed County project goes beyond preserving what is already there, that is, the improvement, betterment, widening or realignment of the road, it constitutes "construction" and triggers the application of 36 C.F.R. § 5.7, may trigger the application of study requirements under NEPA, and signals all parties that the proposed work may be subject to the requirement affirmed in *Hodel* and *Bergland* " 'that the initial determination of whether activity falls within an established right-of-way is to be made by' " the land management agency, in this case the Park Service. 848 F.2d at 1084 (quoting 675 F.Supp. at 606). The significance of the latter signal is at least twofold: (1) if within the existing right-of-way, the County will likely be able to proceed with the proposed work, particularly if no viable alternative exists to accomplish the same purpose; and (2) if the proposed work falls outside the existing right-of-way, the proposal may trigger the Secretary's duty to grant additional rights-of-way, unless doing so would have "significant adverse effects" on Park lands, Park resources, and Park values. 16 U.S.C.A. § 273d(b) (1992).[92]

---

tion" or "maintenance" at all. (State Brief at 15–16.)

**90.** Otherwise, it seems, "construction" becomes "maintenance" simply because it is performed in relation to the existing roadway.

**91.** Even Alex Mansour, defendants' expert, concedes that the County's excavation at the Park's eastern entrance was a "minor betterment." (VII Trial Transcript, dated February

24, 1999, at 44:15, 56:12 (testimony of Alex Mansour).)

**92.** This duty appears unaffected by the provisions of FLPMA which repealed earlier right-of-way statutes affecting "public lands," defined by FLPMA as land "owned by the United States within the several States and administered ... through the Bureau of Land Management ...." 43 U.S.C.A. § 1702(e) (1986). Where the proposed work appears reasonable, it would seem far more effective

Moreover, both the Park Service and the County have affirmative statutory duties to minimize such impacts along the County's existing right-of-way, with the additional directive from the Utah Legislature that the parties involved with an R.S. § 2477 right-of-way "exercise their rights without unreasonably interfering with one another." Utah Code Ann. § 72–5–303(2). At the very least, 36 C.F.R. § 5.7, like § 72–5–303(2), serves as a pointed reminder of the need to consult with each other in carrying out these duties.

## FINDINGS RE: THE UNITED STATES' CLAIMS

■ Based upon the record in this case, and for the reasons set forth above, this court finds that the work performed by employees of Garfield County on the eastern one-mile portion of the Capitol Reef segment of the Boulder–to–Bullfrog Road, particularly in widening and realigning the roadway and in making the cut into the hillside at the park's eastern entrance, constituted "construction of a ... road" within the meaning of 36 C.F.R. § 5.7 (1995 & 2000). The court further finds that the construction was done without a permit or other prior approval by the National Park Service.

■ The court further finds that the proposed widening and horizontal and vertical realignment of the roadway in the one-mile portion, and particularly the bulldozing of part of the hill at .05, implicated the Park Service's duty to protect and preserve Park lands and resources, and triggered the duty of the Park Service to prepare an environmental assessment pursuant to NEPA and applicable regulations. The court further finds that the County's action in performing work on February 13, 1996 effectively precluded the requisite NEPA study and effectively frustrated the Park Service's ability to carry out its duty to formulate alternatives, if necessary, to the proposed action.

The County was on notice of the applicability of NEPA requirements to this particular part of the Capitol Reef segment from and after the issuance of the February 1995 FONSI. The FONSI contemplated the widening and stabilizing of the road surface leading to the eastern boundary of the park, but advised:

> Because of its potential impacts to both the environment and to visitor use and experience, and in order to evaluate the most appropriate alternative solutions to these design and engineering solutions in this environment, *at minimum an environmental assessment will be prepared prior to construction approval of these activities within Capitol Reef National Park.*

(U.S. Exh. 30, at 2 (emphasis added).) Responsible County officials, specifically county engineer Brian Bremner, were reminded of this position by Park Service officials, specifically Robert Cox, immediately prior to February 13, 1996.

■ The scope of Garfield County's R.S. § 2477 right-of-way is defined by what is "reasonable and necessary" to permit safe passage on a two-lane road, not by what may be "desirable," preferable, or even optimal for two-lane highway construction. Between parties having correlative rights, improvements thought to be desirable, preferable, or optimal are the proper subjects for consultation, not unilateral action.

The widening and horizontal realignment of the road at .05 to include the partial bulldozing of the hill was not a County proposal of long standing, which the Park Service had earlier had opportunity to study or otherwise address. The idea was first raised by the County in January 1996, in informal discussions between County and Park Service officials. Park Superintendent Charles Lundy communicated the Park Service's objections to the new proposed work to the County's

to deal with variances through additional right-of-way grants rather than protracted

wrangling over the scope of the existing right-of-way.

special counsel, Barbara Hjelle, who in turn conveyed those objections to the members of the County Commission and to county engineer Brian Bremner on February 12, 1996. The members of the Commission, with the Park Service's position clearly expressed, directed the county's engineer to proceed with the proposed work on February 13, 1996, over the Park Service's known objections.[93]

No written plan, diagrams, or specifications were prepared to define the proposed work. No one testified to any accurate survey work being done in the one-mile segment prior to February 13, 1996; nor were accurate measurements made and stakes placed based upon any set of AASHTO standards. To the contrary, on February 8th, the County placed stakes marking what county engineer Brian Bremner and his crew members believed to be the limits of the "previously disturbed area" adjacent to the existing roadway. (II Trial Transcript, dated February 17, 1999, at 114:10–16 (testimony of Edward Jake Leibenguth) ("We was staking the road there. They were flagging outside of the disturbed area on the road.... [J]ust where it looked like it had been moved before the dirt or something there. I don't really know how to explain it.").) Almost no other stakes, flags or other markers were placed along the eastern one-mile segment to mark the intended boundaries of the work. Mr. Bremner recounts that before the work began on February 13th, he told the workers "that we need to stay definitely within the stakes that I've marked," but does not mention any other limits on the work being prescribed. (U.S. Exh. 49, "Burr Trail Log," dated February 13, 1996, at 1.) He testified that

"A We marked the disturbed area.

Q Which is different from where you were going to do the work?

A *No, no, only in one spot, one limited spot.* We pulled some additional stakes and put those in so that the disturbed area stakes are there and then also the area where we are limiting our work was there also."

(V Trial Transcript, dated February 22, 1999, at 13:11–17 (reading deposition of Brian Bremner) (emphasis added).) According to Bremner, "the way we were limiting the work was by the stakes ...." (VI Trial Transcript, dated February 23, 1999, at 26:18 (testimony of Brian Bremner).)

More than simply the improvement of a one-mile section of road, the work done on February 13, 1996 represented a "field test" of the County's theory that measures the scope of its right-of-way by the limits of whatever "previously disturbed area" may be discernable at the site.[94] Nowhere in this record does the court find a written plan, drafted in advance and drawn to professional highway engineering specifications, that delineates the cut made into the hill at .05 as being *necessary* to construct a two-lane road meeting AASHTO minimum standards or any other mandatory design standards for a road of this kind.

Mr. Leibenguth, the County's bulldozer operator working at .05, cut into the hill at that location up to a point near the stakes marking the "previously disturbed area"—

93. The lessons of *Hodel*, here relied upon by every party to this proceeding, were lost upon those who decided upon and those who directed the construction work done on the eastern one-mile portion of the Capitol Reef segment on February 13, 1996.

94. In his Burr Trail Log, Mr. Bremner recounts his conversation with Robert Cox on site on February 13th, in which Bremner asked Cox

other than those two areas that he had questions about, was there any area that we were outside our disturbed area. He indicated ... that although we had come close—been right up against it, that we had not exceeded the disturbed area anywhere. I followed that up with the statement then that other than being extremely close, there was no place where we were outside. He agreed.

(U.S. Exh. 49, "Burr Trail Log," dated February 13, 1996, at 2.)

not up to a point selected to satisfy minimum AASHTO standards as part of a thoughtfully drawn plan, and marked as such on-site.[95] (*See, e.g.,* U.S. Exh. 62, photos 191, 195, 205.) He did the same at .45, cutting with his bulldozer up to the stakes marking the "disturbed area:"

Q Were you operating of any plans or drawings?

A No.

. . . .

Q And how did you decide when you were finished working here?

A Well there are stakes right here. It doesn't show up very good but I got right back to the stakes that we staked there and that's as far as I got back. When I got to them I was through.

(II Trial Transcript, dated February 17, 1999, at 118:12–21 (testimony of Jake Leibenguth).)[96]

The "previously disturbed area" defined the scope of the work on February 13, 1996.

But the "previously disturbed area" cannot define what is "reasonable and necessary" to construct a two-lane dirt road through rugged country under Utah law, and does not define the scope of Garfield County's R.S. § 2477 right-of-way.

▮ The court finds that Garfield County has failed to establish that the bulldozing of the hill at .05 to accomplish the widening and realignment of the roadway at that point was "reasonable and necessary" to permit two-lane travel on that portion of the road.[97] While several witnesses have opined that the work was "reasonable and necessary"—invoking the magic words—few have offered any thoughtful analysis tying the work on the ground to a pertinent minimum standard, or given any serious thought to viable alternatives, particularly with reference to the Park's eastern entrance. (*See* U.S. Exhs. 67, 69, 1108.) It would certainly "improve the sight distance" to remove the hills in the Park *entirely,* but the court is not so certain that leveling the Park lands, even along an 84– or 100–foot–wide right-of-way, would be "necessary," or even "reasonable" in constructing a two-lane road. The vertical realignment of the road at .9 likewise lacks a compelling rationale establishing it to be "necessary" as distinguished from "preferred" or "desirable," and may have been done to obtain fill material for other work as much as to "improve sight distance."

The Puto–Koreman Report analyzes an alternative to the work done at the eastern entrance, as well as at .45 and .9. (U.S.Exh. 65.) While their alternative—shifting the road alignment southward, away from the hill—requires accepting greater road curvature in exchange for less scarring of the hill slope, the result appears to be safely passable, indicating that the County's excavation in order to

---

95. Concerning the cut into the hill at .05, Bremner wrote: "It should be noted that we were within the disturbed area almost exclusively—the only part that may be in question would be from the 6th to the 7th stake, which is a distance of approx. 11 feet. Any encroachment into the undisturbed area would be less than 2 feet and would have been the result of sloughing material rather than cat work since the cat can't reach that high. . . ." (*Id.* at 3.)

96. Robert Cox, who had discussed the proposed work with Brian Bremner, had expected that the County was "going to go through that area as light as possible:"

Q Did you think they were going to work outside the stakes before you got there?
A I didn't even think they was going to work to the stakes.
(II Trial Transcript, dated February 17, 1999, at 111:18–22 (testimony of Robert Cox).)

97. The court rejects the NPCA's view that the County should be precluded from asserting its right-of-way as an affirmative defense to the United States' trespass claim. While the court has found that the County acted prematurely, the court remains reluctant to declare the County an "outlaw" beyond the law's protection and without opportunity to raise its good-faith defenses.

realign the road in the opposite direction was not "necessary" to make a two-land road wide enough for even cattle trucks to pass safely. The existence of viable alternatives deflates the County's assertion that the particular widening and realignment it chose to construct was "necessary," in the sense of being required to accomplish the purpose of constructing a safer road.

Consequently, the County has failed to establish that the work performed by Mr. Leibenguth and his bulldozer in *making the cuts of the hillsides*, assisted by other County workers and equipment, fell within the existing scope of the County's R.S. § 2477 right-of-way. The County having admitted that it "did not request or receive authorization from the National Park Service for the specific work performed on February 13, 1996," (Pretrial Order, "Uncontroverted Facts," ¶ 55), the Court must find and does find that Garfield County, by and through its employees acting within the scope of their employment and at the direction of a responsible county official, did trespass upon the lands of the United States. This trespass being tortious in nature, the United States is entitled to compensation from the County to redress the injury or loss caused by the County's conduct.

In circumstances such as these, the law expects a reasoned adjustment of correlative rights between two parties having legally protected interests in the same parcel of land. Far from that reasoned adjustment, the widening and realignment of the road—particularly the bulldozing of the hillside at the Park's eastern entrance—signified the naked exercise of power by one party at the expense of the interests of the other party, and that party's opportunity to formulate viable, less intrusive alternatives.

On February 13, 1996, Garfield County tested the limits of its own authority, and in doing so, overstepped its own bounds. For that wrongful conduct, the United States is entitled to relief.

### Injury to Park Values

The County and the State of Utah join in arguing that the work done that day did not significantly harm or compromise Park values, relying, *inter alia*, on the testimony of Carl Skyrman. The State of Utah scoffs at the idea that "one of the many clay hills at the eastern boundary of the Park" was among the "geological features" President Lyndon Johnson had in mind when he extended the boundaries of Capitol Reef National Monument in 1969. (State Brief at 17.) Nothing in the Park's organic documents, the State urges, "requires visitors to risk their lives on a dangerously narrow, dusty, bumpy road before they are privileged to experience the solitude and majestic grandeur of the Park." (*Id.* at 18.)[98] The County points out that the Park's own management plan "doesn't identify improvement of the road . . . as derogative of park values," and also relies on Carl Skyrman's opinion testimony as to significant impact. (County Brief at 36–37; *see* VI Trial Transcript, dated February 23, 1999, at 77:9, 78:21–23, 80:25–81:3 (testimony of Carl Skyrman).)[99]

---

**98.** Traveling the Boulder–to–Bullfrog Road was never intended to be a wilderness experience, since any road and any wilderness are mutually exclusive; yet, a motorist can experience solitude by leaving the automobile's artificial environment of air-conditioning and surround-sound stereo. To walk on the trackless earth, to shade yourself from the intense heat of the summer sun or turn up your collar to winter's icy chill, to hear only the rustle of the wind, to be alone with the grandeur of incredible rock formations, is to experience soul-ex-

panding solitude totally unaffected by the events of February 13, 1996.
(State Brief at 17–18.) Totally unaffected—unless the motorist gazes in from the Park's eastern entrance, looking just beyond the sign. (*See, e.g.,* U.S. Exh. 62, photos 197, 191, 193, 196, 205.)

**99.** On cross-examination, Mr. Skyrman testified as to "significant" impairment:

Q And it's your opinion that park resources were not harmed by the work done on February 13th, 1996, is that correct?

The United States responds that the work done on February 13th damaged three Park resources: "1) the visitor experience; 2) plants; and 3) geologic features." (U.S. Brief at 35.) Relying on the testimony of Bob Reynolds, Charles Lundy, and Elizabeth Koreman, the United States argues that the visitor experience "changed irreparably on February 13," that "[t]he cut in the hillside changed the visitor experience," that "visitors now have a less intimate relationship with their surroundings," and they drive faster, losing "the solid break from a driving experience to a park experience.... The very thing that was special about entering the Park was harmed." (*Id.* at 36.) The cuts into hills at .05 and .45 left jagged scars inimical to the "well patterned landscape" natural to the area, and the vertical cut at .9 removed what had been a small rise revealing "a spectacular view of the Waterpocket Fold." (*Id.* at 37.)

The entire debate concerning impact on Park lands, resources and values, including the "visitor experience," is inescapably context-driven, perception-driven, and deeply subjective. It is also the discussion that should have occurred after the Park Service had been presented with a proper request for its acquiescence in the County's proposed work within the one-mile section—a discussion that unfortunately never took place.

Park lands, resources, and values clearly were impacted by the work performed on February 13th. As Mr. Skyrman testified, the key is the *significance* of the impairment of park values resulting from the work done. *Significance* would have been the proper subject of an environmental

assessment prepared in conformity with the Park Service's duties under NEPA, possibly resulting in a Finding of No Significant Impact concerning much of what the County wished to accomplish.

If, as the State of Utah suggests, "An objective assessment of the impact of the February 13th roadwork on park values could only be given by a professional landscape architect with road construction and maintenance experience in national parks," [100] then the Park Service should have been afforded the opportunity to consult with one *before* the work was done. The County's precipitous actions on February 13, 1996 denied the Park Service that opportunity, interfered with the Park Service's possessory interests in those same Park lands and resources, and implicated its statutory duty to protect Park values, particularly the aesthetic value of a natural landscape.

"The essential element of trespass is physical invasion of the land[.]" *Walker Drug Co., Inc. v. La Sal Oil Co.*, 972 P.2d 1238, 1243 (Utah 1998) [101] The evidence offered by the United States establishes that such an invasion occurred without its authorization. To a large extent, the debate about whether its impact on "Park values" was "significant" at this point seems purely academic.

## REMEDIES

### Compensatory Damages

While proof of damages is not required for a plaintiff to establish liability in an action for trespass, ... the amount of damages recoverable for trespass, because of the nature of the tort, is integrally related to the extent of the defen-

---

A Yes. I think maybe the key there is significant. I don't feel there was any significant impairment.
(VI Trial Transcript at 97:5–8 (testimony of Carl Skyrman).)

**100.** (VIII Trial Transcript, dated February 25, 1999, at 69:8–11 (argument by Mr. Boyden).)

**101.** " '[T]respass is a possessory action.' *John Price Assoc., Inc. v. Utah State Conf.,*

*Bricklayers Locals Nos. 1, 2 & 6,* 615 P.2d 1210, 1214 (Utah 1980) ('The gist of an action of trespass is infringement on the right of possession.'); *see also O'Neill v. San Pedro, L.A. & S.L.R. Co.,* 38 Utah 475, 479, 114 P. 127, 128 (1911) (stating that trespass is a 'wrongful entry upon the lands of another'); Restatement (Second) of Torts § 158 (1977)." *Id.*

dant's interference with both the land and the plaintiff's possessory interests. The plaintiff's recovery can include compensation for diminution in the land's value and compensation for any personal or property injury that resulted from the encroachment on the land. . . .

*Walker Drug Co., Inc. v. La·Sal Oil Co.,* 972 P.2d 1238, 1244 (Utah 1998) (citations omitted).

The United States' trespass claim alleges injury to its land as a consequence of the County's "heavy cuts" at .05, .45, and .9, but the United States seeks an award of damages in the amount of $6,840—reflecting solely the estimated cost of revegetating the hill at the eastern entrance to the Park. (*See* U.S. Exh. 66a; U.S. Exh. 62, photo 205.) Destruction of the existing native plants by the County's excavation was established through photographs and videotape exhibits without significant dispute. (*See* U.S. Exhs. 61, 62, 50, 28, 47, 1099, 1104.)

The County responds that for a trespass, the remedy under Utah law is an award of damages equal to lesser of the reasonable cost of restoration or the diminishment in the value of the land resulting from the wrongful trespass,[102] in this case an amount the County estimates to be less than $100.00, even "assuming that the County's activities destroyed all value to the impacted land." (County Brief at 38, citing *Thorsen v. Johnson,* 745 P.2d 1243, 1244–45 (Utah 1987); *Henderson v. For-Shor Co.,* 757 P.2d 465, 471 (Utah Ct.App. 1988); VI Trial Transcript, dated February 23, 1999, at 44–45 (testimony of Comm'r Louise Liston); VII Trial Transcript, dated February 24, 1999, at 14–15 (testimony of Dr. James Bowns).)[103]

■ Indeed, "As a general rule, damages for permanent injuries are measured by 'the difference between the value of the land before the harm ... and the value after the harm.' Restatement (Second) of Torts § 929(1)(a) (1977)." *Walker Drug Co.,* 972 P.2d at 1248.

> When a permanent injury to property resulting from trespass or nuisance is physical, that injury cannot be repaired. Thus the value of the injured property will not change after the injury has occurred, and it is accurate to assess damages by subtracting the value of the land at the date on which the complaint was filed from the land's value before the harm.

*Id.*

> Yet the general rule is not an absolute

---

102. This alternative measure of damages is similar to the law of other jurisdictions:

> Nominal compensatory damages can be awarded when no actual or substantial injury has been alleged or proved, since the law infers some damage from the unauthorized entry of land. Additionally, compensatory damages can be awarded for actual or substantial injury to realty. These latter damages are generally measured by *the cost of restoring the property to its former condition or by the change in value before and after the trespass.* Consequential damages can also be recovered for a trespass, since a trespasser is liable in damages for all injuries flowing from his trespass which are the natural and proximate result of it.

*Gavcus v. Potts,* 808 F.2d 596, 597–98 (7th Cir.1986) (diversity case applying Wisconsin law) (emphasis added).

103. The County's position assumes that damages are to be measured according to Utah law, notwithstanding the fact that the United States is the plaintiff in an action in federal court, seeking, *inter alia,* to enforce a federal regulation. *See, e.g., United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) ("This Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs.") (priority of liens arising from federal lending programs determined by federal law).

As construed in this opinion, at least, application of Utah law will not "contravene any federal policy" of the national park management program. *United States v. Sullivan,* 1 F.3d 1191, 1195 n. 4 (11th Cir.1993) (citing *United States v. Williams,* 441 F.2d 637, 643 (5th Cir.1971) (In the absence of a contravening federal statute or policy, suits to protect the government's proprietary interests are local in nature.)).

rule.[104] Section 929(1)(a) of the *Restatement (Second) of Torts* also states that "at his election in an appropriate case," damages may include compensation for "the cost of restoration that has been or may be reasonably incurred," as well as other measures, such as "loss of use of the land," and "discomfort and annoyance." Restatement (Second) of Torts § 929(1)(a)-(c) (1977).

As to the cost of restoration, Comment b to *Restatement (Second) of Torts* § 929(1)(a) explains: "Even in the absence of value arising from personal use, the reasonable cost of replacing the land in its original position is ordinarily allowable as the measure of recovery. Thus if a ditch is wrongfully dug upon the land of another, the other is normally entitled to damages measured by the expense of filling the ditch, if he wishes it filled." *Id.* comment b at 545. "If, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass," the *Restatement* reasons that "unless there is a reason personal to the owner for restoring the original condition, damages are measured only by the difference between the value of the land before and after the harm. . . ." *Id.* at 545–46. Under this approach, damages have been awarded for the cost of restoring the grade or contour of land, such as replacing a sand dune. *See Malerba v. Warren,* 108 Misc.2d 785, 438 N.Y.S.2d 936 (1981), *modified on other grounds,* 96 A.D.2d 529, 464 N.Y.S.2d 835 (1983).

Garfield County argues that the estimated cost of revegetating the hill as testified to at trial "would far exceed diminution in value, . . . are very unreasonable and likely would not work in any event." (County Brief at 38.) The diminution measure yields a damages award that "would not even reach $100," and in fact, using the County's figures would almost be nominal (approximately $7.63 (at $154/acre) to $13.38 (at $270/acre)). (*Id.*) Thus, the County asserts, diminution of value, not restoration cost, should determine compensation in this case, and would yield a very nominal amount.

Yet as the Utah Supreme Court recently reminded us, "The aim of compensation under trespass . . . should always be to compensate the plaintiff fully for injuries to the land or his use and enjoyment thereof caused by defendant's actions." *Walker Drug Co.,* 972 P.2d at 1248 (citing Dan B. Dobbs, *Dobbs on Remedies* § 5.1, at 310–11 (1973)).

Where the owner of the damaged land "is using land in a way that suits the plaintiff very well but that does not maximize its economic value," one commentator relied on by the Utah court concludes, "the diminution measure would give the plaintiff no more than nominal recovery." 1 Dan B. Dobbs, *Dobbs Law of Remedies* § 5.2(1), at 715 (2d ed.1993) (footnote omitted).

> For cases of this sort, the diminution measure seems unacceptable, at least if the plaintiff really wants the property . . . for some special purpose such as use for a church rather than as an economic investment and if the repair is in fact likely to be carried out. A variation on the same theme might be seen in those cases in which damage is done to natural resources without harming present market value. . . .

1 Dobbs § 5.2(1), at 716 (footnote omitted).[105] Likewise, where the damage affects others beside the owner, even the

---

**104.** If, as Comment a to Subsection (1), Clause (a) of the *Restatement* suggests, "[t]he effect of the harm upon a reasonable prospective purchaser is the test" of diminution of value, then the difference in the value of the land at .05 before and after February 13th seems an entirely speculative proposition.

Restatement (Second) of Torts § 929 comment a, at 545 (1977).

**105.** "Even so," Dobbs cautions, "an extensive repair that costs more than the diminution in value should not be granted lightly." 1 Dobbs § 5.2(1), at 716.

public at large, "the diminished value of the plaintiff's land is no guide to the actual costs imposed" by the damage to the land because it does not account for the external harm to others. *Id.* § 5.2(5), at 725.

 ˙Where national park lands are concerned, the value protected is the value of "the scenery and the natural and historic objects and the wild life therein," which Congress has reserved from value-based economic use in order to "provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C.A. § 1. Impairment of the land's natural scenic value frustrates the owner's purpose, and the external cost is borne by the public; the decrease in the land's purely hypothetical "market value" cannot serve to measure the value of the owner's frustration or the public's loss.

Indeed, Garfield County's assertion that the market value of Capitol Reef lands is *de minimis* regardless of the injury caused strongly argues in favor of using a measure of damages other than diminution of value. Where damage occurs to "special use" property "that is unique and without market value," the diminution measure may be rejected in favor of a more appropriate measure as determined by the court. *United States v. Sullivan,* 1 F.3d 1191, 1195 (11th Cir.1993) (applying Georgia law). In *Sullivan,* the United States sought trespass damages from private defendants for the unauthorized removal of trees from a federally managed lakeshore on Lake Sidney Lanier, Georgia. The district court found that the lakeshore property was "unique and without market value," and reasoned that "the parcel of government shoreline at issue here is not simply an isolated piece of property with timber on it, but instead is part of an environmental system." 1 F.3d at 1195–96. "As part of a whole environmental system, the property needed to remain as it was in order to continue to perform its function," and as such, the value of the trees "in the ecological scheme of things

far exceeds the market value of the fallen timber...." *Id.* at 1196. The Eleventh Circuit, observing that "[a] more accurate, and more logical measure, is the cost to restore the land, as near as possible, to its original condition," affirmed the jury's $219,000 damage award based upon evidence as to the estimated cost of reforestation. *Id.*

Another approach to the measure of damages in this case also supports an award based upon revegetation costs. *Restatement (Second) of Torts* § 929 describes a third approach to measuring compensation for trespass: "If a thing attached to the land but severable from it is damaged," the owner "may at his election recover the loss in the value to the thing instead of the damage to the land as a whole." *Id.* § 929(2). Or, stated another way, "if that which is destroyed, *even though part of the realty, has a value which can be ascertained separate from the land,* recovery is allowed for the value of the thing destroyed or damaged, rather than for the difference in the value of the land before and after the injury." *Brereton v. Dixon,* 20 Utah 2d 64, 67, 433 P.2d 3 (1967) (Crockett, C.J. & Ellett, J.) (emphasis added & footnote omitted). In *Brereton,* the court affirmed an award of damages for the loss of peach and pear trees to a fire originating on the defendant's land, Chief Justice Crockett explaining that the injured party should have "the benefit of whichever of the two rules will best serve the objective ... of giving him reasonable and adequate compensation for his actual loss as related to his use of his property." 20 Utah 2d at 67, 433 P.2d 3 (footnote omitted). Where what was damaged or destroyed consists of plants growing on the trespassed land, the Utah Supreme Court has approved the cost of revegetation as a measure of trespass damages, at least as to growing crops. *See Cleary v. Shand,* 48 Utah 640, 161 P. 453, 455 (1916) ("if the roots have been destroyed, the cost

of reseeding and restoring the field or meadow") [106]

Here, the United States asserts that the County's trespass uprooted and destroyed natural vegetation on the hillside at the Park's east entrance, and its expert estimates that revegetation of that slope will likely cost $6,840.00. Though the hillside itself cannot be fully restored, revegetation of at least a portion of the slope would reduce the impairment to the scenic value of the original hill due to the destruction of the native plants once rooted there.

Applying Utah law in this fashion avoids a result that would contravene the policy of the national park statutes—and indeed vindicates that policy, where in contrast, a nominal award based upon the reduced market value of lands—lands reserved for public use, lands that will never be sold—would accomplish nothing in that regard.

An award based upon restoration cost will also vindicate the public policy underlying the County's affirmative statutory duty to "design and conduct construction and maintenance activities so as to minimize impacts on adjacent federal public lands" pursuant to Utah Code Ann. § 72–5-303(3) (Supp.2000). An award of restoration costs serves to minimize the actual impact of the County's construction work on February 13th through revegetation actually to be done on the ground—a remedy having some practical benefit, where a nominal award based upon a speculative diminution of a hypothetical market value would accomplish nothing beyond the purely abstract and symbolic. *Cf. Foote v. Clark*, 962 P.2d 52, 57 (Utah 1998) (describing "the role of nominal damages as a means of acknowledging invaded rights without rewarding a successful party for nonexistent damages").

The court finds that the United States has demonstrated that it suffered actual damage as a consequence of Garfield County's trespass at the eastern entrance to Capitol Reef National Park, and is therefore entitled to an award of damages in the amount of the actual cost of revegetation of the hill slope excavated by the County on February 13, 1996, not to exceed $6,840.00.

### Declaratory & Injunctive Relief

Apart from damages, the United States seeks declaratory and injunctive relief against Garfield County, as does the NPCA.

The court finds that the controversy between the parties to this action is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). The real controversy in this case arises from the question of who gets to say, that is, *who* decides *what* will be done on the Capitol Reef segment of the Boulder–to–Bullfrog Road, and *when*. To be useful, the declaratory relief must spell out the key intersections between the lawful authority of the Park Service to manage and protect Park lands and Garfield County's valid existing rights in its R.S. § 2477 right-of-way. Those intersections have been analyzed in this opinion in some detail.

The United States also seeks injunctive relief in the form of a "permanent injunction against Defendants, their agents, and

---

**106.** [T]he question of damages here was not wholly dependent upon a question of value; that is, though value as to some things was an important factor, yet the amount of damages was not determinable by ascertaining what was the value of the land or of the crops before and after the trespass. Where the destruction is a permanent injury to the land, it may be that damages may be measured and ascertained by showing the value of the land before and after the destruction.

But no claim is made that any permanent injury was done to the land. *If the thing destroyed, although it is a part of the realty, has a value which can be measured and ascertained without reference to the value of the soil in which it stands, or out of which it grows, the recovery must be for the value of the thing destroyed,* and not for the difference in the value of the land before and after such destruction. 13 Cyc. 155. . . . *Shand,* 161 P. at 454

their employees prohibiting them from engaging in any activity on the Burr Trail without prior authorization from the Secretary." (Amended Complaint, filed February 19, 1998 (dkt. no. 178), at 18 ¶ B.) In light of the foregoing discussion, this request for equitable relief seems quite generalized and overbroad. "Any activity" would include even those "routine maintenance" activities that the United States concedes may be engaged in by the County without Park Service authorization. *See* "Construction vs. Maintenance," *supra*, at 81–93. Nor does the trial testimony in this case lay a compelling foundation for direct federal court intervention in the operations of one unit of government at the behest of another unit of government. "There are also delicate issues of federal-state relationships underlying this case." *Mayor v. Educational Equality League*, 415 U.S. 605, 615, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). The court's approach must be "more rigorous" when dealing with "an injunction against a state as opposed to a federal agency, since the Supreme Court requires a showing of an intentional and pervasive pattern of misconduct in order to enjoin a state agency." *Thomas v. County of Los Angeles*, 978 F.2d 504, 508 (9th Cir.1992) (injunction against county sheriff's office reversed)(citing *Rizzo v. Goode*, 423 U.S. 362, 375, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)).

Based upon the history of the relationship between Garfield County and the National Park Service concerning the Capitol Reef segment, the court's own experience during the pendency of this proceeding, and the court's undying belief that even now, "a word to the wise is sufficient," [107] the court will deny the United States' application for injunctive relief at this time.[108]

Should new circumstances arise, however, the United States may renew its application for injunctive relief based upon a sufficient showing of a genuine threat of immediate and irreparable harm, coupled with proof of a pervasive pattern of misconduct on the part of the defendants.

## CONCLUSION

Who gets to say?

The rights and powers of the United States and the rights and powers of Garfield County are *correlative* rather than plenary, absolute, or exclusive. The law expects the County and agency to speak to each other about work to be done on lands to which they both have important correlative rights. If study is required, study should be accomplished in a timely fashion. If approval for construction work is required, approval should be requested—and should be forthcoming with great dispatch, absent some significant, well-founded objection on the part of the agency. *Cf.* 5 U.S.C.A. § 706(1) (1996) (empowering reviewing court to "compel agency action unlawfully withheld or unreasonably delayed").

The County may always propose improvements, and absent significant objection after study, may construct those improvements within its right-of-way—the County gets to say.

The Park Service may fulfill its duty and responsibility to protect and preserve the land and resources of the Park, studying the County's proposals as Congress requires, and granting such timely approvals or formulating such alternatives as the circumstances demand—the Park Service gets to say.

**107.** *"Verbum sat sapienti"*—"A word is sufficient to a wise man"—traces to Plautus (c. 254–184 B.C.E.), one of the great Roman comic dramatists. Charles Panati, *Words to Live By* xiv (1999). "Dictum sapienti sat est," or "A sentence ..." is attributed to Publius Terentius Afer Terence, another Roman playwright, ca. 190–159 B.C.E. Cervantes and Franklin repeat it as well. *See Bartlett's Fa-* *miliar Quotations* 151:9, 310:7 (16th ed. Justin Kaplan ed.1992).

**108.** The court also denies the NPCA's request for a permanent injunction, for the same reasons. (*See* Intervenor['s] Complaint for Declaratory and Injunctive Relief, filed April 21, 1998 (dkt. no. 249), at 18 ¶ B.)

Thus, under the statutory scheme devised by Congress, both county and agency may speak, but neither gets to say to the exclusion of the other.

In this case, on February 13, 1996, the conversation broke down, and construction work was done without study where study was required, and without prior approval where approval was required. Rather than reaching accommodation and agreement, as they had been doing since maintenance and improvement work began the November before, County officials chose to act unilaterally, taking action to which they knew the Park Service expressly objected.

Absent communication, accommodation or agreement between county and agency, the interests and goals of one soon collide with the interests and goals of the other, and it is the court that finally gets to say.

Ultimately, then, this case about "who gets to say" proves to be a case about two parties legally bound to share the same land, and one party having a *voice* in the plans and actions of the other, as well as an opportunity in the exercise of its correlative rights to study and formulate less abrasive alternatives to the other's proposed action.

Pre-emptive action that would deny that voice an opportunity to be heard only serves to frustrate the process that Congress has devised, forcing Congress' delegate, the Park Service, to carry out its statutory duties and responsibilities through more adversarial and less accommodating means.

Finally, the court observes that the lands surrounding the Capitol Reef segment of the Boulder–to–Bullfrog Road are national park lands. At this point, those lands are managed and protected as part of a national park intended for public access and enjoyment, *not* as part of a roadless wilderness area. In creating Capitol

Reef National Park, Congress clearly acknowledged the rights-of-way that then existed, and contemplated that additional rights-of-way would be granted within the Park, so long as "significant adverse effects" on Park lands, resources, and values can be avoided.

If, as the 1982 General Management Plan says, "The primary management objective of Capitol Reef National Park is to protect and preserve the natural and cultural environments and provide for the enjoyment of those environments by present and future generations," then the present and future generations should be assured safe access to the Park's scenic vistas and rugged terrain on well-maintained, all-weather roads suitable for the vehicles they drive. Garfield County, not the Park Service, has assumed primary responsibility for ensuring a safe, passable roadway, and may maintain the existing roadway without need of prior "construction" approval. Where widening or realignment of the road may be needed, or some other significant change is desired that would require construction, the law calls upon the owner of the right-of-way to consult with the owner of the underlying lands to allow impacts to be studied, alternatives to be formulated, and plans to be approved.

It shouldn't be that hard to do.

Both before and during this proceeding, much of what Garfield County wanted to do on the road has been accomplished through accommodation, acquiescence, and agreement by the Park Service. According to Mr. Bremner, the County's engineer, much of the rest of the Boulder–to–Bullfrog Road has been improved to a wider, all-weather surface through cooperation between the County and other agencies, such as the BLM.[109] The 28–mile segment from Boulder to the Park is now a 24–26 foot wide, chipsealed road; the 20–

---

**109.** (*See* VI Trial Transcript, dated February 23, 1999, at 32:19–36:16 (testimony of Brian Bremner.))

mile segment leading away from the Park's eastern boundary has been widened to 26–28 feet, then graveled or chipsealed as well.[110] The last segment crossing the national recreation area has been constructed to a 24–28 foot wide, mostly chipsealed road by the time of trial.[111] Whatever the merits of meeting "an abrupt change in cross-section" [112] upon entering the Park may be in terms of the "visitor experience," it still seems anomalous to the Court to find an 8.4–mile dirt road in the middle of 57 more miles of all-weather surfaced highway. Historically, at least, the Park Service has looked upon the improvement of the Capitol Reef segment with at least tentative approval.

The court remains hopeful that the same pattern of cooperative improvement on the Boulder–to–Bullfrog Road will continue after this litigation is concluded, and will be the case along the entire length of the road.

As evidenced by the record in this case, the contest of wills over the future of the Boulder–to–Bullfrog Road has already generated its own mountain of paper, and the continuing interplay of the parties' correlative rights will likely produce even more. That mountain exists because of the balance that the Legislative Branch has struck between the interests of those who build roads, those who travel on them, and those who value the beauty of a scenic landscape kept in its natural state, and because of the process Congress has devised to allow each to have a voice in important decisions to be made.

Here, as in other settings, the long way proves to be the short way.

For all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the United States is entitled to Judgment against the defendants, excluding the State

110. (*Id.* at 33:4–14, 34:18–24 (same).)

111. (*Id.* at 35:2–10, 36:13–16 (same).)

112. (VII Trial Transcript, dated February 24, 1999, at 33:11 (testimony of Alex Mansour);

of Utah, in the amount not more than $6,840, representing the actual cost of revegetation of the hillside located at the eastern entrance to Capitol Reef National Park, which was partially excavated by a County bulldozer on February 13, 1996;

**IT IS FURTHER ORDERED** that the United States and the National Parks and Conservation Association (and jointly as to (D), Garfield County and the State of Utah), are entitled to a declaratory judgment establishing:

(A) that pursuant to the Property Clause, Article IV, § 3, cl. 2 of the United States Constitution, pertinent Acts of Congress, and lawful rules and regulations issued by the Secretary of the Interior, the National Park Service has the power to regulate construction work performed by or at the direction of Garfield County or the State of Utah in connection with Garfield County's established R.S. § 2477 right-of-way to the extent that right-of-way falls within the existing boundaries of Capitol Reef National Park, to the extent provided by 36 C.F.R. § 5.7 and other pertinent statutes and rules;

(B) that Garfield County, its officers, agents, employees, or contractors, may not perform work constituting "construction" within the meaning of 36 C.F.R. § 5.7 without first obtaining a permit, approval or agreement from the National Park Service, including but not limited to widening, realigning, surfacing, or otherwise significantly altering the existing road; installing of culverts or other new structures; or excavating, removing or displacing of rock, soil, or other earth materials outside of the existing road and shoulders;

(C) that any road construction project contemplated by Garfield County to be

*see id.* at 33:11–14 (same) ("as one ... enters into the park ... it has considerably more curvature, less sight distance, less width, less reliable situation.").)

commenced within the boundaries of Capitol Reef National Park is subject to, and must await compliance by the National Park Service with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370e, and regulations made pursuant thereto; and

(D) that upon receiving a proposed plan for construction work within the Park, the National Park Service shall proceed in timely fashion (1) to determine whether the proposed work falls within an existing right-of-way held by Garfield County and/or the State of Utah; (2) to comply with the requirements of NEPA concerning the preparation of environmental assessment(s), environmental impact statement(s), as well as any other applicable legal requirements; (3) to consider each application for approval of construction within Park boundaries in light of its compliance with NEPA and its duties to protect Park lands, resources and values against injury and impairment, as well as its duty to respect valid existing rights; and (4) to grant timely approval of proposed work within the existing right-of-way, unless it finds that the work will significantly and adversely impact Park lands, resources, values, or administration, in which case it must formulate viable alternatives to the proposed work having less impact on Park land resources or values, and promulgate the same to the County and the public;

**IT IS FURTHER ORDERED** that the Defendants are entitled to a declaratory judgment establishing:

(E) that the County has a valid existing right to an R.S. § 2477 right-of-way along the Capitol Reef segment of the Boulder–to–Bullfrog Road; and

(F) that Garfield County, its officers, agents, employees, or contractors, may engage in work maintaining the existing roadway so as to preserve the status quo through repair of wear or damage to existing road surfaces, shoulders, cut and fill slopes; repair, clearing, or replacement in kind of culverts and other structures; maintaining the existing shape and width of the road, grading it as needed to preserve a passable surface in both lanes, or similar routine maintenance work, without prior authorization from the National Park Service;

**IT IS FURTHER ORDERED** that Motion for Judicial Notice and Receipt into Evidence of Pre–Trial Order, Briefs and Transcript from Proceedings in Sierra Club v. Hodel, filed February 10, 1999 (dkt. no. 327), is GRANTED, and Exhibits 2001–2009, received into evidence on February 24, 1999, shall remain part of the record in this case;

**IT IS FURTHER ORDERED** that Garfield County's Motion to Dismiss NPCA's Complaint, filed May 4, 1998 (dkt. no. 259), is DENIED;

**IT IS FURTHER ORDERED** that the NPCA's Motion to Dismiss Counterclaim for Lack of Jurisdiction, & etc., filed April 21, 1998 (dkt. no. 247), and having been considered in the context of the Pretrial Conference, is DENIED;

**IT IS FURTHER ORDERED** that NPCA's "Motion for Ruling that National Park Service Determination of Scope of Claimed Right–of–Way Satisfies *Hodel* Requirement," filed June 19, 1998 (dkt. no. 286) is DENIED as premature, without prejudice to its renewal at an appropriate time; and

**IT IS FURTHER ORDERED** that the United States shall be awarded its costs of action; the remaining parties shall bear their own costs.

Any issues still pending in this proceeding, including Garfield County's Counterclaim, shall be addressed at a Status and Scheduling Conference to be set by the court.